# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

In re:

UNITED REFUSE LLC,

       Debtor.

Case No. 04-11503-RGM
(Chapter 11)

## <u>MEMORANDUM OPINION</u>

This case is before the court on the final fee application of Frank & Company PC and the joint objection of United Leasing Corporation and United Refuse, LLC.

### <u>Prior Proceedings in the Case</u>

United Refuse, then under the control of James C. Lehner, filed a voluntary petition in bankruptcy under chapter 11 of the United States Bankruptcy Code on April 5, 2004, as a result of litigation between it and its acknowledged principal secured lender, United Leasing. The real issue in the litigation was the true ownership of United Refuse. Lehner and his wife, Suzanne Lehner, were in possession of United Refuse and were the ostensible owners. United Leasing asserted that it was the true owner.

United Refuse was organized to manage Garcia's, a trash collection company owned by the Garcia brothers and financed by United Leasing. The Garcias had run a successful company for many years during most of which United Leasing had financed it. Problems arose that led to the financial decline of the trash company. In 2003, United Leasing which had a lien on all of Garcia's assets (principally trash trucks) and on the Garcia brother's stock ownership of the company exercised its right to control Garcia's under a stock pledge. Lehner, a long-time and trusted

1

employee of United Leasing, was assigned the task of stabilizing Garcia's operations and selling the business as a going concern. United Leasing organized United Refuse, a limited liability company, to gain control of Garcia's, to manage it and to sell it, not to own its assets. Lehner was made the sole member and manager of United Refuse in an attempt to insulate Edward Shield, the owner of United Leasing, from personal liability arising from the transaction.

United Leasing later decided that it was better to take direct ownership of the trash company's assets because a stock sale of Garcia's was simply not realistic. There were simply too many known and unknown liabilities that would follow such a sale. An asset sale, on the other hand, was more realistic. The assets, in a properly managed sale, could be sold free and clear of the corporate liabilities of Garcia's and result in a larger recovery by United Leasing. One precipitating event triggering the revised approach was a claim by the District of Columbia for unpaid sales taxes. Most of Garcia's business was conducted in the District and the District threatened to prohibit Garcia's from operating its trucks in the District unless the sales taxes were paid. The response was to move the assets to United Refuse. When the District continued to threaten to prohibit the trash trucks from operating in the District, United Refuse successfully convinced the District that it was a new entity that was not liable for Garcia's sales taxes. United Refuse continued to operate in the District without paying Garcia's unpaid sales taxes.

The revised approach is generally a two-step process. First, the secured lender conducts a Uniform Commercial Code sale of its collateral. In a case such as this where the secured lender's objective is increase the value of the business as a going concern by rehabilitating it and then selling it as a going concern, the secured lender may organize a subsidiary to bid in and hold the assets. The second step is to sell the revitalized company as a going concern at a private sale, typically as an

asset sale.  The parent company – the secured lender – funds its subsidiary's acquisition of the collateral with either a loan or an equity contribution.  It is, in either event, a paper transaction.  The secured lender will actually realize on its collateral when it resells it.  From an accounting point of view, the purchase price at the UCC sale is credited to the borrower's loan and a deficiency – usually – is established.  The amount of the parent's loan (or, in some cases, equity) to its subsidiary is documented.

If the purchasing entity is not established as a subsidiary of the secured lender, ownership of the purchasing entity becomes important only if the assets are ultimately sold for more than the amount that the secured lender funded the subsidiary for the acquisition of the collateral and the operations during the pendency of the final sale.  In this event, there may be real equity in the purchasing entity.  If there is no equity, ownership of the purchasing entity is generally irrelevant.  In this case, the purchasing entity was United Refuse which was initially set-up as a single member limited liability company owned by Lehner.

United Leasing made three mistakes.  Its first mistake was that it never documented Lehner's relationship to United Refuse or United Leasing.  Its second mistake occurred when it changed its plan from using United Refuse as a managing agent for Garcia's to holding Garcia's assets.  It failed to change the ownership of United Refuse from Lehner to itself or to otherwise document Lehner's relationship, duties and responsibilities.  These were mistakes that would have been without consequences if, as all of the parties expected, there was no equity in United Refuse.[1]  The third mistake was that United Leasing did not properly document or book the UCC repossession transaction.  It did not credit Garcia's notes with any sales proceeds from the UCC sale.  It kept

---

[1]After all of the assets were liquidated and all administrative claims and creditors other than United Leasing were fully paid, United Leasing's claims in this case were not fully paid.

Garcia's notes outstanding – apparently accruing interest on the full balances – and only crediting payments as money was actually received.  In addition, United Leasing created and kept "tracking notes" made by United Refuse to United Leasing.  No one ever clearly explained the purpose or necessity for such tracking notes.

There were more complications.  There was a third series of notes; there was a dispute over whether Shield gave United Refuse to Lehner, or was going to give him the opportunity to purchase it, or intended to keep it as a related entity to United Leasing; there were notes made by Lehner individually to United Leasing; there were guarantees given by Lehner of United Refuse's debts; and there were questions as to the authenticity of Lehner's signature on documents he presented. In short, what should have been a straight-forward UCC transaction, turned into a botched, complicated mess.

By the end of 2003, Lehner was operating United Refuse as if he owned it and as if it were financed by United Leasing.  Shield at United Leasing had a distinctly different view.  In early 2004 United Leasing sought to resolve the problems that arose from the botched UCC transaction by filing suit in state court.  In the first suit United Leasing asserted its ownership of United Refuse.  The suit started with United Leasing obtaining an ex parte injunction ousting Lehner from United Refuse. Lehner successfully had the injunction dissolved within two weeks and was restored to possession. The suit, apparently, could have proceeded to a resolution on its merits.  However, United Leasing changed course and asserted its rights as a secured creditor and sought to repossess its collateral from United Refuse.  United Refuse filed the petition in this case in response to United Leasing's creditor actions.

4

Two days after this case was filed, United Leasing filed a motion to prohibit the use of cash collateral and United Refuse responded with a motion to approve the use of cash collateral. The debtor was granted limited authority to use cash collateral at the preliminary hearing. A budget was approved and the debtor was required to provide weekly operating reports, later modified to monthly reports, to United Leasing. The weekly reports were required to include accounts receivable, aging accounts receivable, accounts payable, aging accounts payable, the general ledger (including all cash receipts) and a report matching actual revenue and expenditures to the budget. The authority to use cash collateral was extended from time to time.

United Leasing unsuccessfully objected to the debtor assuming the lease for its business premises or obtaining a ruling that the lease was terminated. The premises were owned by United Leasing and the inability to use the premises would have effectively terminated the case.

The principal activities in the case were two adversary proceedings. Both parties filed an adversary proceeding against the other. United Refuse filed first. Its complaint sought a determination of the extent, validity and priority of United Leasing's various equipment leases, loans and liens. United Leasing's complaint sought a determination of the ownership of United Refuse. They were consolidated for trial. The court determined the extent, validity and priority of United Refuse's obligations to United Leasing and found that Lehner and his wife held legal title to the debtor in constructive trust for the benefit of United Leasing. The order was entered on March 14, 2005. United Leasing immediately removed Lehner as manager of United Refuse and assigned Raymond C. Cullen, then vice-president and later president of United Leasing, the task of completing the Garcia's transaction. He did so. United Refuse, then under the control of United Leasing, filed a liquidating chapter 11 plan that was confirmed. The plan subordinated all of United

5

Leasing's claims to all other creditors. The assets were sold as a going concern. Settlement was held on July 1, 2005. All creditors other than United Leasing were paid in full about August 2005.[2] United Leasing received $700,000 in December 2005 which was not payment in full.

## Frank & Company: Employment and Interim Fee Application

United Leasing was dissatisfied with the weekly reports the debtor prepared as required by the cash collateral order. It had many complaints. One was the discrepancies that arose because the debtor maintained two separate computer systems, one for billing (the WAMS system) and the second for general accounting (the Peachtree system). The two computer programs were not integrated and the numbers in each were not reconciled to the other.

Counsel for the debtor was also faced with a daunting task in attempting to unravel the multiple accountings United Leasing maintained with respect to the obligations between the debtor and United Leasing, in particular, the various notes between the entities, the payments on the notes, the credits on the notes, the pay-off of the notes and the collateral securing the notes. Lehner testified that despite repeated requests, United Leasing had never given him a pay-off statement for the various equipment leases and loans.

While the debtor had an accountant on its staff, the employee was unable to satisfy United Leasing's concerns and counsel's concerns. It became apparent that an outside accountant was necessary to review the transactions between the debtor and United Leasing so that the extent, priority and validity of the debtor's obligations to United Leasing could be determined. It also

---

[2]Two administrative claimants were not paid: the District of Columbia and Frank & Company.

6

appeared that while the in-house accountant could perform her job requirements, she could use

assistance from time to time. The in-house accountant maintained the debtor's books and records

and prepared the United States Trustee's monthly reports.

The debtor sought to employ Frank & Company on August 30, 2004, to address these needs.

The debtor's application stated its objectives in retaining Frank & Company:

> 1.      The Debtor seeks to employ Frank & Company, P.C. as
> Independent Auditors and Accountants for matters arising in the
> Debtor's Chapter 11 case.
>
> 2.      The Debtor wishes to employ Frank & Company, P.C. to
> assist the Court to determine the amount the Debtor owes to United
> Leasing Corporation ("United Leasing").
>
> 3.      In addition, the Debtor seeks to rely upon Frank & Company,
> P.C. to 1) handle the general corporate filings and taxes of the Debtor
> as has been done in the Debtor's ordinary course of business; 2) assist
> in the preparation of reports as is required by the United States
> Trustee's Office; and 3) assist and advise on periodic accounting
> reports to United Leasing pursuant to Judge Robert Mayer's Order
> Authorizing Debtor's Use of Cash Collateral (April 21, 2004); Order
> on Motion to Condition Rights of Debtor in Possession (May 13,
> 2004); and Order on Motion to Prohibit Use of Cash Collateral (June
> 3, 2004).

Application for Employment at 1-2. (Docket Entry 92). The application was granted on September

20, 2004, by an order endorsed without objection by United Leasing. (Docket Entry 104).

On January 18, 2005, the debtor filed an application for interim compensation of Frank &

Company. The application, under the section titled "Employment of Frank & Co. as Accountant",

stated:

> 12.      The terms of Frank & Co.'s employment order are typical,
> and are designed [and] set in accordance with the accountants'
> seniority and experience. Frank & Co. also charges the Debtor for its
> actual out-of-pocket expenses incurred such as copying, long distance

7

telephone, travel, overnight mail, computer research and other disbursements.

13.    To the best of its counsel's knowledge, information and belief, the Debtor has paid its quarterly fees to the U.S. Trustee.

14.    Additionally, the Debtor has filed with the U.S. Trustee all monthly operating reports due in addition to the weekly reports ordered as a result of United Leasing's oppositions to the Debtor's use of cash collateral. Frank & Co.'s services were instrumental in this task.

15.    According to the Debtor's monthly operating reports, the Estate is more than sufficient to pay the fees and expenses sought in this Application.

Application for Compensation 3-4.  (Docket Entry 133).

Under the heading "Summary of Services Rendered" the debtor stated:

16.    Frank & Co. provided various services to the Debtor, has been summarized and/or categorized in the billing statement attached. The work performed was essential to the asset analysis and recovery, asset disposition, business operations, and case administration, which requires extensive oversight due to the nature of Chapter 11 proceedings and the issues presented by United Leasing. The work of Frank & Co. was also essential to determining financing arrangements of the Debtor, which in turn helped to clarify issues which will be presented in litigation through an adversary proceeding.

*Id.* at 4.

The application was signed by the debtor by counsel.  It requested fees of $18,847.93 and expenses of $96.90.  The overwhelming amount of time was devoted to unraveling the equipment lease and note situation which was essential for counsel in preparing for trial on the debtor's complaint.

United Leasing objected to the application for compensation on the basis that the accounting firm was not a disinterested party.  It asked the court to disallow all fees and expenses.  (Docket

Entry 136).  United Leasing asserted that Frank & Company had prepared the Lehner's personal income tax return shortly after it was employed by the estate.  A hearing was held on the application and the objection on February 8, 2005, at which Frank & Company was represented by its own attorney.  The court found that Frank & Company did prepare the Lehner's tax return while it was employed by the debtor, but that it did not bill the debtor for any time involved and no time was included in the application.  The objections were overruled and the application was approved. (Docket Entry 144).

United Refuse is a limited liability company that was ostensibly owned by Mr. and Mrs. Lehner.  A single member limited liability company does not itself file a tax return.  Instead, the income and expenses are reported on the member's income tax return, in the case of an individual, on Schedule C.  When a limited liability company is owned by a husband and wife, the income and expenses are also reported on Schedule C on their joint income tax return.  Schedule C is completed from the books and records of the limited liability company, in this case, United Refuse.  Schedule C is prepared independently of the member's tax return.  The results from Schedule C flow over to the member's Form 1040.  In this case, if the owner were Shield himself and not United Leasing, the Schedule C prepared by Frank & Company would be equally applicable to Shield's Form 1040 as to the Lehners'.  It is not clear that the Schedule C could be as easily used by a corporate member of a single-member limited liability company.  Both the limited liability company's tax information and the corporate member's tax return must be on either an accrual basis or a cash basis.  One cannot be cash and the other accrual.  Thus, there may need to be adjustments to bring them into conformity.    United Leasing argued that there could be inconsistent tax positions taken by the debtor and the Lehners, positions that could benefit the Lehners at the expense of the debtor.  In

9

particular, it argued that certain obligations personally guaranteed by the Lehners could give rise to such a conflict.  It argued that post-petition payments on the guaranteed debt could have been applied to the pre-petition guaranteed debt rather than post-petition debt not guaranteed by the Lehners.  It also argued that the treatment of certain payments to the Lehners as salary rather than equity could have created a conflict between them and the debtor.

Hal Young,  the partner at Frank & Company in charge of the engagement and the accountant who did most of the work, testified that Frank & Company made no such decisions.  As a tax return preparer, it only reported the income and expenses as reflected on the books and records of the taxpayer or, in this case, the limited liability company.  Here, the in-house accountant maintained all of the debtor's books and records and made all such decisions.  Frank & Company was not involved in characterizing payments or entering them on the debtor's books and records.

The court found that the time devoted to the Lehners' personal return was small in comparison to the time the accounting firm expended on the lease and note issues; that although a conflict could, theoretically, arise, none did; and that no part of the time for which compensation was requested benefitted the Lehners individually.  The application was approved as submitted.

The principal purpose of the accountant's employment was to assist debtor's counsel in preparing for the complaint on United Leasing's liens.  United Leasing objected to Young testifying at the trial of the adversary proceeding.  The objection was sustained and he was not permitted to

testify.  Tr. 3/27/2006 at 42, 50 and 52-53.[3]   Trial commenced on January 24, 2005, and extended

over 10 days, concluding on March 14, 2005.

Lehner who was in control of United Refuse when the application for compensation was

approved on February 11, 2005 (Docket Entry 144)[4] did not pay Frank & Company before he lost

control on March 14, 2005.  United Leasing, after obtaining control of United Refuse on March 15,

2005, negotiated a payment plan with Frank & Company, asserting insufficient cash flow to pay the

award immediately in full.  It agreed to pay Frank & Company $2,500.00 a month until the allowed

fee was paid.  Frank & Co. was paid $10,000 prior to filing its final fee application.[5]  In July 2005,

after the sale of the debtor's assets and at a time when the debtor had over $1.0 million in cash and

more than enough cash to pay the balance of Frank & Company's allowed fee in full, United Refuse

not only did not pay the allowed fee in full – its prior plea of insufficient cash flow no longer being

valid – it stopped paying the agreed upon monthly payments.  It asserts that a new concern

surfaced – non-payment of post-petition D.C. sales taxes and the inaccuracy of the monthly reports.[6]

---

[3]Q       You mention that you did not testify at the trial with respect to the notes and the leases.  Why?

A       I wasn't permitted to.

Q       What do you mean?

A       Well, my recollection was that the exhibits that we had hadn't been shared with Mr. Sullivan within
the time frame that they were supposed to have been shared; and so, on that basis I wasn't permitted
to testify.

[4]The hearing on the application and United Leasing's objection was held on February 8, 2005.

[5]Five thousand dollars was paid from a retainer and United Refuse, then controlled by United Leasing, paid two
installments of $2,500.00.  *See* Application for Compensation at ¶2 n. 1.   (Docket Entry 302).

[6]The court is not clear when the concern arose.  Cullen knew of the non-payment within days after he took
control of United Refuse on March 15, 2005, and had all of the monthly reports and cash collateral reports at that time.
The agreement to pay Frank & Company in monthly instalments was made within a few weeks after March 15, 2005,
at a time when Cullen knew of the non-payment and knew or should have known of the inaccuracy in the monthly
reports.  The first time the issue was raised with Frank & Company was in August 2005 more than a month after United
(continued...)

11

## Debtor's Monthly Reports

The monthly reports prepared by United Refuse's in-house accountant and signed by Lehner were inaccurate. The monthly reports are on a form prescribed by the United States Trustee and consist of two parts. The first part is textual. The second part is financial data. The textual part asks certain questions, one of which is whether all taxes have been paid. The first part of the monthly report is titled "Financial Background Information". Question 9 asks:

> TAXES. Are all taxes being paid to the proper taxing authorities when due? Yes ___ No ___. On the attached IRS Form 6123 report all tax deposits made with any financial institution for federal employment taxes. Be sure the form is complete and signed by an authorized employee of the receiving institution or taxing authority.

---

[6](...continued)
Refuse had sufficient funds on hand to pay Frank & Company in full and had stopped honoring its commitment to make monthly payments.

Kermit A. Rosenberg, who was retained as United Refuse's new counsel after United Leasing regained control by order entered on March 15, 2005, stated in a letter to the United States Trustee dated May 23, 2005 that:

> During the course of assuming control of the United Refuse pursuant to Judge Mayer's order of March 14, 2005, the owner prepared and filed monthly debtor-in-possession reports for March and April with the information and in the format provided by James and Suzanne Lehner when they controlled the Debtor in order to maintain month-to-month continuity. However, we have determined that the following entries on the Balance Sheets for both months are wrong:
>
> • Sales Tax Payable: Substantially understated, does not include underreported DC sales taxes.

Supplemental Report of Debtor In Possession - Addendum to March 2005 and April 2005 Monthly Reports, Letter from Kermit A. Rosenberg, counsel for United Refuse to Frank J. Bove, Office of the United States Trustee, dated May 23, 2005 at 1 (Docket Entry 188).

The May 2005 monthly report signed by Raymond C. Cullen, filed on July 20, 2005, but undated, added in answer to Questions 9 and 16:

> **9. Taxes.** Although, as stated, all taxes are now being paid to the taxing authorities as due, it appears that taxes owed to the District of Columbia were deliberately understated and underpaid by prior management and that approximately $200,000 in post-petition taxes may be due and unpaid.
>
> .   .   .   .
>
> **16. Payments to Professionals.** Payment of accounting fees to Frank & Co. per court order, $2500 installment.

Monthly Financial Report for Calendar Month May 1 to May 31, 2005 at 3. (Docket Entry 219).

Attach to this report a completed Form 6123 for each deposit made during the
reporting period.  Also attach copies of the monthly sales tax report, payroll tax
report and unemployment tax report with evidence of payment of <u>both federal and
state taxes.</u>

Monthly Operating Report for Calendar Month April 1, 2004 to April 30, 2004 at 1 (Docket Entry
150).

United Refuse's first monthly report, for the month of April 2004, has the notation "N/A"

interlineated after "sales tax" and before "report".  Subsequent reports do not contain the

interlineation.  That report and those following, have the "Yes" line checked for payment of taxes.

No copies of sales tax reports, payroll tax reports or unemployment tax reports are attached to any

of the monthly reports.  Nor is evidence of payment of federal or state taxes attached to any of the

monthly reports.  The monthly reports appear to have been regularly filed with the United States

Trustee and United Leasing, but were belatedly filed with the court.

The second portion of the monthly reports contains financial data reporting the debtor's

operations.  United Refuse's reports contain reports printed from United Refuse's in-house

accounting system.  The April 2004 report contains a report titled "Vendor Ledgers" and covers the

period from April 6, 2004, to April 28, 2004.  Each vendor is listed with a balance forward, and if

there are any transactions, debit amounts and credit amounts.  The District of Columbia is not listed.

There is no entry for sales taxes.

The May 2004 monthly report and those following include an Income Statement, a Balance

Sheet and an Aged Payables report.  (Docket Entries 151 through 159 and 162).  The Income

Statements for the months ending May 31, June 30, July 31, August 31 and September 30, 2004,

show payment of "Taxes and Licenses Expense" of $1,728.59, $1,060.00, $6,213.33, $0.00 and

$1,624.97, respectively.[7]  These are the only entries that could relate to D.C. sales taxes.  The sales

taxes should have been in the range of $8,000.00 to $10,000.00 a month[8].  The Balance Sheets for

each of these months shows the same current liability of $8,178.30 for sales taxes.  This does not

reflect an accruing sales tax liability.

The order authorizing Frank & Company's employment was entered on September 21, 2004.

(Docket Entry 104).  The first time entry on its time records is October 19, 2004.  Interim

Application for Compensation at 12.  (Docket Entry 133).

The Income Statements for the months ending October 31, November 30, December 31,

2004, January 31 and February 28, 2005, are similar to the earlier monthly reports.  They show

payment of "Taxes and Licenses Expenses" of $2,907.45, $3,142.45, $2,907.45, $1,190.29, and

$3,487.05, respectively.  The Balance Sheets show current liabilities for sales taxes of $703.16,

$9,714.82, $18,726.61, $27,904.61, and $37,405.72, respectively.  This reflects an increasing sales

tax liability and non-payment of taxes and licenses, which may include D.C. sales taxes, as they

became due.

Like the monthly reports from February 2004 through September 2004, the October 2004

through the February 2005 monthly reports do not have any sales tax reports or receipts for payment

attached.

The October 2004 monthly report was signed by Lehner and dated November 15, 2004.  The

Balance Sheet stated at the bottom, in capitalized, bolded letters: **FOR MGMT PURPOSE ONLY**

---

[7]It is not clear the extent to which these entries reflect payment of D.C. sales taxes as opposed to other taxes
or licenses.  The testimony and pleadings indicate that no sales taxes were paid and, therefore, that these entries reflect
other taxes and licenses.

[8]The total unpaid sales taxes during Lehner's tenure was $104,654.18, according to debtor's current counsel.
Supplemental Report to Statement of Post-Closing Assets and Liabilities at 2.  (Docket Entry 385).

**"unaudited"**.  The first page of the Income Statement also stated at the top, in capitalized, bolded

letters:  **"FOR MGMT PURPOSE ONLY" unaudited**.  The November 2004 monthly report was

signed by Lehner and dated December 14, 2004.  There was no disclaimer on the Income Statement

or the Balance Sheet.  The December 2004 and January 2005 monthly reports followed the pattern

of the November 2004 report.  The textual portion of the February 2005 report was not filed with

the court.  However, the Income Statement contained the statement, in capitalized, bolded letters:

**United Refuse Unaudited Income Stmt**.  The February 2005 Balance Sheet contained the

statement, also in capitalized, bolded letters:  **United Refuse Unaudited Balance Sheet**.

**United Leasing's Complaint Against**
**Frank & Company Relating to D.C. Sales Taxes**

United Leasing argues that the monthly reports were false and were a fraud on the court and

on it because they represented that the D.C. sales taxes were paid when, in fact, they were not.  The

total amount of unpaid sales taxes was $104,654.18.  Supplemental Report to Statement of

Post-Closing Assets and Liabilities at 2.  (Docket Entry 385).  The fact that the D.C. sales taxes were

unpaid was discovered immediately after United Leasing regained control of United Refuse on

March 15, 2005.[9]  In August 2005, Stephen Norment, a United Leasing employee, telephoned

Young.  Norment testified to the call as follows:

---

[9]United Leasing called Stephen Norment, Vice President of United Leasing, as a witness.  Beginning on
March 15, 2005 he was assigned as the operations manager of United Refuse.  Almost immediately upon taking over
from Lehner, he discovered that D.C. sales taxes were not paid:

> Q    How much digging did you have to do to find out that the [sales] taxes had not been filed and had not
> been paid?
>
> A    Not very much.  Just opened the file drawer and found the file that said "D.C. taxes" and just went
> through it.  It was very obvious.

Tr. 3/27/2006 at 70.

Q       And will you tell me the course of the conversation, please?

A       I called Mr. Young on the phone and I said that I had reviewed the documents that he had sent.  I had some questions and we had some discussion about – I asked him what he did for United Refuse in comparison to the application [for employment] and he said he only did what he was asked to do by the debtor.  I said, well, you were charged with a court order to do this and that; and he said, well, I only did what I was asked to do by the debtor.  I said, well, that sounds pretty thin to me.

And then, I could feel that the conversation was getting a little strained.  So, I said , did you know that Mr. Lehner had not paid the D.C. taxes during the period of bankruptcy?  And he said, what is your next question?  And I said, well, you haven't answered that question yet.  And I asked it again.  And he said, what is your next question?  And I said, well, I guess we will have to consult our attorneys.  And he hung up.

Tr. 3/27/2006 at 82

Young testified about the same conversation.  He testified as follows:

Q       Can you tell me when and how you first learned of the allegation that Mr. Lehner was doing something improper with respect to United Refuse's D.C. sales tax liabilities?

A       It came in a telephone call in August of '05 with Mr. Norment.  And I don't recall whether he called me, or whether he called me and left a message and I returned the call, but we had a conversation.

And the conversation, as I recall, was to be about the bills.  And in the conversation, he asked me about specific tasks – the Trustee reports and other tasks.  And I told him, as he asked about those, that we weren't asked to do anything about them.  And his response to me in each case was that, "Well, you were ordered by the Court to do that."  And I said, "Well, it may have been included in the request for appointment of Frank & Company, but we weren't ever specifically asked to do it."

And then he – somewhere around the conversation about the income tax return – I don't remember exactly how it came in, but it came in at that point that Mr. Rosenberg had identified that there were sales taxes that were underpaid and that we – as tax return preparers preparing the Schedule C, we should have seen that the sales taxes had not been – had not been paid.

16

And he told me in terms of my answers regarding the fact that we were
ordered by the Court to do these things, but saying we weren't asked to – his
comment to me – and I remember the word, as I said to Sullivan in my
deposition because it's not a word that I use or am familiar with – that my
answers were pretty thin and that he was going to talk to counsel about that.

And I said at that point, "Did you have any other questions about the bills?"
And there weren't any other questions about the bills.  And that was of end
of the conversation.

Tr. 3/23/2006 at 106.

After the August 2005 telephone conversation, there were communications between counsel

but the matter was not resolved.  Finally, on December 23, 2005, Frank & Company filed its final

fee application requesting an additional $5,663.00 in fees and $29.83 in expenses.  (Docket Entry

302).  On January 17, 2006, United Refuse and United Leasing filed a joint objection to the final fee

application.  (Docket Entry 390).  United Leasing and the debtor asserted that Frank & Company

"knew that James C. Lehner, then acting as manager of United Refuse, submitted to this Court, to

the United States Trustee, and to the creditors of United Refuse, under oath, financial statements that

were false and fraudulent" in that they stated that all tax obligations were current when the debtor

had "not paid any of its sales tax obligations to the District of Columbia during the pendency of the

case.  Despite such knowledge, Frank & Co., failed to inform the Court, the United States Trustee,

or any of the creditors of the estate of the falsity and fraudulence of the said financial statements and

aided and abetted James C. Lehner in concealing the same."  Objection at ¶6.

United Leasing and the debtor also asserted that:

Upon information and belief, Frank & Co., performed work for United
Refuse which Frank & Co., did not disclose to the Court, the United States Trustee,
or any of the creditors of the estate for the purpose of concealing from the same the
falsity and fraudulence of the monthly financial statements submitted under oath by
James C. Lehner.

17

Objection at ¶7.

## Payment of D.C. Sales Taxes

All D.C. sales taxes were paid by United Refuse on August 22, 2006, after the District of

Columbia abated all penalties and interest.  Motion to Vacate, in Part, and alter or Amend, in Part

at ¶1.  (Docket Entry 377).[10]

---

[10]While a footnote to the matters under consideration, the path taken by United Leasing in paying the D.C. sales taxes is worth commenting on.  It is troubling.

United Refuse, then controlled by United Leasing, filed a second complaint against the Lehners on November 16, 2005, seeking recovery of certain overpayments.  *United Refuse LLC v. James C. Lehner et ux.* (Bankr.E.D.Va. A.P. No. 05-1551).  During the trial in 2006, Cullen, now president of United Leasing, testified on behalf of United Refuse.  He testified that he was responsible for United Refuse after control was regained from the Lehners although Norment was the individual United Leasing placed in charge of day-to-day operations of United Refuse in lieu of Lehner.  Cullen recognized immediately on taking control on March 15, 2005, that United Refuse had not paid its post-petition sales taxes to the District of Columbia.  He testified that the amount of the sales taxes due during Lehner's management was readily ascertainable from corporate books and records, in particular, the WAMS computer program.  In fact, Cullen relied on WAMS to compute and pay the sales taxes for March 2005 and forward.  He paid all sales taxes accruing after United Leasing took control but did not pay sales taxes that accrued from April 2004 through February 2005, the period during which the Lehners were in control of the debtor.  The assets of United Refuse were sold for $2.5 million shortly after United Leasing regained control and settlement was held on July 1, 2005.  United Refuse received $1,881,063.61 in cash, with an additional escrow of $200,000.00 held back for 120 days.  Report of Sale at 2.  (Docket Entry 215).  After payment of liens and creditors other than the District of Columbia (for postpetition sales taxes), Frank & Company (on its allowed interim application for compensation) and United Leasing, United Refuse had on hand about $1.0 million.  On December 27, 2005, United Refuse paid United Leasing $700,000, but still did not pay the District of Columbia.

The debtor's disclosure statement, dated July 15, 2005, states:

B. Significant Post-Petition Events.

During the period during which the Lehners were in control, United Refuse continued to operate and showed (on its reports to the United States Trustee) an operating profit. However, that operating profit shown was due, at least in part, to the fact that United Refuse falsely underreported its taxes due to the District of Columbia government – by approximately $100,000.  Since United Leasing was declared the owner of United Refuse, United Leasing began properly stating its tax liabilities to the District of Columbia government and has, as a result, operated at little or no profit.

Disclosure Statement at 12 (footnote omitted).  (Docket Entry 216).

United Refuse's chapter 11 plan was confirmed on August 11, 2005.  The effective date was August 12, 2005. The confirmed plan required that the debtor pay all administrative expenses on the effective date of the plan.  Article III, paragraph 12 provided that "Under the Plan, Allowed Administrative Claims will be paid in full in cash on the

(continued...)

## United Leasing's Objections to
## Frank & Company's Application for Compensation

At the conclusion of the hearing on the application for compensation, United Leasing and

the debtor moved to conform their objection to the evidence presented at the hearing.  The amended

objection asserted seven grounds.  It asserted:

1.  Any benefit provided by Frank & Company, to the estate was less than the amount sought

in the application for compensation.

---

[10](...continued)
Effective Date if not previously paid pursuant to appropriate orders entered by the Court." Plan, Art. III, ¶12.  This plan
provision mirrors the requirement under §1129(a)(9)(A) of the Bankruptcy Code to pay administrative expenses in cash
on the effective date.  The debtor had ample cash on hand with which to satisfy these obligations, but did not.

Discussion of United Leasing's intention to seek abatement commenced shortly after March 15, 2005 and Cullen
confirmed was in process in July 2005, dates preceding the July 15, 2005 disclosure statement and the August 2005
confirmation hearing.

The court held a status hearing on August 22, 2006, to address the non-payment of the D.C. sales taxes and
Frank & Company's allowed fees, both unpaid administrative claims.  At the hearing, United Refuse's counsel, stated
that the sales taxes had not been paid because the District of Columbia was notoriously difficult to deal with.  United
Refuse wanted the District of Columbia to abate the penalties and interest that accrued during the Lehners' management
but had not been able reach an agreement with the District.  It was using non-payment of the admittedly due
administrative expense as leverage.  United Refuse computed the principal amount of the delinquent sales taxes as
$104,654.18.  Counsel knew of no reason why that amount was not due.  His belief was that withholding payment of
over $100,000 in taxes due would assist United Refuse in obtaining a favorable response to its request to abate penalties
and interest.  United Leasing's counsel made the same argument at a prior hearing when the matter first surfaced.

After the August 22, 2006, hearing on the matter, the court ordered United Refuse to pay the D.C. sales taxes
and the allowed fee of Frank & Company.  Order dated August 24, 2006.  (Docket Entry 375).  Four days later, the
debtor filed a motion seeking to vacate or amend the payment order.  Motion to Vacate.  (Docket Entry 377).  That
motion argued that the D.C. sales taxes were paid on August 22, 2006, and that the penalties and interest had been abated
by the District of Columbia.

The court's finds the conduct troubling.  The purpose of chapter 11 is to permit debtors to reorganize their
financial affairs and continue in business, or, as in this case, effect an orderly liquidation and pay their creditors.  The
court and the creditors rely on the good faith of debtors to comply with the terms of their confirmed chapter 11 plans.
While unforeseen circumstances may regrettably prevent a debtor from fulfilling its obligations under a confirmed plan,
once a debtor's financial arrangements have been restructured  and the debtor has the ability to fully execute the
confirmed plan, the debtor may not use the confirmed plan as a base from which to extract further concessions from
creditors.  If modification is appropriate, there are procedures that allow consideration of proposed modifications.  Here,
the debtor knew of the sales tax situation, announced in  its disclosure statement and plan that it intended to pay all
administrative expenses in full, obtained confirmation on that basis, had cash on hand at the time of confirmation to
honor its stated intention, and, in a quite calculated manner, wilfully failed to comply with the terms of its own plan so
as to gain further advantage.

2.   The affidavit submitted by Frank & Company in support of its application for employment was false because neither the accounting firm nor Young "intended at the time of signing such affidavit to accept employment on the basis set forth in the application." Motion at ¶5.

3.   "Frank & Co., did not conduct any audit, did not handle the Debtor's taxes, did not assist in the preparation of the Debtor's monthly reports required by the United States Trustee, and did not inform this Court, the United States Trustee, or any of the creditors of the estate that it had not done so." Motion at ¶6.

4.   Frank & Company's interim application was false because the application asserted that it was "instrumental" in the debtor's preparation of the U.S. Trustee's monthly reports when it was not. Motion at ¶7.

5.   Frank & Company represented an interest adverse to the interest of the estate. Motion at ¶8.

6.   Frank & Company performed tax work for United Refuse which it did not disclose. Motion at ¶9.

7.   Lehner filed false financial statements in that the statements reports that all taxes were paid when in fact the D.C. sales taxes were unpaid. "Frank & Co., knew or should have known, and failed to inform the Court, the United States Trustee, or any of the creditors of the estate, of the falsity and fraudulence of said financial statements." Motion at ¶10.

## Discussion

United Leasing's objections to Frank & Company's application for compensation revolve around three issues. The first is the scope of Frank & Company's employment. The question is not

whether Frank & Company acted outside the scope of its authorized employment, but whether Frank & Company failed to perform mandated functions. The second issue is Frank & Company's disinterestedness. The question is whether the preparation of the Lehners' personal income tax return for 2003 rendered Frank & Company not disinterested and, if so, whether Frank & Company should forfeit all professional fees which it would otherwise have been awarded. The third, and last, issue is the adequacy of Frank & Company's time records.

## Scope of Employment

United Leasing's principal argument is that Frank & Company was required to perform certain jobs:  audit the debtor's financial statements; prepare and review the monthly financial reports; and prepare sales tax returns. Frank & Company did not perform these functions. United Leasing asserts that had it done any of the three, it would have discovered the error in the answer to Question 9 on the monthly reports – that is, that all taxes were being paid on a current basis.[11]

---

[11]United Leasing admits that Frank & Co., is not be responsible for the payment of the sales taxes themselves. It would only be responsible for the penalties and interest which accrued. United Leasing presented no evidence as to the amount of the penalties and interest. At the same that it was prosecuting this objection, it was also seeking an abatement of the penalties and interest by the District of Columbia and was successful in obtaining a full abatement on August 22, 2006. As a result of the debtor's successful request that the penalties and interest be abated, there are no damages.

United Leasing knew at all times during Lehner's management of the debtor that D.C. sales taxes were not being paid. First, it knew that Garcia's was liable for D.C. sales taxes. United Leasing had financed Garcia's for years and was familiar with its operations and financial records. It knew that Garcia's operated in the District of Columbia. It knew that there was a pre-petition claim for D.C. sales taxes. *See* Schedule E, Creditors Holding Unsecured Priority Claims (District of Columbia is only listed creditors; claim is scheduled as sales taxes in the amount of $10,000). (Docket Entry 38).  Second, United Leasing knew that D.C. sales taxes were not being paid. They did not appear on the monthly reports filed with the United States Trustee or on the cash collateral reports.

The first task is to determine whether the three services were within the scope Frank & Company's employment and, if so, whether Frank & Company was mandated to perform them within the applicable period of time. The employment order does not mandate that Frank & Company perform an audit, prepare or review the monthly reports, or prepare sales tax returns. It only sets out the permissible scope of employment of the accounting firm, that is to say, the services which, at the request of the debtor, it was authorized to perform without further order of the bankruptcy court. It does not mandate that any services be performed. The employment application and the employment order are typical of those in most other chapter 11 cases. The objective is to provide the scope of employment of the professional so that the debtor has the services that the professional may render available to it as it needs them and requests them. The scope of employment is generally broad. Applications for employment and orders of employment establish the outer range of the scope within which the professional may work and be compensated.

United Leasing asserts that Frank & Company was required to perform an audit. It asserts that an "audit" is an accountant's full review of the books and records of the debtor which results in a statement by the accountant of the accuracy of the financial statements of the company. The opinion is normally given by an accountant in the form of a letter with the applicable financial statements, appropriately footnoted, attached. It asserts that Frank & Company had an independent duty to perform the audit without further request from the debtor.

The application for employment does not support such a reading. No basis was given suggesting a need for an audited financial statement. Few cases require audited financial statements. What was needed, as was made clear in the application and the hearings leading up to the application, was an outside expert to determine the financial obligations between United Leasing

22

and United Refuse.  This was the context in which the word "audit" was used in the application for

employment and in the order of employment.

        This understanding is reflected in United Leasing's response to Frank & Company's interim

application for compensation.  The interim application shows quite clearly that the debtor's financial

statements were not being audited.  There were no time entries related to an audit.  United Leasing

did not object to the interim application for compensation on the ground that the accountant was not

doing his job, that is, auditing the debtor's books and records.  It objected to the interim application

for compensation on other grounds.  The failure to object at that time evinces its understanding of

the scope of employment; that is, that the employment order did not require an audit of the debtor's

books and records as United Leasing  now asserts.  It addition to not objecting to the accountant's

interim fee application on this basis, it never sought to compel the accountant to perform an audit.

        The court did not understand the application for employment to require an audit of the books

and records of the debtor and did not intend that in its order of employment.  Such an undertaking

is a major undertaking, very costly and not likely in most cases to benefit the estate or the creditors

in light of the prospective costs.  The term "audit" was used more casually; it meant the services the

debtor needed to determine the liabilities between it and United Leasing.  Other than ownership of

United Refuse, this was the essential issue in the case.  The debtor could not reorganize without

knowing how much it owed to United Leasing.  Debtor's counsel needed a professional to evaluate

the records to determine which notes were legitimate and which notes were duplicative or only used

for internal tracking purposes.  He needed a witness to testify as to payments made as they appeared

on the books and records of United Refuse and the balance due.  He needed a witness to determine

what property was collateralized under which equipment lease. The purpose of the employment was primarily to achieve these objectives.[12]

Other circumstances at the time the order of employment was entered also illustrate the meaning of the order. United Leasing was concerned about the continued discrepancies reported by United Refuse, particularly between the Peachtree and the WAM systems. There was concern that the in-house accountant might need assistance in reconciling the books. The purpose of an outside accountant was to provide additional support, as necessary. It was clear that the outside accountant was never to take over the in-house accountant's duties or assume the position or function of the in-house accountant. The accountant was only to provide assistance as necessary. It would have been unduly expensive and wasteful of the debtor's resources to substitute an outside accounting firm for an in-house salaried accountant.

The application and the order were both drafted by debtor's counsel. Debtor's counsel is an experienced and competent attorney who has appeared in this court over a number of years. However, as he acknowledged in his testimony, he has not handled many chapter 11 cases. The application to employ is well within the range of acceptability of pleadings filed in this court, but supports counsel's own admission of his limited practice in the chapter 11 arena. A more experienced chapter 11 practitioner probably would have drafted the application for employment differently, but the scope of employment would have remained the same. The application is

---

[12]The point made by United Leasing that there was no benefit given to the debtor because Young did not testify is not grounds for objecting to payment of fees when the failure to testify was the result of counsel not of the accountant. It is true that Young ultimately was not permitted to testify as a expert at the trial. This was, however, due to the objection of United Leasing that United Refuse had failed to comply with the pre-trial order. The failure to comply was not Young's failure. The benefit of services rendered is determined at the time the services are rendered not later. Almost all of the services rendered had been rendered before Young was precluded from testifying. 11 U.S.C. §330(a)(3)(C).

24

consistent with the discussions the debtor and the accountant had concerning the proposed engagement.[13]

United Leasing's theory has other problems. An audit takes time. In order to discover discrepancies, accountants test the financial information. They send audit letters to vendors, lenders and others with whom the company deals.[14] It reviews invoices, reports, returns and other back-up information. All of this takes time. Frank & Company began work on October 19, 2004, the date of its first time entry. Trial was set for January 24, 2005, at a pre-trial hearing held on October 18, 2004. Exhibits were due January 10, 2005. The interim application covers services rendered from October 19, 2004 to December 13, 2004, and was filed on January 18, 2005.[15] Trial extended over ten days until March 14, 2005, when the decision was announced and Frank & Company was effectively terminated by United Leasing. The accountant's time records reflect the greatest concern of debtor's counsel: trial preparation. All the time expended by Frank & Company on its engagement preceded the start of the trial. The record is insufficient to show that even if Frank & Company had an audit obligation, that in the limited time Frank & Company had available and with the priorities imposed by the trial schedule, that it could have conducted an audit or would have,

---

[13]United Leasing asserts that Frank & Company's affidavit and support of its application for employment was false because it did not intend at the time it signed the affidavit to perform the duties set out in the application itself. After having heard the testimony, the court finds that, in fact, the accounting firm was ready, willing and able to perform all duties, if requested, but that the services in question were never requested. This was their understanding of the employment relationship and they fully performed. The statement was truthful. The fact that the debtor never requested some services does not change the accountant's intent. The court recognizes Young's hesitancy in responding to some questions at the hearing but attributes that hesitancy to prudence. If a request had been made to provide services that the accounting firm felt that it could not then perform, it would have, and ought to have, spoken up. But, it was prepared to supply the services described in the application, knew of no reason why it could not perform them and could have performed them if requested.

[14]No audit letters were sent to United Leasing.

[15]The final fee application covered serviced rendered through January 24, 2005, essentially when the trial commenced.

within that time, discovered the information United Leasing now asserts that it should have discovered.

The court finds that Frank & Company was not mandated to perform an audit of the debtor's books and records.  The order merely set out the permissive scope of Frank & Company's employment, the services that it could provide, if requested by the debtor.  The term "audit" does not include an audit of the financial statements of United Refuse.  Frank & Company was expected to, and did, investigate and analyze the leases, notes and liens between United Refuse and United Leasing.  The order used the term "audit" in this sense only.

United Leasing also asserts that Frank & Company was mandated to prepare all tax returns, including sales tax returns.  The employment order did not envision this, or any other service, as a mandated duty. Nor was the evidence clear that sales taxes were within the description of tax returns that Frank & Company could prepare for the debtor, even if requested.  The employment order envisioned Frank & Company being available to assist or prepare returns as necessary.  But, this was subject to a limitation.  The employment application stated that the debtor wanted Frank & Company to be available to "handle the general corporate filings and taxes of the Debtor *as has been done in the Debtor's ordinary course of business*."  Application for Employment ¶19 (emphasis added). (Docket Entry 92).  No particular type of return was identified.  United Leasing produced insufficient evidence that the sales tax returns, which are fairly simple to prepare, were prepared by the debtor's pre-petition accountant in the ordinary course of the debtor's business.  The evidence is unclear on this issue but it appears that the sales tax returns were prepared in-house by  the in-house accountant and Lehner.  The in-house accountant ran the sales tax reports from the WAMS system and gave them to Lehner.  There were various documents entered into evidence relating to

26

sales tax computations and returns, all of which were in or contained Lehner's handwriting. All sales tax information was generated in-house from the WAMS computer system and should have been directly transcribed to the sales tax forms.[16] There was insufficient evidence as to what the debtor's pre-petition accountants prepared and the court can discern nothing in the process of preparing the sales tax returns that required the professional services of an accountant. Without knowing what tax returns were routinely prepared by the debtor's pre-petition accountant, the court cannot conclude that preparation of sales tax returns was within the scope of employment of Frank & Company. This conclusion is supported by the fact that Frank & Company was never asked to prepare sales tax returns, that there was no time entry on its applications for compensation for preparing sales tax returns and that United Leasing did not object to the interim fee application that Frank & Company was not preparing sale tax returns.[17]

Similarly, Frank & Company was not mandated to prepare or assist in the preparation of the monthly reports. As discussed above, this was not a mandated duty. It was a function that Frank & Company could perform, if requested, and to the extent requested. It was never requested and the firm never performed the function.

United Leasing asserts that Frank & Company had an obligation to disclose the fact that the answer to Question 9 on the monthly reports was wrong in that sales taxes were not being paid. It argues that Frank & Company knew of the incorrect answer, or, if it had performed any of the three

---

[16]Cullen testified that he relied on the WAMS reports to prepare D.C. sales tax forms after United Leasing took control of United Refuse.

[17]This was known to United Leasing at all material times. It knew that Frank & Company did not prepare or review sales tax returns because there were no time entries on its interim fee application. It knew that sales taxes were not being paid because of the absence of sales tax deposits on the monthly reports and the absence of any financial entries showing payment of sales taxes. Presumably, the cash collateral reports showed the same thing. United Leasing knew of the obligation to pay D.C. sales taxes from its prior relationship with Garcia's.

mandated duties, would have known of the discrepancy.  Frank & Company did not provide any of

the three services and did not know that the answer to Question 9 was incorrect.[18]  (In fact, there was

no testimony that it even knew how Lehner had answered Question 9.)  Because the duties were not

mandated, it cannot be said that Frank & Company should have known of the discrepancy had it

performed any of the three services.

## **Disinterestedness**

United Leasing's second argument is that Frank & Company was not disinterested during

the entire period of its employment and, thus, should be denied all compensation.  11 U.S.C.

§328(c).  In this regard, it again raises, as it raised at the time of the interim application, the fact that

Frank & Company prepared the personal tax returns for Mr. and Mrs. Lehner in October, 2004, for

calendar year 2003.  It prepared Schedule C relating to the operations of United Refuse as well as

the balance of the 2003 federal form 1040.  United Leasing argues that this renders Frank &

Company not disinterested at all times during its employment.  It relies, in large part, on the

argument that there may be tax positions that may be taken that would benefit one to the detriment

to the other.  This would be a conflict of interest that would disqualify the accountant.

The evidence does not reflect that the potential conflict ever matured into an actual conflict.

Despite an adverse ruling with respect to this issue on the interim application and an opportunity to

---

[18]United Leasing endeavors to make much ado about the August 2005 telephone conversation between Norment and Young.  It asserts that Young's failure to answer Norment's question as to whether Young knew that United Refuse had not paid D.C. sales taxes was an admission that he did.   The court is unpersuaded.  The call, initiated by Norment, was made at a time when United Refuse, under the control of United Leasing, had reneged on its agreement to pay Frank & Company's previously awarded fee in monthly installments.  The tone, as set by Norment, was hostile.  Young could clearly see that he was being set-up for something, but not necessarily what.  He certainly knew that payment of his previously awarded fee was being challenged.

explore it further, no significant new evidence was presented at the most recent hearing.  The court

found at the hearing on the interim application and finds again on all the evidence presented that

there was no actual conflict of interest that arose as a result of preparing the Lehner's personal

income tax forms and that there was no injury to the debtor, the estate or the creditors.

The provision of 11 U.S.C. §328(c) is not mandatory but rather permissive.  *Electro-Wire

Products, Inc. v. Sirote & Permute, P.C. (In re Prince),* 40 F.3d 356, (11th Cir. 1994).  The better

practice is for an accountant not to undertake such engagements, but United Leasing's proposed

sanction – denial of all fees – is unnecessarily harsh.  No actual conflict arose, no damages resulted,

and the court will not construe this minor incident such as to cause a forfeiture of the accountant

fees.[19]  *In re Marvel Entm't Group,* 140 F.3d 463, 476 (3rd Cir. 1998); *In re Firstmark Corp.,* 132

F.3d 1179, 1183 (7th Cir. 1997).  *See* 3 Collier on Bankruptcy ¶328.05[4]  (15th ed. 2006).

United Leasing also asserts that Frank & Company performed other services which were not

disclosed.  United Leasing refers to a tax letter.  This was a minor undertaking for which the

accountants did not bill the debtor.  As such, it did not appear on any of the time records.  It had no

impact on anything with respect to the case and may well have been a benefit.  It was of such minor

significance, the accountants performed the service as an accommodation.

---

[19]Frank & Company did not bill the debtor for preparation of the Lehner's personal tax returns.  It billed the
Lehners.  It appears from the evidence presented at another trial on another complaint that this bill was paid by a United
Refuse check.  That complaint filed by the debtor seeks reimbursement from Mr. and Mrs. Lehner for improper corporate
payments which it asserts were made for the benefit of the Lehners and not the company.  The court previously entered
judgment on that matter and presently has under advisement motions to reconsider.  The issue of the payment for the
Lehner's personal taxes was not litigated with the same vigor in this application as in the adversary proceeding.  In light
of the ruling of the court which presently encompasses that payment, if the court were to allow an additional recovery
to United Refuse by reducing the accountant's fees by the same amount, United Refuse would receive a double
reimbursement.  In light of the record in this case and the ruling made in the other adversary proceeding, the court will
not order Frank & Company to disgorge any portion of that payment.  It was not made in connection with a fee
application.  In addition, there appears to be of some benefit – although not quantified –  to the company in the
preparation of the Schedule C.  United Refuse has received an adequate remedy with respect to this issue in the adversary
proceeding.

## **Time Records**

The third and last objection is that the accountant's time records are not adequate to support its application for compensation. At trial, United Leasing sought to show that the time records were inaccurate. It sought to compare various records to show discrepancies between them. It sought to discredit the time records by showing that there was no uniform method for all timekeepers to keep their time records. The accounting firm has since changed its time and billing program. At the time, the accounting firm did not provide detailed billings to its clients on a regular basis. Detailed billings are, of course, required in bankruptcy cases. In order to comply with the bankruptcy rules, it maintained billing records for this engagement independently of its standard time and billing system. The court reviewed the evidence with respect to the manner in which the time records were maintained and the bills prepared and is satisfied as to the accuracy of the billing statements. The amount of time expended on the principal object of their employment, the reconciliation of the amounts due to United Leasing, is consistent with the amounts billed. The court compared, as did counsel, the original entries to the extent they still exist, the draft billings and the final billings. It also reviewed the court's docket and the pleadings filed as they related to the accountant's work. It listened closely to the testimony, principally of Young, and finds that the time records adequately reflect the time actually expended and for which the accountants requested be compensated. The time expended was reasonable for the tasks undertaken and was necessary. The court is satisfied that they accurately reflect the tasks undertaken and the work performed. While it is hoped that the new time and billing system will produce better billing records, these are adequate.[20]

---

[20]United Leasing asserts that the interim application for compensation was false because it stated that Frank & Company was "instrumental" in preparing the monthly reports, when in fact, it did not prepare or review them. The application was prepared by debtor's counsel. The court is satisfied that debtor's counsel's description is more generous

(continued...)

## **Conclusion**

The court carefully reviewed the applications for compensation (both the interim application and the final application), the extensive activity in the case and the adversary proceedings, Frank & Company's involvement in the case, how its work product was used, and the joint objection of United Leasing and United Refuse (now controlled by United Leasing). The court concludes that the employment order does not mandate that Frank & Company provide any services (particularly an audit, preparation or review of monthly reports or prepare or review of D.C. sales tax returns) but only sets out the scope of its employment, that is, the services that it may provide to the debtor upon request of the debtor. Frank & Company was truthful in its application for employment, its affidavit accompanying the application for employment and its applications for compensation. The services rendered were necessary when rendered, were reasonable, and benefitted the estate to the extent of the fees sought and awarded. Frank & Company performed all tasks requested by the debtor. The fee applications were adequately supported with adequate time records. The preparation of the Lehner's 2003 income tax return, while improvident, did not rise to the level of an actual conflict or a conflict for which Frank & Company should forfeit its fees earned.

The final fee application will be allowed in full.

---

[20](...continued)
than necessary. However, from counsel's point of view, the accountant's availability to consult with the in-house accountant and the fact that there were some, although not many, consultations was assistance in the preparation of the monthly reports even though Frank & Company did not work directly on them. Admittedly, there were few consultations and they consumed very little of the accountant's time, but from debtor's counsel's point of view, the accountant's availability was important. Counsel pled the matter in the light most favorable to the applicant. While too generous, it was not materially false. Debtor's counsel's generous praise formed no part of the court's ruling on the applications, either the interim application or the final application.

Every professional should carefully review every application for compensation prepared on its behalf. Typically, they are prepared by debtor's counsel and will likely present the matter from debtor's counsel's point of view as opposed to the professionals. Usually there is little difference. But, nonetheless, the professional should review these and edit them as necessary.

Alexandria, Virginia
December 20, 2006

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

copies to:

Kermit A. Rosenberg
William Daniel Sullivan
Donald F. King

13290

32