# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

In re:

UNITED REFUSE LLC,

Case No. 04-11503-RGM
(Chapter 11)

Debtor.

## MEMORANDUM OPINION

This case is before the court on United Refuse LLC's and United Leasing Corporation's Motion for Recusal and New Trial or, in the Alternative, to Alter and Amend Findings (Docket Entry 394). The motion was filed after a ruling adverse to them on the Final Fee Application of Frank & Company, P.C. Although the United States Trustee joined in United Refuse's and United Leasing's original objection to Frank & Company's final fee application, he did not join in this motion.

United Refuse and United Leasing argue that under 28 U.S.C. §455(a), this judge's "impartiality might reasonably be questioned" and he should, therefore, recuse himself. Motion at 32. While ostensibly asserting an appearance of bias under 28 U.S.C. §455(a), the motion actually goes much further and argues the existence of actual bias under 28 U.S.C. §455(b)(1).

## The Law of Recusal

The disqualification of a bankruptcy judge is governed by 28 U.S.C. § 455. It provides, in relevant part:

> (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

1

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

• • •

(e) No justice, judge, or magistrate shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b).  Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

28 U.S.C. §455.

There are two separate tests for disqualification, actual bias in §455(b)(1) and the appearance of bias in §455(a).  The Court of Appeals for the Fourth Circuit addressed the relationship between §455(a) and (b) in *United States v. DeTemple,* 162 F.3d 279 (1998).  It stated:

Section 455(a) provides that a judge or justice "*shall* disqualify himself in any proceeding in which his impartiality *might* reasonably be questioned." 28 U.S.C.A. § 455(a) (emphasis added). The critical question presented by this statute "is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his impartiality on the basis of all the circumstances." *Hathcock v. Navistar Int'l Transp. Corp.,* 53 F.3d 36, 41 (4th Cir.1995); *Aiken County v. BSP Division of Envirotech Corp.,* 866 F.2d 661, 679 (4th Cir.1989). In sum, § 455(a) forbids more than actual bias. Obviously, it is possible for facts to indicate that a judge might be biased such that recusal is required under § 455(a) even though none of those facts indicates actual bias necessitating recusal under § 455(b).

*United States v. DeTemple,* 162 F.3d at 286.  The test is an objective standard for purposes of §455(a).  The Court of Appeals stated:

A federal judge is obliged to recuse himself if a person with knowledge of the relevant facts might reasonably question his impartiality. 28 U.S.C. § 455(a). The test is an objective one: as we have previously observed, a judge must disqualify himself whenever his "'impartiality might reasonably be questioned.'" *In re Beard,* 811 F.2d 818, 827 (4th Cir.1987) (quoting 28 U.S.C. §455(a)). In other words, "[d]isqualification is required if a reasonable factual basis exists for doubting the judge's impartiality. The inquiry is whether a reasonable person would have a

> reasonable basis for questioning the judge's impartiality, not whether the judge is in fact impartial." *In re Beard,* 811 F.2d at 827 (citation omitted). A presiding judge is not, however, required to recuse himself simply because of "unsupported, irrational or highly tenuous speculation." *United States v. DeTemple,* 162 F.3d 279, 287 (4th Cir.1998) (internal quotation marks omitted). Put simply, "[t]he proper test to be applied is whether another with knowledge of all of the circumstances might reasonably question the judge's impartiality." *Beard*, 811 F.2d at 827.

*United States v. Cherry,* 330 F.3d 658, 665 (4th Cir. 2003).

> The Court clarified the standard in *United States v. DeTemple* when it stated that §455(a)

> does not require a judge to recuse himself because of "unsupported, irrational, or highly tenuous speculation," *In re United States,* 666 F.2d 690, 694 (1st Cir.1981). To disqualify oneself in such circumstances would be to set "the price of maintaining the purity of appearance" too high – it would allow litigants "to exercise a negative veto over the assignment of judges." *Id.* Congress never intended the disqualification statute to yield this result. See H.R.Rep. No. 93-1453 (1974), reprinted in 1974 U.S.C.C.A.N. 6351, 6355 ("Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.").

*United States v. DeTemple,* 162 F.3d at 287.  This echoes the Supreme Court which wrote:

> As Judge Jerome Frank pithily put it: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence.  If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *In re J.P. Linahan, Inc.,* 138 F.2d 650, 654 (CA2 1943).  Also not subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings.  It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant.

*Liteky v. United States,* 510 U.S. 540, 551, 114 S.Ct. 1147, 1155 (1994).

> The goal of section 455(a) is to avoid even the appearance of partiality. If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no actual partiality exists

*Health Services Acquisition Corp. v. Liljeberg,* 796 F.2d 796, 802 (5th Cir. 1986) quoted in *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 862, 108 S.Ct. 2194, 2204 (1988).

*Liteky* discussed the extrajudicial source factor which addresses the issue of recusal when a court has heard a prior matter involving the same parties or issues. Broadly stated, the court may not be influenced by private information, that is, information obtained outside the judicial proceeding. Being exposed to such information may create the appearance of bias. This follows from the essence of the adversary system that emphasizes the responsibility of the parties to find, prepare and present to the court the information necessary for a judicial decision. Both sides have the opportunity to present their case and the opportunity to challenge the other party's case. Information that a court obtains outside that process is not subject to the same scrutiny or challenges and should not be considered. However, this ideal meets the reality of sequential hearings in the same case. In a non-bankruptcy civil action, there may be many hearings within a single case – motions challenging pleadings, discovery motions, motions for summary judgment – all before the trial on the merits. Bankruptcy cases can be even more complicated.

Bankruptcy judges are not precluded from hearing multiple matters in a single bankruptcy case and information learned in one matter does not in and of itself require a bankruptcy judge to recuse himself in a later matter. *United States v. Parker,* 742 F.2d 127, 128-129 (4th Cir. 1984). Bankruptcy cases are prime examples of the propriety and the necessity of the same judge hearing multiple matters involving the same parties. One of the strengths of bankruptcy proceedings is the ability to address issues one at a time. As one issue is resolved, others become susceptible to resolution and still others arise. There is a certain sequential and chronological aspect to bankruptcy cases that makes the idea of a single, all-encompassing trial that resolves all matters at one time unrealistic. During the bankruptcy process, the bankruptcy judge learns about the debtor, the creditors, the assets and the case itself, knowledge that is helpful in bringing the case to a

4

conclusion.  There is no impropriety in the same judge hearing various matters, whether routine administrative matters, uncontested matters, contested matters governed by Fed.R.Bankr.P. 9014, or adversary proceedings governed by Fed.R.Bankr.P. 7001.  *See Zimmerman v. Rosenthal (In re Pasco Tobacco Co., Inc.),* 34 B.R. 295, 297 (1983) (recusal denied in adversary proceeding where judge presided at first meeting of creditors under Bankruptcy Act of 1898 and various hearings in the bankruptcy case); *Runnels v. Hatzis (In re Fine),* 35 B.R. 302 (1983) (recusal denied in adversary proceeding where judge presided at hearing on defendant's motion for a temporary restraining order and where there were a "large number of docket entries" in the bankruptcy case).  Nor is there any impropriety in the same judge hearing related bankruptcy cases.  In many instances related bankruptcy proceedings are administratively consolidated[1] and in a few, substantively consolidated. *See* Fed.R.Bankr.P. 1015.

This is not license to ignore §455(a) in a bankruptcy or non-bankruptcy matter.  There are other circumstances to consider.  Judges must reach decisions which may be hard or unflattering. Hard or unflattering comments or determinations are not generally sufficient to require recusal. However, such a determination can become the basis for recusal if, "even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment."  *Liteky,* 510 U.S. at 551, 114 S.Ct. at 1155.

Another circumstance is when prior rulings appear to "box in" the judge in subsequent matters.  *Frates v. Weisshienk,* 882 F.2d 1502 (10th Cir. 1989).  In *Frates*, the bankruptcy judge approved a chapter 11 plan.  Plan approval requires finding that confirmation is not likely to be followed by the need for further financial reorganization.  11 U.S.C. §1129(a)(11).  The *Frates* plan

---

[1] This is, in fact, the rule rather than the exception in joint cases filed by married couples.

5

relied, in part, on recoveries in anticipated adversary proceedings.  When the debtor brought the adversary proceedings after plan confirmation, the defendants sought to have the judge recuse himself because he had confirmed the chapter 11 plan.  They argued that he must already have determined that the adversary proceedings, considered as a part of the confirmation process and including the one then pending, were meritorious.  *Frates*, 882 F.2d at 1504.  The Court of Appeals for the Tenth Circuit stated:

> A bankruptcy judge may preside over both the administrative and adversarial portions of a bankruptcy case.  *See* 28 U.S.C. § 157. But recusal is necessary if there is evidence of actual bias, if the bankruptcy judge by words or actions reasonably appears to have prejudged adversarial proceedings over which he is to preside, or if the judge appears "boxed in" by prior rulings such that he will be forced to reach a certain result in an adversarial proceeding regardless of the merits.  We do not, however, read our cases or any other authorities to require a judge who approves a Chapter 11 reorganization plan automatically to disqualify himself from presiding over adversarial proceedings that will affect the total recovery of the bankrupt's creditors.  *See Klenske v. Goo (In re Manoa Finance Co.),* 781 F.2d 1370, 1373 (9th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987).

*Id.*

The test under 28 U.S.C. §455(b)(1) is actual bias.  The test  under 28 U.S.C. §455(a) is the appearance of bias, that is, whether an ordinary person with knowledge of all of the circumstances might reasonably question the judge's impartiality.  "[U]nsupported, irrational or highly tenuous speculation" is not enough.  *United States v. DeTemple,* 162 F.3d at 287.  With few exceptions, the appearance of bias does not arise from the judge having heard prior matters involving the parties or the issues presented.  In this case, there is no suggestion that any information originated from any source except the judicial proceedings in this bankruptcy case.

## **Use of Prior Proceedings**

One issue that United Refuse and United Leasing raise is the propriety of the court in referring to, or using rulings from, prior proceedings in this bankruptcy case.[2]  To put it boldly, their argument would have the court restrict itself solely to the words spoken and the exhibits introduced at the hearing on Frank & Company's final fee application on March 23 and 27, 2006.  The use of anything from a prior hearing would constitute an appearance of bias requiring recusal.  This actually raises two issues.  The first is whether a judge must recuse himself in a subsequent hearing and the second is the substantive use of rulings from prior proceedings.

The law is clear that for recusal purposes, participation in prior hearings or in other proceedings involving the same parties is not itself grounds for recusal.  This was discussed above together with the limitations on the rule.  The limitations do not apply here.  No ruling in the Frank & Company final fee application hearing called into question a ruling in a prior proceeding or was pre-determined by a prior ruling as discussed in *Frates v. Weisshienk*.  Neither approval nor disapproval, in whole or in part, of Frank & Company's final fee application was necessary to vindicate a prior ruling of the court.  While it is true that United Refuse and United Leasing raised issues that they argued impeached Frank & Company's interim fee application that the court had previously approved, all interim fee applications are by their very nature subject to further review and the same judge who approves them usually hears subsequent interim applications and the final fee application, all without creating an appearance of impropriety.[3]

---

[2]They do not assert that the court ought not have heard the final fee application because it heard prior motions and adversary proceedings.  If that were the objection, it would not be timely.

[3]In *Gold v. Guberman (In re Computer Learning Centers, Inc.),* 407 F.3d 656 (4th Cir. 2005) the Court of Appeals dismissed an appeal from an order approving, in part, interim fee applications because it was not a final order.  The court noted that "the bankruptcy court remains free to act in this manner – to increase or decrease amounts
(continued...)

The second aspect of relying on rulings made in prior hearings is not related to recusal.  It is related to due process.  Reliance on rulings made in other cases or made in earlier proceedings in the same case is well established in American jurisprudence.  The doctrines of res judicata, collateral estoppel and law of the case come to mind.  These issues are not directly raised by United Refuse and United Leasing, but they are implicit in their arguments.  Use of prior rulings in bankruptcy cases do not neatly fit entirely within these doctrines because of the multiple parties involved in a single case.  Relying on rulings made in prior proceedings in a bankruptcy case is entirely appropriate, and necessary, in reaching decisions in subsequent matters with the caveat that the rights of absent parties must be protected.  Efforts are made to protect absent parties' rights by giving notice and an opportunity to be heard to creditors and parties in interest of proposed actions.[4]

The use of rulings from prior hearings is especially appropriate in this bankruptcy case.[5] This bankruptcy case has, from the beginning, been essentially a two-party proceeding: United Leasing on the one hand and the Lehners on the other.  Other creditors have played, at most, minor and inconsequential roles.  United Refuse has always been somewhat of a captive of the principal parties, initially the Lehners and later United Leasing.  One or the other has always effectively

---

[3](...continued)
previously awarded on an interim and provisional basis". *Id.* at 662.

[4]Notice is not required to be given to every creditor or party in interest in every instance.  For example, notice may be given to the unsecured creditor's committee instead of all individual creditors or in the absence of a creditor's committee, to the twenty largest unsecured creditors.  *See* Fed.R.Bankr.P. 2002 and 4001.

[5]United Refuse introduced the transcript of the court's ruling in *United Refuse LLC v. United Leasing Corporation,* Adv.Proc. 04-1196, in the trial on the second adversary proceeding, *United Refuse LLC v. James C. Lehner and Suzanne Lehner,* Adv.Proc. 05-1551.  *See* Exhibit 91.

controlled the debtor.[6]  United Leasing has been involved in almost every matter brought before the

court in this case.  It was a defendant and counterclaimant in *United Refuse LLC v. United Leasing*

*Corporation,* Adv.Proc. 04-1196.  It was a joint objector to the Lehners' proof of claim which was

also a part of *United Refuse LLC and United Leasing Corporation v. James C. Lehner and Suzanne*

*Lehner,* Adv.Proc. 05-1551.   William Daniel Sullivan, originally counsel for United Leasing,

principally tried the counterclaim in that case on behalf of United Refuse.  United Leasing objected

to Frank & Company's interim fee application and together with United Refuse filed an objection

to Frank & Company's final fee application.  United Leasing filed its own suit against the Lehners,

*United Leasing Corporation and Edward H. Shield v. James C. Lehner and Suzanne Lehner,*

Adv.Proc. 04-1222 which it subsequently dismissed without prejudice.  It enforced its cash collateral

rights including the reporting requirements under the cash collateral order.  It filed a joint chapter

11 plan with United Refuse.  There was no significant proceeding in this bankruptcy case in which

United Leasing did not participate.

---

[6]Bankruptcy courts have long struggled with the problem of assuring the representation of debtors independently of controlling directors, officers, shareholders, partners and members.  In some instances some of these parties are also creditors.  The issues are illustrated by this case.  United Refuse's initial application to employ Gregory M. Wade disclosed that James C. Lehner and Suzanne Lehner had paid him $40,000 out of a $50,000 retainer.  (They later paid an additional $40,000 retainer).  The $10,000 balance of the retainer was paid by United Refuse.  (Docket Entry 33). This raised the issue of Mr. Wade's disinterestedness and United Leasing objected.  (Docket Entry 44).  While Mr. Wade's employment was approved, the issue arose again when Mr. Wade filed his interim application for compensation. *See* Docket Entries 129, 131, 135, 142 and 143.  It arose again when he filed his last fee application. *See* Docket Entries 148, 161 and 173.

Similar issues arose with United Refuse's application to employ Mr. Wade's successor after control of United Refuse passed to United Leasing.  After the ruling in *United Refuse LLC v. United Leasing Corporation,* Adv.Proc. 04-1196, which put United Leasing in control of United Refuse, United Refuse sought to employ LeClair Ryan as its new counsel. (Docket Entry 168).  LeClair Ryan had represented United Leasing throughout the bankruptcy proceeding and at that point intended to continue representing United Leasing.  Its employment application divulged the obvious conflicts and was rejected by the court.  (Docket Entries 176 and 184).  Kermit A. Rosenberg of Tighe Patton Armstrong Teasdale, PLLC, was later employed by the debtor.  (Docket Entry 180).  William Daniel Sullivan, the attorney at LeClair Ryan who was responsible for the representation of United Leasing, left LeClair Ryan and joined Tighe Patton Armstrong Teasdale, PLLC effective October 16, 2006, which was after confirmation of the joint chapter 11 plan of United Refuse and United Leasing.  (Docket Entry 388).  Tighe Patton Armstrong Teasdale now represents both United Refuse and United Leasing as they note in their motion.  Motion at 10 n.1.

9

The particular proceeding before the court, Frank & Company's final fee application, is a prime example of the need to consider the entire record of the case. In evaluating the application of any professional, the court needs to know what the professional did. It needs to determine whether the services were necessary to the administration of the case; were beneficial at the time at which they were rendered; and were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue or task. 11 U.S.C. §330(a). United Refuse and United Leasing raised multiple objections to Frank & Company's final fee application, *inter alia* that the work did not benefit the debtor; that Frank & Company did not do all that it was required to do; that Frank & Company committed fraud; and that Frank & Company was not disinterested. In order to evaluate their objections, the court needed to know what happened in the case, why Frank & Company was employed, what it did and what it did not do. A full understanding of the case was necessary. Although more clearly defined in this case, the same issues present themselves in every fee application.

The court's December 20, 2006 Memorandum Opinion evaluated Frank & Company's final fee application in light of the proceedings in this case. It discussed the prior proceedings. It discussed Frank & Company's employment and its interim fee application. It discussed the debtor's monthly reports and the District of Columbia sales taxes, issues that United Refuse and United Leasing raised and were the heart of its allegations of fraud. These discussions essentially set out the background and circumstances in which Frank & Company was employed and operated. It was not intended to, and on review did not, go beyond the prior rulings. The words may differ. Discussions may have been abbreviated or elaborated upon. Counsel may see the rulings differently today than when they were made earlier. But, the rulings made in the prior proceedings were those

10

referred to in the December 20, 2006 Memorandum Opinion.  To the extent that United Refuse and United Leasing felt that any rulings went beyond a prior ruling, reconsideration or clarification is the appropriate remedy.  The use of prior rulings in this case is appropriate.  Substantively, United Leasing was a party to every significant proceeding in this case and is fairly bound by the facts found in them and the decisions reached.  The court's uses of prior rulings in this matter went no further than the rulings it previously made.  The court notes the distinction between findings of fact and a discussion of the findings of fact, how they were reached, why they were reached, and their significance.  But that does not alter the use of prior findings of fact or rulings.  Nor does the use of prior findings of fact or rulings violate 28 U.S.C. §455(a) or (b).  The law of recusal is clear. Participation in prior proceedings is not grounds in and of itself for recusal.  There is no allegation, and none could be made, that the court received any information other than through the judicial proceedings in this bankruptcy case.

## **General Procedural Background**

Garcia's, Inc., was a trash disposal business owned and operated by two brothers, Aurelio and Hugo Garcia.  Their business was financed by United Leasing and had been for many years. United Leasing is in the business of financing small businesses and accomplishes this primarily through equipment leases.  United Leasing obtains its funds through banks which typically have a security interest in the equipment leases.  Sometime before 2002, Garcia's began to experience financial problems again.  It had previously reorganized under chapter 11 of the United States

11

Bankruptcy Code in this court.[7]  United Leasing, which had significant lending facilities open with

Garcia's, organized United Refuse LLC to first manage Garcia's, and then to hold Garcia's assets

until the business could be sold to a third party.  Edward H. Shield, the principal and president of

United Leasing, authorized James C. Lehner, a United Leasing vice-president, to be the sole member

of United Refuse when United Refuse was organized and assigned him to operate the business until

it was sold.  Some time later, Mr. Lehner claimed to be the sole owner of both the legal and

equitable interest of United Refuse which he transferred to his wife and himself.  Mr. Shield and

United Leasing contested Mr. Lehner's claim of ownership.  United Leasing commenced two suits

in an effort to regain control of United Refuse.  United Refuse  filed the petition in this case.

This case was commenced on April 5, 2004 when United Refuse  LLC, then under the

control of James C. Lehner and Suzanne Lehner, filed a voluntary petition in bankruptcy under

chapter 11 of the United States Bankruptcy Code.  There were two principal issues in the case:  The

extent, validity and priority of United Leasing's claims against United Refuse and the ownership of

United Refuse.  United Leasing and Mr. Shield asserted that they were the true owners of United

Refuse rather than James C. Lehner and his wife, the ostensible owners.

United Refuse filed a complaint on April 30, 2004, seeking a determination of the validity

and extent of United Leasing's liens and interests.  *United Refuse LLC v. United Leasing*

*Corporation,* Adv.Proc. 04-1196.  United Leasing filed a complaint on June 10, 2004, consisting of

seven counts seeking a determination of the ownership of United Refuse, an injunction and a

---

[7]Testimony of Richard C. Cullen, Tr. 2/15/2005 at 48.  *See also* Docket, *In re Garcia's, Inc.,* Case No. 93-12429-SSM filed June 7, 1993; chapter 11 plan confirmed on May 18, 1995; final decree entered on January 21, 1997. United Leasing and the District of Columbia were among those who filed proofs of claims.

monetary judgment.  By agreement of the parties,[8] United Leasing dismissed its complaint[9] and filed an amended answer and a counterclaim in United Refuse's adversary proceeding.[10]  The counterclaim sought to determine the ownership of United Refuse as had one count in United Leasing's complaint and to declare that Lease 5352 was valid and was a true lease, not a sale and financing instrument. Trial was held on January 24, 25, 28, 31, 2005; February 1, 11, 15, 18, 2005; and March 10, 2005.  The court announced its ruling orally on March 14, 2005.  It held that the Lehners were constructive trustees for the benefit of United Leasing; directed the turnover of management to United Leasing; and made determinations with respect to three notes and Lease 5352.  Order dated March 14, 2005 (*United Refuse LLC v. United Leasing Corporation,* Adv.Proc. 04-1196 Docket Entry 142).  *See* Tr. 03/14/2005 (*United Refuse LLC v. United Leasing Corporation,* Adv.Proc. 04-1196 Docket Entry 147).

There were other matters before the court during the period that the Lehners controlled United Refuse during this bankruptcy, that is, from the filing date, April 5, 2004 through March 14, 2005.  Initial matters relating to the use of cash collateral and the treatment of certain prepetition claims typical of newly filed cases were addressed in the immediate aftermath of the filing.  The cash collateral matters were initiated on April 7, 2004, when United Leasing filed a motion to prohibit the use of cash collateral and requested an expedited hearing on its motion. (Docket Entries

---

[8]Order, *United Refuse LLC v. United Leasing Corporation,* Adv.Proc. 04-1196 (July 28, 2004) (Docket Entry 9).

[9]Notice of Dismissal, *United Leasing Corporation v. United Refuse LLC,* Adv.Proc. 04-1222 (July 30, 2004) (Docket Entry 7).

[10]Amended Answer of United Leasing Corporation to Complaint to Determine the Validity and Extent of Liens and Counterclaim of United Leasing Corporation To Determine Ownership of United Refuse LLC and Rights in Certain Property Claimed by United Refuse LLC, *United Refuse LLC v. United Leasing Corporation,* Adv.Proc. 04-1196 (July 28, 2004) (Docket Entry 8).

6, 7 and 11).  United Refuse filed its motion to approve the use of cash collateral on April 9, 2004

and its request for an expedited hearing on its motion on April 12, 2004.  (Docket Entries 13 and

20).  The debtor was authorized to use cash collateral on an interim basis on April 14, 2004.

(Docket Entries 31 and 36).  The cash collateral order authorized the use of cash collateral in

accordance with an agreed budget and United Leasing was granted adequate protection in the form

of the continuation of any prepetition liens it may have had to the same extent and priority as they

had prior to the filing of the petition.  Paragraph 9 of the order imposed weekly reporting

requirements on the debtor.  Six types of information were required: accounts receivables, aging

accounts receivable, accounts payable, aging accounts payable,  the general ledger (including all

cash receipts) and a report matching actual revenue and expenditures to the approved budget.  The

reports were to be delivered directly to United Leasing and to United Leasing's attorney by fax or

e-mail.

A final hearing on the cash collateral motions was set for May 26, 2004, but was continued

to July 8, 2004.  The final hearing on cash collateral was held on July 8, 9 and 13, 2004 and the

ruling of the court was announced on July 14, 2004.  (Docket Entries 53, 70, 73, 74 and 75).  The

final order allowing use of cash collateral was entered on August 4, 2004.  Order entered on

August 4, 2004.  (Docket Entry 79).  It allowed the use of cash collateral in accordance with a

budget and imposed reporting requirements on the debtor similar to those in the interim order, albeit

more extensive.  The frequency of reports was altered.  A detailed general ledger for all accounts

was required weekly.  Other reports were required monthly.

United Leasing filed a motion to terminate United Refuse's use of cash collateral on

November 8, 2004, which the debtor opposed.  (Docket Entries 118 and 120).  United Leasing raised

four issues, heading each argument as follows: "The Debtor Has Failed to Submit Any Budget as Required by this Court's Order"; "The Debtor Has Failed to Comply with Maximum Expenditure and Minimum Net Income Provisions of This Court's Order"; "The Debtor has Failed to Comply with the Monthly Reporting Requirements of This Court's Order"; and "The Debtor has Failed to Comply with the Requirement of This Court's Order that it Reconcile its Accounts Payable in the Face of Apparent Payments of Pre-Petition Debts".  A mechanism to address the issues raised was agreed upon and the motion was withdrawn without prejudice to refiling.  It was not renewed.  Tr. 11/23/04 at 21-27 (Docket Entry 418).

United Refuse filed a motion on May 14, 2004, to assume the lease for its business premises which was owned by United Leasing.  (Docket Entry 46).  United Leasing objected.  (Docket Entry 54).  The objection was a limited objection which put in issue certain terms of the lease, in particular, the responsibility (as between the parties) for the payment of real estate taxes.  United Leasing sought to have United Refuse pay real estate taxes and reimburse it for real estate taxes it had previously paid.  The reimbursement was sought under the cure requirement of 11 U.S.C. §365(b)(1)(a).  United Leasing filed an amended objection on June 25, 2004.  (Docket Entry 62).  It asserted that the lease had been terminated prior to the filing of the petition and could not be assumed.  If granted, the effect would have been to evict the debtor.  The debtor's motion to assume was granted and the debtor was required to pay real estate taxes and reimburse United Leasing for real estate taxes it had advanced. Order dated August 20, 2004 (Docket Entry 88).[11]

On August 27, 2004, United Leasing filed a motion seeking adequate protection.  (Docket

---

[11]United Leasing filed a notice of appeal on August 30, 2004, and United Refuse filed a notice of cross-appeal on September 9, 2004.  (Docket Entries 93 and 95).  The appeals were dismissed as moot after this court resolved the ownership issue.  (Docket Entry 170).

Entry 90). The motion was granted over United Refuse's objection. The court ordered adequate protection payments of $12,000 per month and that the assets be insured. Order dated October 28, 2004 (Docket Entry 116).

After United Leasing obtained control of United Refuse on March 14, 2005, it sold substantially all of the assets of United Refuse on July 1, 2005, and obtained confirmation of a joint chapter 11 plan on August 11, 2005. In the course of one of the hearings after control of United Refuse was returned to United Leasing, United Refuse asserted that the Lehners had not paid District of Columbia sales taxes incurred while in control of United Refuse.[12] It later developed that United Refuse did not pay these sales taxes after control was returned to United Leasing, the assets had been sold and there were funds available to pay them. (It paid all sales taxes that accrued after it regained control in the ordinary course of its operations.) After the sale of the assets on July 1, 2005, there was more than sufficient cash on hand to pay the taxes. The court entered an order on August 3, 2006, setting a status hearing to address post-confirmation matters in general and the non-payment of D.C. sales taxes in particular. (Docket Entry 369). The status hearing was held on August 22, 2006, during which the court ordered United Refuse to pay the D.C. sales taxes and the unpaid portion of Frank & Company's interim fee application approved by the court on February 11, 2005. Order dated August 24, 2006. (Docket Entry 375). On August 28, 2006, United Refuse filed a motion seeking to alter or amend the August 24, 2006 order asserting that after the August 22, 2006 hearing, the District of Columbia accepted United Refuse's offer with respect to the sales taxes and that United Refuse had paid them. (Docket Entry 377). The agreement was for United Refuse to

---

[12]This was one of the allegations in *United Refuse LLC v. James C. Lehner and Suzanne Lehner,* Adv.Proc. 05-1551 (filed Nov. 16, 2005). The initial pleading in the adversary proceeding containing the allegation was also filed in the bankruptcy case. Objection to Claims and Counterclaim, Counterclaim ¶7(*l*). (Docket Entry 293).

pay the sales taxes in full and the District of Columbia to abate all penalties and interest on the delinquent taxes. The court granted the motion in part by deleting the payment requirement to the District of Columbia since that portion of the order was moot when entered, but reaffirmed the balance of the order. (Docket Entry 381). The reasons for the order were set out in the accompanying Memorandum Opinion. (Docket Entry 380). No appeal was taken and the order is final.

The final significant matter in this bankruptcy proceeding is United Refuse's suit against the Lehners. *United Refuse LLC v. James C. Lehner and Suzanne Lehner,* Adv. Proc. 05-1551 (filed Nov. 16, 2005). The suit asserted numerous claims against the Lehners. Trial was held on July 13, 14, 24 and 26, 2006 and the court's ruling was announced on August 16, 2006. Tr. 08/16/06 at 3-44. (Docket Entry 46). Both parties filed motions seeking reconsideration. (Docket Entries 30 and 31). United Refuse substantially prevailed. The court's ruling on those motions will be announced immediately after the court's ruling on this motion is announced.

## Procedural Matters Specifically Concerning Frank & Company

United Refuse, then under the control of the Lehners, filed an application to employ Frank & Company. It was filed on August 30, 2004, and entitled "Debtor's Application for Order to Employ Frank & Company, P.C. as Independent Auditors and Accountants Pursuant to Bankruptcy Code §327(a)-(b)." (Docket Entry 92). The order granting the application was entered on September 21, 2004. (Docket Entry 104). On January 18, 2005, the debtor filed an interim application for the allowance of compensation for Frank & Company. (Docket Entry 133). United Leasing objected. (Docket Entry 136). A hearing was held on United Refuse's application and United Leasing's

17

objection on February 8, 2005, at which Frank & Company was represented by its own counsel. The application was approved. Order dated February 11, 2005 (Docket Entry 144).

Frank & Company filed its own final application for compensation on December 23, 2005. (Docket Entry 302). United Refuse (which was then controlled by United Leasing) and United Leasing filed a joint objection to the application. (Docket Entry 308). The United States Trustee joined in the objection. (Docket Entry 309). The hearing on the application was held on March 23 and 27, 2006. (Transcripts at Docket Entries 400 and 367, respectively). Final arguments were held on March 29, 2006, after which United Refuse and United Leasing sought to amend their objections to conform to the evidence. They filed their written motion and amended objections on April 6, 2006. (Docket Entry 356). The United States Trustee did not file a motion to amend and did not join in United Refuse's and United Leasing's motion. Frank & Company responded. (Docket Entry 357). The court entered its Memorandum Opinion and Order approving the fee application on December 20, 2006. (Docket Entries 392 and 393). On January 2, 2007, United Refuse and United Leasing filed the motion now under consideration and which Frank & Company oppose. (Docket Entry 394). United Refuse and United Leasing replied to Frank & Company's opposition. (Docket Entry 397). On March 1, 2007, they noticed their January 2, 2007 motion for a hearing to be held on March 27, 2007. (Docket Entry 398). The hearing was held on March 27, 2007. *See* Tr. 3/27/2007 (Docket Entry 403).

## **Particular Pleadings**

**Application for Employment.** The application for employment of Frank & Company is titled "Debtor's Application for Order to Employ Frank & Company, P.C. as Independent Auditors

and Accountants Pursuant to Bankruptcy Code §327(a)-(b)".  The application consists of four

numbered parts, "I. Introduction", "II. Jurisdiction", "III. Background" and "IV. Requested Relief"

The last section consists of several subparts: "Qualifications of Frank & Company, P.C.", "Services

to be Provided by Frank & Young P.C.", and "Payment of Fees and Expenses."

> The Introduction identifies why the debtor wants to employ Frank & Company.  It states:

> 2. The Debtor wishes to employ Frank & Company, P.C. to assist the Court to determine the amount the Debtor owes to United Leasing Corporation ("United Leasing").

> 3. In addition, the Debtor seeks to rely upon Frank & Company, P.C. to 1) handle the general corporate filings and taxes of the Debtor as has been done in the Debtor's ordinary course of business; 2) assist in the preparation of reports as is required by the United States Trustee's Office; and 3) assist and advise on periodic accounting reports to United Leasing pursuant to [various orders]

Application at ¶¶2, 3.  It continues by describing the debtor's pre-petition accountants and what, in

general, they did and the fact that they were conflicted out of the case.  The application continues:

> 9. As with most bankruptcy matters, a complete and accurate audit is essential for the fair administration of the estate. Since the inception of suits in local courts by United Leasing and motions in the Debtor's bankruptcy case, the Debtor has been attempting to perform its auditing work without the benefit of a certified public accountant to save costs for the benefit of its creditors.

> 10. Currently, the amount of the Debtor's obligation to United Leasing is in dispute. Accordingly, accurate and reliable audits demonstrating payments by the Debtor to United Leasing are pivotal to determine what obligations the Debtor owes.

*Id.* at ¶¶9, 10.   In paragraph 11, which follows the "Requested Relief" heading, the debtor states:

> 11.  The Debtor desires to retain and employ Frank & Company, P.C. as their auditors and accountants, to perform auditing and accounting services as described herein.

*Id.* at ¶11.  In paragraph 19, which follows the "Services to be Provided by Frank & Young P.C.

heading, the debtor states:

19

19. Mr. Young will render specialized accounting and auditing services to the Debtor necessary throughout the Debtor's case. These services are aimed primarily to determine the amount owed by the Debtor to the Creditor, United Leasing. In addition, the Debtor seeks to rely upon Frank & Company P.C.'s professional accounting and auditing services to1) handle the general corporate filings and taxes of the Debtor as has been done in the Debtor's ordinary course of business; 2) assist in the preparation of reports as is required by the United States Trustee's Office; and 3) assist and advise on the periodic accounting reports to United Leasing pursuant to Judge Robert Mayer's Order Authorizing Debtor's Use of Cash Collateral (April 21, 2004); Order on Motion to Condition Rights of Debtor in Possession (May 13, 2004); and Order on Motion to Prohibit Use of Cash Collateral (June 3, 2004). The non-exclusive services described above are essential to the Debtor's reorganization efforts.

*Id.* at ¶19.

**Order Approving Employment of Frank & Company.**  The order was a simple order merely stating that "that Frank & Company, P.C. Certified Public Accountants shall be employed as Independent Auditors and Accountants pursuant to 11 U.S.C. § 327for the reasons and upon the conditions set forth in their application and in the Affidavit of Hal L. Young, CPA."  Order dated September 20, 2004 (Docket Entry 104).

**United Refuse's and United Leasing's Objection to Final Fee Application.**  United Refuse and United Leasing filed its objections to Frank & Company's final fee application. Objection (Docket Entry 308).  It raised four issues:

1.  the benefit and reasonableness of the requested compensation

2.  Frank & Company's disinterestedness

3.  "6. Upon information and belief, Frank & Co. knew that James C. Lehner, then acting as a manager of United Refuse, submitted to this Court, to the United States Trustee, and to the creditors of United Refuse, under oath, financial statements that were false and fraudulent, to wit: each of the monthly financial statements of United Refuse, in each of which James C. Lehner did, on behalf of United Refuse, falsely state that United Refuse was current in the payment of all of its tax obligations, notwithstanding that James C. Lehner knew that United Refuse had not paid any of its sales tax obligations to the District of Columbia during the pendency of the case.

20

Despite such knowledge, Frank & Co. failed to inform the Court, the United States Trustee, or any of the creditors of the estate of the falsity and fraudulence of the said financial statements and aided and abetted James C. Lehner in concealing the same."

Objection at ¶6.

4. "7. Upon information and belief, Frank & Co. performed work for United Refuse which Frank & Co. did not disclose to the Court, the United States Trustee, or any of the creditors of the estate for the purpose of concealing from the same the falsity and fraudulence of the monthly financial statements submitted under oath by James C. Lehner."

*Id.* at ¶7.

United Refuse and United Leasing wrote, in part, that:

Two specific reasons for the retention of Frank & Co. by United Refuse were "to 1) handle the general corporate filings and taxes of the Debtor as has been done in the Debtor's ordinary course of business; [and] 2) assist in the preparation of reports as is required by the United States Trustee's Office[.]" [Application to Employ, ¶ 3.] . . .

On the basis of this approved application, United Refuse, the Court, the United States Trustee, and the creditors of United Refuse had the clear and legitimate expectation that Frank & Co. would do what the Debtor hire[d] it to do and what Frank & Co. said it would do, including "handl[ing] the general corporate filings and taxes of the Debtor as has been done in the Debtor's ordinary course of business [and] assist[ing] in the preparation of reports as is required by the United States Trustee's Office." . . .

Upon this information and belief, it appears quite certain that, indeed, "Frank & Co.'s services were instrumental in th[e] task" of filing these false reports, if only by their silence in the face of the false reports. . . .

Frank & Co. was employed to assist United Refuse in its fiduciary obligations, and it has no right to sit silent while knowing that United Refuse was falsifying its court records. . . .

It was not, of course, Frank & Co. that falsified the accounting records of United Refuse. It might as well have been, however. *The records were falsified by Frank & Co.'s other client—James C. Lehner.* This fact placed Frank & Co. in an irreconcilable conflict of interest: Frank & Co. represented both United Refuse and Mr. Lehner, the latter falsifying records on behalf of the former. Instead of withdrawing—much less noisily withdrawing—from either representation, however,

21

> Frank & Co. betrayed the public trust reposed in it by this Court by continuing in
> both representations and actively omitting from its time records submitted to this
> Court any reference to the work it did for the Debtor in regard to its tax obligations.

*Id.* at 3 - 6. (emphasis in original).

**United States Trustee's Objection.**  The United States Trustee's objection stated only:

> The United States Trustee joins in and adopts the arguments set forth in the
> objection filed by the Reorganized Debtor, United Refuse, LLC, and United Leasing
> Corporation, a party in interest in this case, to the application of Frank & Company,
> PC for allowance of compensation and reimbursement of expenses.

U.S.Tr.Obj. at 1 (Docket Entry 309).

**United Refuse's and United Leasing's Amended Objection.**  After both parties had rested

their cases on March 27, 2006, and presented their final arguments on March 29, 2006,  United

Refuse and United Leasing sought to amend their objection to conform to the evidence.[13]  In addition

to its original objections, it also stated that:

> This Court approved the application for employment on the basis set forth in
> the application of the affidavit Hal L. Young, directing that Frank & Co. shall be so
> employed. Neither Frank & Co. nor Hal L. Young intended at the time of signing
> such affidavit to accept employment on the basis set forth in the application.
> Specifically, Frank & Co. did not intend to conduct any audit (as stated in ¶ 11 of the
> Employment Application), did not intend to handle the Debtor's taxes (as stated in
> ¶ 3.1 of the Employment Application), did not intend to assist in the preparation of
> the Debtor's monthly reports required by the United States Trustee (as stated in ¶ 3.1
> of the Employment Application), and never informed the Court, the United States
> Trustee, or the creditors of United Refuse that it did not intend to accept such
> employment.
>
> 6. Frank & Co. did not conduct any audit, did not handle the Debtor's taxes, did not
> assist in the preparation of the Debtor's monthly reports required by the United
> States Trustee, and did not inform this Court, the United States Trustee, or any of the
> creditors of the estate that it had not done so.

Amended Objection at 2-3.

---

[13]While the United States Trustee joined in United Refuse's and United Leasing's original objection without
expanding on any of the objections in its pleading, it did not join in the amended objection.

**Memorandum Opinion of December 20, 2006.**  The court considered the objections raised and addressed them in its December 20, 2006 Memorandum Opinion.  The opinion set out the history of the case so that the context of Frank & Company's employment and of the objections could be understood.  Memorandum Opinion at 1-6.  It discussed Frank & Company's employment and interim fee application.  *Id.* at 6-11.  The monthly reports, key elements of the alleged fraud, were examined.  *Id.* at 12-15.  The principal objections to the application for compensation were set out.  *Id.* at 15-18, 19-20.  Finally, the court discussed the issues: The scope of employment including whether any duties were mandatory; the firm's disinterestedness; and the sufficiency of the firm's time records.  *Id.* at 20-31.  The court overruled the objections and approved the fee application.  *Id.* at 31.

**Recusal Motion.**  The court will not attempt to summarize United Refuse's and United Leasing's recusal motion.  It can be read in its entirety.  It is organized in four main sections which are captioned, "Misstatements and Omissions", "The Court's Descriptive Language", "The Court's Unwarranted Inferences and Patent Illogic", and "Argument."  Motion at 2-24, 24-25, 25-31 and 31-33, respectively.  The "Misstatements and Omissions" section is the longest.  It is a "catalog of the misstatements and omissions by the Court .   .   . presented in the order the misstatements and omissions appear" consisting of 32 numbered paragraphs, several with lettered subparts, covering 23 pages.

## Discussion

## I.  Recusal

Neither United Refuse nor United Leasing presented any evidence at the hearing on their motion.  They relied solely on the court's record to show the appearance of bias.  The essence of

23

their argument, in their own words, is:

> The extensive discussion in the MO [Memorandum Opinion of December 20, 2006] of facts completely unrelated to the Final Application, the misstatement of the most elemental facts of both the evidence in two unrelated adversary proceedings and the evidence in this contested matter, the repetitive excoriation of United Leasing and the reorganized United Refuse for supposedly improper conduct in matters unrelated to the Final Application (some of which matters have already been the subject of written opinion by this Court), and the drawing of completely unfounded inferences against United Leasing and the reorganized United Refuse, even while excusing a patent misrepresentation in the interim application of Frank & Co. – a misrepresentation that gave rise to this contested matter – as "simply more generous than necessary" all point to but one conclusion:

> The Court decided this contested matter on the basis of bias unrelated to the contested matter and, indeed, unwarranted even if related to any of the prior proceedings in the case.

Motion at 2.

The premise of United Refuse's and United Leasing's argument is that the court made an overwhelming number of errors expressed with particular vehemence.  An opinion so riddled with error and vehemence, they argue, can only be the result of bias.  They recognize, as they must, that mere unflattering language, even harsh language, is not a basis for recusal.  *Liteky,* 510 U.S. at 551, 114 S.Ct. at 1155.  There are limits, of course.  Language can be "so extreme as to display clear inability to render fair judgment" *Id.*  Repeated use of extreme language reenforces the appearance of lack of impartiality.  United Refuse's and United Leasing's use of the term "repetitive excoriation" captures the essence of the Supreme Court's statement and describes what they set out to prove. Motion at 2.

United Refuse and United Leasing also recognize, as they must, that an error or misstatement is not a basis for recusal.  "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky,* 510 U.S. at 555, 114 S.Ct. at 1157.  The remedy for errors is appeal.

There are limits, however.  Numerous errors not otherwise explainable may, like extreme language, display a clear inability to render a fair judgment.  United Refuse's and United Leasing's effort to compile a 23-page "catalog of the misstatements and omissions by the Court" recognizes this and describes what they set out to prove.  Motion at 2.

### Repetitive Excoriation

United Refuse and United Leasing spend little time discussing the court's "repetitive excoriation" of them for a good reason: There was none.  *See* Motion at 24-25.  Anyone reading the court's Memorandum Opinion will find it calm, even-handed and dispassionate.  United Refuse's and United Leasing's assertions are simply without merit.

United Refuse and United Leasing argue that the court criticized Gregory H. Wade and them in disproportionate terms.  Mr. Wade, who was United Refuse's counsel at the time, described Frank & Company's services as "instrumental" with respect to the debtor's filing of its reports in the interim fee application he drafted.[14]  United Refuse (then under the control of United Leasing)

---

[14]The court's discussion is in footnote 20 which states:

United Leasing asserts that the interim application for compensation was false because it stated that Frank & Company was "instrumental" in preparing the monthly reports, when in fact, it did not prepare or review them. The application was prepared by debtor's counsel. The court is satisfied that debtor's counsel's description is more generous than necessary. However, from counsel's point of view, the accountant's availability to consult with the in-house accountant and the fact that there were some, although not many, consultations was assistance in the preparation of the monthly reports even though Frank & Company did not work directly on them. Admittedly, there were few consultations and they consumed very little of the accountant's time, but from debtor's counsel's point of view, the accountant's availability was important. Counsel pled the matter in the light most favorable to the applicant. While too generous, it was not materially false. Debtor's counsel's generous praise formed no part of the court's ruling on the applications, either the interim application or the final application.

Every professional should carefully review every application for compensation prepared on its behalf.  Typically, they are prepared by debtor's counsel and will likely present the matter from debtor's counsel's point of view as opposed to the professionals. Usually there is little difference. But,

(continued...)

failed to pay delinquent sales taxes of more than $100,000 when there were more than sufficient

funds to do so and failed to disclose its intent not to pay them on confirmation of the joint chapter

11 plan.[15]  Their argument of disproportionate criticism is founded on false assumptions.  They

assume that they are comparing similar incidents, and counsel of similar experience.  As explained

in footnote 20 of the Memorandum Opinion, the court did not rely on Mr. Wade's description and

did not find it material.  The court had earlier noted debtor's counsel's relative inexperience in

chapter 11 matters.[16]

United Refuse's and United Leasing's conduct was different.  Counsel representing United

Refuse and United Leasing are very experienced bankruptcy counsel who both have extensive

---

[14](...continued)
nonetheless, the professional should review these and edit them as necessary.

Memorandum Opinion at 30-31, n.20.

[15]The discussion is also in a footnote.  Memorandum Opinion at 18, n.10.

[16]Mr. Wade, in answer to a question by Mr. King, testified as follows:

Q       Do you recall how many other applications to employ an accountant for a chapter 11 debtor
        that you had prepared?
A       Not many.  I don't do a lot of Chapter 11 work.  And this may have been the only one.  There
        might have been one more several years ago.

Deposition of Gregory M. Wade, Tr. 3/17/2006 at 24.

The court stated in its Memorandum Opinion:

        The application and the order were both drafted by debtor's counsel.  Debtor's counsel is an
        experienced and competent attorney who has appeared in this court over a number of years.  However,
        as he acknowledged in his testimony, he has not handled many chapter 11 cases. The application to
        employ is well within the range of acceptability of pleadings filed in this court, but supports counsel's
        own admission of his limited practice in the chapter 11 arena.  A more experienced chapter 11
        practitioner probably would have drafted the application for employment differently.  .  .

Memorandum Opinion at 24.

chapter 11 experience.  Each has appeared in numerous chapter 11 cases.[17]  They failed to disclose

what they intended to do and failed to comply with the terms of the confirmed plan.  11 U.S.C.

§§1125, 1141(a).  There was nothing wrong with seeking an abatement of penalties and interest that

they felt they had an equitable basis for avoiding.  What was wrong was failing to disclose that to

the creditors in the disclosure statement and failing to pay all taxes, penalties and interest when

United Refuse had the funds to do so after confirmation.[18]

It is unrealistic to expect that criticism of Mr. Wade for his drafting of Frank & Company's

interim fee application and Mr. Sullivan and Mr. Rosenberg for their non-disclosure and failure to

comply with their own joint chapter 11 plan should be the same.  Their conduct was not equivalent.

The errors were not of equivalent materiality.  Their experience was not equivalent.

---

[17]United Refuse, after United Leasing obtained control, requested that its counsel be employed as debtor's counsel.  In describing the law firm Mr. Sullivan was then affiliated with, the application stated:

> 7. LeClair Ryan is particularly well suited for the type of representation required by the Debtor.  LeClair Ryan has one of the largest bankruptcy practices in Virginia, with a local, regional (and sometimes, national) practice, and has experience in all aspects of the law that may arise in this chapter 11 case. In particular, LeClair Ryan has substantial bankruptcy and restructuring, corporate, employee benefits, finance, employment, litigation, securities and tax expertise.

> 8. LeClair Ryan's Bankruptcy & Creditors' Rights Team comprises approximately 12 core attorneys, plus attorneys in the firm's corporate, real estate, litigation, and employee benefits practices that routinely assist the more formal Bankruptcy & Creditors' Rights Team. LeClair Ryan's attorneys have played significant roles in many of the largest and most complex cases in this region, including the chapter 11 cases of Ceyoniq, Inc., National Spa & Pool Institute, US Airways, Fas Mart Convenience Stores, Inc., Tultex Corporation, Tidewater Memorial Hospital, Inc., Miller & Rhodes, Inc., Best Products Co., Inc. (I and II), Heilig-Meyers Co., JGB Industries, Inc. (Baker Equipment), R.H. Macy, and Frank Ix & Sons, Inc. Additionally, Bruce H. Matson, one of the partners of LeClair Ryan, serves as a member of the Chapter 7 panel of trustees for the Richmond Division.

Application to Retain and Employ LeClair Ryan as Counsel for the Debtor, ¶¶7-8 at 3.  (Docket Entry 168).  The application was signed by Tara L. Elgie and the accompanying affidavit by Stephen K. Gallagher.

[18]The court did not order the payment of penalties and interest, only the sales tax.  It permitted the then-pending request for an abatement to proceed to a conclusion.  United Refuse and United Leasing say that they do not understand what the court meant by its comment that they sought further concessions from the District of Columbia.  The confirmed plan required payment of all administrative expenses on the effective date of the plan.  This included the unpaid sales taxes together with penalties and interest.  The abatement of the penalties and interest was the additional concession they sought.

Even though the criticism should not be expected to be equivalent, it was mild as to all and clearly not "egregiously disproportionate." Motion at 24.  The court only found Mr. Sullivan's and Mr. Rosenberg's conduct "troubling."[19]  Troubling it was.  Troubling it remains.

At the end of their discussion, United Refuse and United Leasing write, "And that is only the language use in a single footnote!"  *Id.* at 25.  They suggest that there are other objectionable comments throughout the opinion that also unfairly criticize United Refuse or United Leasing.  The statement is without any basis as a review of the Memorandum Opinion reveals.  The suggestion that there is "repetitive excoriation" of United Refuse or United Leasing in the Memorandum Opinion is without merit.  That leaves United Refuse's and United Leasing's 23-page catalog of misstatements and omissions as a basis for recusal.

## The Catalog of Misstatements and Omissions

United Refuse's and United Leasing's second argument is that there are so many errors in the court's Memorandum Opinion that the only explanation is bias.  Simply because the court did not find all of the facts as United Refuse and United Leasing argued it should have does not mean that the court erred.  In an adversary system, each side has the opportunity to present its version of the facts in the light most favorable to itself.  Courts resolve disputed facts.  The result is that one or both parties' version of the facts is rejected in whole or in part.  Judicial rulings alone almost never constitute a valid basis for a recusal motion. *Liteky,* 510 U.S. at 541, 114 S.Ct. at 1150.  The proper remedy for a disappointed litigant is to appeal.  To distinguish mere error from bias, they

---

[19]They also complain that the court used the words "calculated" and "willfully."  Motion at 25.  Their actions were not accidental.  Their conduct commenced before the disclosure statement was drafted and continued long after confirmation, a period of about 16 months.

assert that there are *numerous* errors and omissions.

Because United Refuse's and United Leasing's argument is premised on the existence of *numerous* errors, the court must examine their assertions to determine whether the court's statements were erroneous. When faced with 23 pages of alleged errors, the undertaking is necessarily lengthy. While it is easy for United Refuse and United Leasing to pick out particular words or phrases and proclaim them wrong, it takes longer to analyze each assertion. The words, phrases or findings need to be placed in context and evaluated. The court examined all of their assertions but will only discuss a few. When a reasonable person reviews the remaining assertions, it will become apparent quickly enough that those not specifically discussed fare no better than those discussed. But, the discussion should allow a reasonable person who wants to read the entire record to become knowledgeable of the facts and consider the assertions. Many matters raised by United Refuse and United Leasing appear to be insignificant – and they are – but, because United Refuse and United Leasing assert that they too are part of the cumulative effect, of the "catalog of misstatements and omissions," they must be examined as well.

**Paragraph 13.** United Refuse and United Leasing object to the court's language in the following paragraph of its Memorandum Opinion:

> The principal activities in the case were two adversary proceedings. Both parties filed an adversary proceeding against the other. United Refuse filed first. Its complaint sought a determination of the extent, validity and priority of United Leasing's various equipment leases, loans and liens. United Leasing's complaint sought a determination of the ownership of United Refuse. They were consolidated for trial. The court determined the extent, validity and priority of United Refuse's obligations to United Leasing and found that Lehner and his wife held legal title to the debtor in constructive trust for the benefit of United Leasing.

Memorandum Opinion at 5-6 (footnote omitted).

They write:

13. The Court recites that the "principal activities in the case were two adversary proceedings," that each of United Refuse and United Leasing filed an adversary proceeding against the other, United Refuse filing first, and that the two were consolidated for trial. MO at 5.)  *All wrong:* United Leasing filed the first adversary proceeding, No. 04-1122. There was *no* activity in that case. Then United Refuse filed No. 04-1196. Then (by consent order entered by this Court) United Leasing *dismissed* 04-1122 and filed its claims as counterclaims in 04-1196. *Nothing* was consolidated for trial.

Motion ¶13 at 9 (emphasis in original).

United Refuse's and United Leasing's assertions are perplexing.  The court's brief description of these essential actions in the bankruptcy case is correct.  The essential issues in the case were the extent, validity and priority of United Leasing's interests and the ownership of United Refuse.  Both United Refuse and United Leasing filed adversary proceedings, United Refuse to resolve the issue of United Leasing's interests in its assets and United Leasing to determine the ownership of United Refuse.  The issues were tried together in a single trial that lasted ten days.  The court resolved them as stated.

United Refuse's and United Leasing's first assertion, that United Leasing filed the first adversary proceeding, is simply wrong.  They have the wrong case number.  Rather than being Adv.Proc. 04-1122, it was Adv.Proc. 04-1222.  The former is *H. Jason Gold v. Hilton Hotels Corporation* and was filed before United Refuse's adversary proceeding, *United Refuse LLC v. United Leasing Corporation,* Adv.Proc. 04-1196.  United Leasing's adversary proceeding was the latter, *United Leasing Corporation and Edward H. Shield v. United Refuse LLC, James C. Lehner and Suzanne Lehner,* Adv.Proc. 04-1222, and was filed after United Refuse's adversary proceeding.

The criticism of the court's use of the word "consolidated" is interesting.  Their argument depends on the legal, technical meaning of "consolidated."  They are correct that there was no consolidation in the strict legal sense of the word.  The effect was the same, however.  United Refuse

filed its adversary proceeding on April 30, 2004.  On June 10, 2004, United Leasing timely filed its answer as well as its complaint in its adversary proceeding.  The reason why United Leasing did not simply file a counterclaim is clear from the complaints.  There were party issues and claim issues.

The only parties to United Refuse's complaint were United Refuse and United Leasing.  The only issue was the extent, validity and priority of United Leasing's interests.  The parties to United Leasing's complaint were different.  The plaintiffs were both United Leasing and Edward H. Shield, the principal of United Leasing, who claimed that they were joint owners of United Refuse.  The defendants were United Refuse, James C. Lehner and Suzanne Lehner.[20]  United Leasing and Mr. Shield pled seven separate counts.  The first was the ownership issue.  The other six counts were claims against either or both Mr. and Mrs. Lehner:  breach of fiduciary duties; conspiracy to unlawfully seize control and ownership of United Refuse; tortuous interference; conversion; fraud; and violation of trade secrets.  The ownership issue could not be raised as a counterclaim in United Refuse's adversary proceeding because none of the competing owners were parties.  Nor could any of the additional six claims be pled as a counterclaim because the Lehners were not parties.  On July 28, 2004, the court signed an order in United Refuse's adversary proceeding (Adv.Proc. 04-1196), permitting United Leasing to dismiss its adversary proceeding (Adv.Proc. 04-1222) and to file an amended answer and a counterclaim in United Refuse's adversary proceeding.  Order dated July 28, 2004 (Adv.Proc. 04-1196, Docket Entry 9).[21]  United Leasing filed its amended answer and its counterclaim twice, once on July 27, 2004 and then again on July 28, 2004.  (Adv.Proc. 04-1196,

---

[20]United Refuse was not a necessary party.  It was named as a precaution.  As United Leasing explained in its complaint, "Although the Plaintiffs seek no relief from the Debtor it has been named as a party to the proceeding because the relief requested herein will supplant the Lehners as the alleged owners/operators of the Debtor."  Complaint at 2 n.1 (Adv.Proc. 04-1222, Docket Entry 1).

[21]This was by consent.  The time within which a counterclaim could be filed without leave of court had expired.

Docket Entries 6 and 8).  The counterclaim raised the ownership issue and the validity of Lease 5352.  On July 30, 2004 United Leasing dismissed its adversary proceeding (Adv.Proc. 04-1222).  Notice of Dismissal (Adv.Proc. 04-1222, Docket Entry 7).

This still left matters a bit untidy.  Mr. Shield, who United Leasing asserted had an ownership interest in United Refuse, was not a named party to United Refuse's adversary proceeding nor were the Lehners who were counterclaim-defendants.[22]  Summons were served on the Lehners.  (Adv.Proc. 04-1196, Docket Entries 11, 12, 17 and 18).  United Refuse filed an answer to the counterclaim.  The Lehners did not.  No one requested that parties be added under Fed.R.Bankr.P. 7019 or 7020 which incorporate Fed.R.Civ.P. 19 and 20.  On October 7, 2004 the court signed two orders, the first a consent order by and between United Refuse, United Leasing, Mr. Shield, Mr. Lehner and Mrs. Lehner dismissing the Lehners as parties to the counterclaim, ordering that Mr. Shield not be joined as a party and stipulating that the three individuals would be bound by the result of the adversary proceeding.  The second order, also a consent order, provided that the pleadings would not thereafter be amended to add any additional claims.  Orders dated October 7, 2004 (Adv.Proc. 04-1196, Docket Entries 33 and 34, respectively).  On October 18, 2004, the court held a final pre-trial and set the trial for January 24,2005.  Order entered October 18, 2004 (Adv.Proc. 04-1196, Docket Entry 37).

The parties requested that the two issues – the extent, validity and priority of United Leasing's interests and the ownership interest – be tried together because the evidence in both overlapped significantly.  They were correct in that assessment.  The two issues were tried together.

---

[22]United Leasing recognized this in paragraph 19 of the counterclaim where it stated:  "Mr. Shield, although not a party to this action, irrevocably consents to be bound by the determination of this Court regarding the ownership of United Refuse."  Counterclaim ¶19 at 6 (Docket Entry 8).

While United Refuse and United Leasing are correct that the two adversary proceedings were not consolidated for trial in the strict, legal use of the word, there were ad hoc legal proceedings that resulted in the two issues being tried together.   In common usage, Webster's New Universal Unabridged Dictionary defines "consolidate" as "1. to bring together (separate parts) into a single or unified whole; united; combine .  .  . 2.  discard the unused or unwanted items of and organize the remaining .  .  ." Webster's New Universal Unabridged Dictionary at 434 (New York:  Barnes & Noble Books, 1996).  That is exactly what happened.

United Refuse and United Leasing further say that, "There was *no* activity in" their adversary proceeding, *United Leasing Corporation and Edward H. Shield vs. United Refuse LLC, James C. Lehner and Suzanne Lehner,* Adv.Proc. 04-1222.  It is true that there were not many **docket entries** in their adversary proceeding, there were eight altogether, but there were more than none.  The number of docket entries, though, is not the measure of activity.  It is quite clear from the docket entries in both adversary proceedings that the parties engaged in a great deal of activity concerning both issues, both before and after United Leasing's adversary proceeding was voluntarily dismissed and re-filed as a part of United Refuse's adversary proceeding.

The court's succinct statement of these matters was correct.  It properly captured the essence of the matters discussed, was even-handed, and placed neither party in an unfavorable light.  The issues United Refuse and United Leasing raise, even if accurate – which they are not – are trivial. The arguments are plainly wrong (the unimportant issue of who filed which adversary proceeding first); seek to impose a narrow technical meaning on a word when the context nowhere suggests such a meaning (the use of the word "consolidate"); or seek to unreasonably characterize the matters the court was discussing (the characterization of "*no* activity").  Taken either individually or as part

33

of a "catalog", none is evidence of bias or constitutes an appearance of impartiality.

**Paragraph 14.** United Refuse and United Leasing find fault with the court's statement that their chapter 11 plan was a liquidating plan. Motion ¶14 at 10 ("And it was a plan of *reorganization*, not liquidation, because United Refuse continued to operate as a contractor to the purchaser of its assets for several months after the sale."). The fact is that all of the assets of United Refuse were sold before confirmation. Report of Sale filed July 7, 2005 (Docket Entry 215). It is true that the disclosure statement stated that United Refuse intended to continue to operate the business on behalf of, and at the expense of, the buyer for a period not to exceed 60 days after settlement. Settlement was on July 1, 2005. The confirmation hearing was on August 9, 2005. The 60-day period expired before the end of August. United Refuse and United Leasing assert that this makes their chapter 11 plan a reorganization, not a liquidation.

They are simply wrong. Liquidation plans do not require the liquidation to be completed before confirmation or before the effective date of the plan. Most liquidating plans envision a reasonable period – sometimes years – during which the assets will be sold and the proceeds distributed to creditors. Here, the assets had been sold and there was at most a brief period during which any operations were to be conducted, and those on the behalf of and at the expense of the buyer. Again, the issue is trivial. However, unlike paragraph 13 of their motion in which they use the word "consolidated" in a narrow, technical manner, here, even a narrow, technical use is unavailable.[23]

**Paragraphs 15 and 21.** United Refuse and United Leasing object to the court writing that

---

[23]The matter of control of United Refuse was discussed above. *See* footnote 6 and accompanying text. The fact that United Refuse, a subsidiary of United Leasing, each had separate counsel (until Mr. Sullivan became a member of Mr. Rosenberg's law firm) does not address the issue of effective control of the two entities.

"United Leasing was dissatisfied with the weekly reports the debtor prepared as required by the cash collateral order. It had many complaints." Memorandum Opinion at 6. *See* Motion ¶15 at 10. They say, "First of all, the complaints were not about the 'weekly reports.'" They continue by explaining that their complaints arose because the debtor was out of compliance with the budget parameters. While United Leasing did raise these issues in its November 8, 2004 motion to prohibit the use of cash collateral (Docket Entry 118), it also complained that "The Monthly Reports which the Debtor has filed have been deficient in that they did not include all of the general ledgers of the debtor, but, rather, only those portions of the general ledger showing receipts and disbursements." Motion to Prohibit Use of Cash Collateral ¶11 at 5. The general ledgers were part of the required weekly reports. Cash Collateral Order dated Aug. 3, 2004, ¶7a (Docket Entry 79). It further complained that "The Monthly Reports submitted do not include any identification of the customers from whom the Debtor is making collections, nor the costs of those collections, as required by Paragraph 7(d) of the Final Order." *Id.* ¶12 at 5. Prior to this time, United Leasing complained about the form and substance of the required reports.[24]

---

[24]Mr. Wade's deposition was read into evidence at the hearing on Frank & Company's final fee application. Mr. Wade was answering Mr. Sullivan's questions. In discussing United Refuse's in-house accountant and the reasons Frank & Company are retained, he stated:

> And as I recall, she was a well-educated person and also was a Certified Public Accountant. But she didn't have any experience doing bankruptcy matters. And she had been responsible for preparing the data that would support the filings with the Court.

> And at that time, counsel for the other side, which was you [Mr. Sullivan], kept filing objections to what we would file. And at some point in hearing these objections, the Court suggested, Judge Mayer suggested that we might want to get somebody to assist her in these filings, so at least to be set with consulting with her.

> Now I forget whether – I don't know whether we had gotten Mr. Young [of Frank & Company] either before or after Judge Mayer made that comment. But at some point, at least as far as I was concerned, I asked him to be a separate set of eyes and just be available to consult with her if she thought that she needed it.

(continued...)

United Refuse and United Leasing also object to the court's second sentence, "It [United Leasing] had many complaints." "[B]y leaving its misstatement at what the court wrote, with nothing more, the Court implies that United Leasing was simply a 'complainer' without reason." Motion ¶15 at 10. The objection is without merit. It distorts the context of the court's comment and the proceedings it describes.

The issue of the debtor's compliance with the cash collateral orders came to a head at the hearing held on November 23, 2004, on United Leasing's motion to prohibit the use of cash collateral. (Docket Entry 118). The hearing opened:

> MR. SULLIVAN: Good afternoon, Your Honor. Dan Sullivan, counsel for United Leasing.
>
> MR. WADE: Gregory Wade here for United Refuse.
>
> MR. SULLIVAN: Your Honor, you have the pleadings; so, I'm not going to restate them.
>
> There's been a complete failure to abide by the final cash collateral order that was entered.
>
> When we complained on October 5th in a letter that I sent to Mr. Wade that he hadn't done the required reconciliation of payables that was due within 30 days of the Court's order and when I complained in the motion that he hadn't done the reconciliation of payables, he said the receivables were within 10 percent. That was his response in the motion.

Tr. 11/23/2004 at 3 (Docket Entry 418). Mr. Sullivan detailed matters of concern to United Leasing.

*See* Tr.11/23/2004 at 3-7 (Docket Entry 418). He continued:

> Now, I know. Complain, complain, complain. What do you want me to do about it is the question.

---

[24](...continued)
Deposition of Gregory Wade, March 17, 2006 at 10.

> It's very difficult because we don't want to put the debtor out
> of business but we would like to impose some discipline.

*Id.* at 7.

Mr. Wade did not agree with Mr. Sullivan's argument.  The court raised the possibility of appointing a chapter 11 trustee but neither party was receptive.  After further discussions, the parties agreed to have their respective staffs or accountants meet to resolve open issues.  With the consent of the parties, the court ruled:

> Well, I think if that is what you want to do, I think it's a good approach. Take it off the docket and you can re-notice it for a motions day if you feel that that's necessary; and when you do that, I need you to notice it to all creditors and parties in interest and talk to the U.S. Trustee because one [of the] remedies I would consider – unless you've narrowed the scope very clearly as to what you need and can do, I would consider appointing a Chapter 11 trustee at that time.
>
> So, I'll take [the motion to prohibit cash collateral] off the docket and that's how we will resolve it at this point, with leave to renew it and notice it as may be appropriate.

*Id.* at 27.

The court took United Leasing's issues seriously, as is reflected in the full transcript, and, more through mediation than adjudication, established a *modus operandi* designed to resolve the problems.  It did not rule on any of the matters raised and reserved judgment on whether the debtor was in compliance.  The motion to prohibit the use of cash collateral was removed from the docket and never placed back on the docket.  The court's Memorandum Opinion did not imply that United Leasing was a complainer without reason, and in light of what actually happened, a reasonable person could not read it in that fashion.

United Refuse and United Leasing also object to the court's use of the word "complaint" as a heading on page 15 in the Memorandum Opinion.  The heading was "United Leasing's Complaint

37

Against Frank & Company Relating to D.C. Sales Taxes."  The section discussed United Refuse's and United Leasing's objection that Frank & Company knew or should have known that the statement in the United States Trustee's monthly report that all taxes had been paid was false.  They say, "United Leasing never filed a complaint against Frank & Co." although they acknowledge that they "filed objections to the [fee] application".  Motion ¶21 at 13.  They apparently use the word "complaint" in its legal, technical sense; the court used it in its common, everyday sense.  The juxtaposition of their two objections to the court's use of the word "complaint" is interesting.  *Cf.* Motion ¶15 at 10 and Motion ¶21 at 13.  In the former, they object to the court's use of the word "complaints" in its common, everyday sense because it portrayed United Leasing, they erroneously say, as "simply a 'complainer' without reason."  Motion ¶15 at 10.  In the latter, the court again used the word in its common, everyday sense, but they object, relying on its technical, legal sense, which was clearly not intended.

**Paragraph 31.**  United Refuse and United Leasing complain that no judgment was "entered" in *United Leasing Corporation v. James C. Lehner and Suzanne Lehner,* Adv. Proc. 05-1505.  "It is simply another misstatement that 'The court previously entered judgment on that matter.'"  Motion ¶31 at 24 (referring to Memorandum Opinion at 29, n.19).  The facts are simple.  The court orally announced its ruling and the parties filed motions for reconsideration which were under advisement.  While there is a legal distinction between announcing a judgment and entering the judgment, the distinction here is without any  material difference, particularly where the same sentence also sets out the motions for reconsideration and the fact that they were under advisement.

**Paragraph 12.**  United Refuse and United Leasing object to the court's description of events precipitating the filing of the petition in this case.  They write:

38

12. The Court states that "apparently" the state court suit filed by United Leasing "could have proceeded to a resolution on the merits" but that United Leasing turned around and attacked United Refuse as a secured creditor. "Apparently" is a give-away to an assumption. This assumption not only has no support in the evidence but is, in fact, flatly contradicted by the record: The suit United Leasing filed (in Hanover) was stayed pending resolution of the suit United Refuse filed (in Richmond), and the latter was never served or otherwise prosecuted. (Tr. Jan. 24 at 38-39, 49.)

Motion ¶12 at 9.

This is what the court said in its Memorandum Opinion:

By the end of 2003, Lehner was operating United Refuse as if he owned it and as if it were financed by United Leasing. Shield at United Leasing had a distinctly different view.  In early 2004 United Leasing sought to resolve the problems that arose from the botched UCC transaction by filing suit in state court. In the first suit United Leasing asserted its ownership of United Refuse. The suit started with United Leasing obtaining an ex parte injunction ousting Lehner from United Refuse.  Lehner successfully had the injunction dissolved within two weeks and was restored to possession.  The suit, apparently, could have proceeded to a resolution on its merits. However, United Leasing changed course and asserted its rights as a secured creditor and sought to repossess its collateral from United Refuse. United Refuse filed the petition in this case in response to United Leasing's creditor actions.

Memorandum Opinion at 4.

The court did conflate the Hanover and the Richmond suits.  The Hanover County suit was United Leasing's suit to oust the Lehners from control of United Refuse.  It was filed in February 2004.  The Richmond City suit was the Lehners' suit to determine ownership of United Refuse.[25] The court did not delve deeper into the details in its Memorandum Opinion.  It could have.  It was not necessary because the essential background information was set out.  The rest is simply

---

[25]Steven Biss, counsel for United Refuse in the state courts testified in *United Refuse LLC v. United Leasing Corporation,* Adv.Proc. 04-1196, as to the cases: "The judge granted my motion, quashed the injunction, and stayed all matters – all other matters relating to the bill of complaint filed by Mr. Kane [United Leasing's attorney] pending the outcome of the action, Your Honor, that I had filed earlier in Richmond." Tr. 1/24/2005 at 46.  Although filed about the same time, the Richmond City suit was apparently filed first.  Testimony of Steven Biss, Tr. 1/24/2005 at 36-37;Testimony of James E. Kane, Tr. 1/28/2005 at 204-206.

collateral to the issues before the court.  The testimony at the *United Refuse LLC v. United Leasing*

*Corporation* trial was that after the unfavorable ruling in Hanover County, United Leasing bought

two secured notes with confession of judgment provisions from Southern Financial Bank.  The notes

were made by United Refuse and guaranteed by United Leasing.  A few days after purchasing the

notes, United Leasing filed a second suit against United Refuse – this time in Fauquier County –

confessed judgment against it, and issued garnishments against United Refuse's banks.[26]  The

---

[26]Mr. Biss indicates that United Leasing's second suit was in Hanover County, but Mr. Cullen is clear that it was Fauquier County.  *See* testimony of Raymond C. Cullen, generally, on February 15, 2005, Tr. 2/15/2005 at 74, 84-86; and more specifically on February 18, 2005, Tr. 2/18/2005 at 10-12 (affidavit for Fauquier County suit), 18-20 (note purchase agreements), 13 & 17 (material and adverse change).  Mr. Cullen was cross-examined by Mr. Wade, counsel for United Refuse:

| | |
|---|---|
| Q | Now, these [note purchase agreements] were done on March 15, 2004; is that correct? |
| A | They are dated that. |
| Q | Yes.  And on March 17, 2004, you sign the affidavit in Fauquier County court. |
| A | Right. |
| Q | Okay.  Now, what is your understanding that United Leasing purchased when it purchased the note? |
| A | Just what it says – the note. |

Tr. 2/18/2005 at 20.

| | |
|---|---|
| Q | And can you explain the nature of the default of United Refuse? |
| A | This was a note that we had purchased from Southern Financial Bank.  And one of the conditions – one of the conditions in the loan is that the loan can be called – there was confessed judgment in the note, and the note could be called for material and adverse changes in the conditions underlying the note. |
| | And that was the – what we invoked when we did that, and Mr. Lehner['s] spurious complaint, you know, saying that he owned the company was, obviously, a very material and very adverse change, from our standpoint, as a creditor. |
| Q | So it wasn't that a payment had been missed, or no financial default.  It was the fact that Mr. Lehner was claiming to be 100 percent managing member. |
| A | That's correct. |

Tr. 2/18/2005 (Corrected Copy) at 13.

| | |
|---|---|
| A | .  .  . Southern Financial Bank had expressed a real concern about those notes because of Mr. Lehner's assertions.  We bought them in and determined – and, again, I'm sure it was discussed.  I just don't recall.  But we chose to do it because, for one thing, we did have that material and adverse change.  I believe we had the same language, but, for whatever reason, the decision was made to do it on those two notes. |

*Id.* at 18.

40

garnishments effectively froze all of United Refuse's cash assets.  United Leasing asserted that the notes were in default because there had been a material change of circumstances in the debtor.  The alleged material change of circumstances was the Lehner's claim of ownership of United Refuse.  United Refuse was successful in having the garnishments quashed.  On the same day that the garnishments were quashed, it filed its petition in bankruptcy.[27]

It is difficult to understand what United Refuse and United Leasing are driving at in this paragraph.  The court's statement is substantially correct and for the purpose for which it was used, to set out the background of the case, entirely acceptable.  It shows the dispute between United Leasing and the Lehners and that the dispute was sufficient to cause the state court to dissolve its *ex parte* injunction and United Leasing to look to a different approach to resolve the matter.  It placed no party in an unfair or unfavorable light.  The fuller description set out here adds little to the background or to the understanding of the case.  United Refuse's and United Leasing's paragraph, on the other hand, is misleading.  It suggests a different history, that United Leasing was stymied in its efforts to resolve the matter.  While the court conflated the Hanover and the Richmond suits, the point was correct.  There was a method to resolve the ownership issue.  Even if the Richmond suit had not been served on United Leasing, it knew of the suit and could have filed an answer without waiting for service of process.  *See* Testimony of Steven Biss, Tr. 1/24/2005 at 36-37; Testimony of James E. Kane, Tr. 1/28/2005 at 209-213.  It could have filed its own declaratory judgment suit.  Either way, there would have been no existential threat to United Refuse.  Recourse

---

[27]*See* Testimony of Steven Biss, *United Refuse LLC v. United Leasing Corporation,* Adv.Proc. 04-1196.  Tr. 1/24/2005 at 34-66.

41

to bankruptcy would not have been necessary.[28]  United Leasing created the existential threat justifying the filing of the bankruptcy by commencing the creditor suit in Fauquier County, garnishing United Refuse's banks and freezing its cash assets.  The court did not characterize United Leasing's motives.  It did not say that United Leasing "attacked" United Refuse.[29]  That is their word, not the court's.  As a characterization of the court's Memorandum Opinion, it is without foundation.  The testimony at the trial was clear.  United Leasing had a problem.  The Memorandum Opinion clearly sets out that problem.  It states, "Lehner was operating United Refuse as if he owned it."  Memorandum Opinion at 4.  United Leasing thought that it had a sale of the business.  Lehner refused to go forward.  United Leasing's bank was concerned.

The state court suits were discussed as background so that the context of this bankruptcy case could be better understood.  This is the controversy into which Frank & Company entered.  This is part of the context that is necessary and appropriate to understand in evaluating Frank & Company's fee application and United Refuse's and United Leasing's objections to it.  It is not material which state court suit could have been the vehicle to resolve the ownership issue in state court.  The brevity of the court's description of the pre-petition litigation properly reflected the weight to be given to the description.  United Refuse and United Leasing articulate their view in their Disclosure Statement Accompanying Jointly Proposed Plan of Reorganization dated July 15, 2005, at 11-12

---

[28]The reasons for filing the bankruptcy are discussed more fully in the Memorandum Opinion issued this day in *United Refuse LLC v. James C. Lehner and Suzanne Lehner,* Adv.Proc. 05-1551.

[29]The complete sentence in United Refuse's and United Leasing's motion is: "The Court states that 'apparently' the state court suit filed by United Leasing 'could have proceeded to a resolution on the merits' but that United Leasing turned around and attacked United Refuse as a secured creditor."  Motion ¶12 at 9.

(Docket Entry 216).[30]  While itself incomplete, it, like the court's description, is sufficient to achieve the limited purpose for which it was used.  *See also* Testimony of Raymond C. Cullen's.  Tr. 2/18/2005 (Corrected Copy) at 13, 17-18, 20.

**Paragraph 22, Re-organized Debtor's Failure to Pay D.C. Sales Taxes.**  One of the two issues in the Memorandum Opinion with which United Refuse and United Leasing appear to be most concerned is the discussion of the payment of D.C. sales taxes in footnote 10 at page 18 of the Memorandum Opinion.  *See* Motion ¶22 at 13 - 17.  Most of footnote 10 sets out the events themselves.  Only the last paragraph discusses the court's concerns.  United Refuse's and United Leasing's efforts to find fault with the court's description of the background facts are without merit. They state that the court misstated the payor of the sales taxes as United Leasing rather than United Refuse.  Motion ¶22(a) at 13.  United Refuse was the payor, but, as plainly stated and as is obvious, United Refuse was then controlled by United Leasing.  Mr. Norment, a vice-president at United Leasing, was in day-to-day control of United Refuse.  Mr. Sullivan, United Leasing's counsel, asked Mr. Norment:

> Q     All right.  And that's an obligation of United Refuse but practically speaking United Leasing?

---

[30]This is United Refuse's and United Leasing's description in their joint disclosure statement:

> After several months of unsuccessful negotiations between Mr. Shield and Mr. Lehner, United Leasing sued the Lehners in the Circuit Court for Hanover County, Virginia, seeking and obtaining a preliminary injunction barring the Lehners from United Refuse on the ground that Mr. Shield and United Leasing owned United Refuse jointly. That court dissolved the injunction a week later, on application by the Lehners.  United Leasing then bought SFB Notes '029 and '133 from SFB (for the amounts then due) and sought to enforce them against United Refuse.  In order to stay those actions, on April 5, 2004, United Refuse filed its petition herein.

Disclosure Statement at 11-12.  (Docket Entry 216).

A   Correct.

Tr. 3/27/2006 at 81.  The confirmed chapter 11 plan subordinated all of United Leasing's claims to all other claims.  "Practically speaking," United Leasing bore the burden of paying the sales tax although United Refuse actually wrote the check.[31]

In paragraph 22(b) United Refuse and United Leasing take issue with how quickly Mr. Cullen found out about the non-payment of the D.C. sales taxes after United Leasing regained control of United Refuse on March 14, 2005.  They argue with the court's conclusion that Mr. Cullen "recognized immediately on taking control" that the taxes were unpaid.  Memorandum Opinion at 18 n.10.  The court fairly set out the evidence on this matter and reached the conclusion stated.  They now argue with the court over this conclusion stating that the court "misstates the testimony."  They say that "Mr. Cullen did not testify that he 'recognized immediately'" the non-payment.  "His testimony was that Mr. Norment discovered it, and not 'immediately.'"  Motion at 13.  Mr. Norment was placed in his position at United Refuse by Mr. Cullen and reported directly to Mr. Cullen.  All of this is set out in footnote 10.  The court concluded that Mr. Cullen knew of the non-payment.[32]

United Refuse's and United Leasing's comments on whether post-petition sales taxes are "administrative claims" or "administrative expenses" are without merit.  Motion ¶22(c), (d) and (g).

---

[31]It has always been apparent who the real party in interest is.  United Refuse was organized for the benefit of United Leasing; was to be operated for the benefit of United Leasing; and will distribute all of its net proceeds to United Leasing.  United Refuse and United Leasing recognize this.  They state, "United Refuse (*and, therefore, United Leasing*) is now faced with a $100,000 tax bill – plus penalties and interest that wold not have accrued .   .   ."  Amended Objection to Conform to the Evidence (Docket Entry 356) ¶10 at 4 (emphasis added).  *See also Id.* ¶3 at 2.

[32]Parties may well have different opinions from the court as to what the facts are and may well be able to articulate reasons for holding those opinions.  Here, though, the motion is a recusal motion.  United Refuse and United Leasing are endeavoring to show the appearance of bias.  That is not accomplished by merely reaching a different conclusion in evaluating the evidence or by rearguing the evidence.  They did not support their arguments with references to the transcript and it is, therefore, not possible to examine their assertions further.

They never fully or timely developed their argument.[33]  However, the gist of their argument appears to be that post-petition sales taxes are described in 11 U.S.C. §507(a)(8)(C), taxes "required to be collected or withheld and for which the debtor is liable in whatever capacity" and that any tax described in §507(a)(8) is not an administrative expense because §503(b)(1)(B)(I) expressly excludes taxes described in §507(a)(8) from the definition of administrative expenses.

Section 507(a)(8)(C) is a catch-all provision intended to catch all other taxes attributable to pre-petition tax periods not specifically enumerated in §507(a)(8)(A) or (B).  It is not redundant of §507(a)(8)(A) or (B).  If it were, §507(a)(8)(A) and (B) would have no meaning.  Sales taxes, limited to the pre-petition period, are described in §507(a)(8)(A).  Post-petition sales taxes are not pre-petition priority claims.

---

[33]In United Refuse's and United Leasing's motion, they say:

> (g) The Court also omits from its recitation the fact that United Refuse had already pointed out to the Court that sales taxes were not, by definition, necessarily administrative expenses that even could be allowed and be required to be paid upon confirmation of a plan. (DE 385; 11 U.S.C. §§503 (b)(1)(B)(I), 507(a)(8)(A)(iii).)

Motion ¶22(g) at 16.

This argument was not presented at the August 22, 2006 hearing.  *See* Tr. 8/22/2006 (Docket Entry 419).  It was not raised in United Refuse's Motion to Vacate, in Part, and Alter or Amend, in Part.  (Docket Entry 377).  It was first raised in United Refuse's  Supplemental Report to Statement of Post-closing Assets and Liabilities on September 5, 2006.  (Docket Entry 385).  There United Refuse set out its argument:

> **Applicable Law.** Title 11, section 507(a)(8)(C) provides a priority for the claims of the District of Columbia for sales taxes. (*See id.,* section 503(b)(1)(B), providing an exception for such claims from the definition of administrative claims).  The District of Columbia claim, therefore, was not an administrative expense of the estate, nor was it an "allowed claim" as defined in the confirmed plan. (Even if the District's claim were a potential administrative claim, it had not been allowed, as required by section 503(b) and as required for payment under the plan pursuant to the definition of "allowed administrative claim," which comports in all respects with section 503(b).)

Supp. Rep. at 2.

The argument in the Supplemental Report was made on September 5, 2006, two weeks after the August 22, 2006 hearing on the status of the payment of D.C. sales taxes. The court ordered the fees paid and explained its reasons in its Memorandum Opinion of August 28, 2006. (Docket Entry 380).  No appeal was taken from that order and the matters resolved are the law of the case.

The structure of chapter 11 in general also undermines United Refuse's and United Leasing's argument.  Section 1141(d)(1)(A) effects a discharge of not only pre-petition debts, but also post-petition debts up to the date of confirmation.  This includes post-petition administrative expenses.  The *quid pro quo* for this treatment is that administrative claims "of a kind specified" in §507(a)(2) or (3) be paid on the effective date of the plan.  But for this confirmation requirement, every chapter 11 debtor who receives a discharge would be relieved of any obligation to pay his post-petition, pre-confirmation obligations, including ***all*** post-petition, pre-confirmation taxes of whatever nature or description.  That has never been the law.

Moreover, United Refuse and United Leasing fail to address the role of §364(a) which states:

> If the trustee is authorized to operate the business of the debtor .  .  . unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

11 U.S.C. §364(a).  Credit obtained under §364(a) is an allowed administrative claim.  No request for payment is necessary in order to establish this status.  The issue arises when a bankruptcy court is called upon to determine whether credit that was not approved by the bankruptcy court was obtained in the ordinary course of the debtor's business.  If it was, it is an allowed administrative expense under §364(a).  No court approval was necessary.  If it is not, it must quality under §364(b).

*In re Poff Construction, Inc.,* 141 B.R. 104, 105 (W.D.Va. 1991) stated:

> 11 U.S.C. § 364(a) allows the trustee (or debtor in possession if no trustee has been appointed, see § 1107) to incur unsecured debt in the ordinary course of business which will be allowed as an administrative priority under § 503(b)(1). However, §364(b) requires notice, hearing and court approval before the debtor in possession may incur debt outside the ordinary course of business. Consequently, this appeal turns on what is meant by "ordinary course of business."

*Id.* at 105.  *See also In re Gloria Mfg. Corp.,* 65 B.R. 341 (E.D.Va. 1985); *In re Ockerlund Const.*

*Co.,* 308 B.R. 325, 328 (Bankr.N.D.Ill. 2004); *In re Husting Land & Development, Inc.,* 255 B.R.

772 (Bankr.D.Utah 2000), *aff'd,* 274 B.R. 906 (D.Utah 2002); *In re John Deskins Pic Pac, Inc.,* 59

B.R. 809, 812 (Bankr.W.D.Va.1986).

Post-petition, pre-confirmation obligations are paid in the ordinary course of the debtor's

business (unless the debtor is not authorized to operate its business) without following the request

for payment procedures.  Those procedures require that the putative administrative claimant file a

request for payment, that notice of the request be given to all creditors, that creditors be given an

opportunity to be heard, and that the court approve the request.  To require every vendor and every

taxing authority to jump through these hoops to be paid its post-petition, pre-confirmation debt is

unreasonable and unworkable.

The Court of Appeals for the Tenth Circuit articulated the purpose behind §364(a).  It stated:

> Indeed, the Bankruptcy Code, in its ordinary course of business exception to the
> notice and hearing provisions of § 363(c)(1), recognizes the commercial facts of life.
> The Code takes cognizance of the fact that if a debtor had to seek court approval to
> pay for every expense incurred during the normal course of its affairs, the debtor
> would be in court more than in business. Thus, the Code does not require
> micromanagement by the bankruptcy court for the day-to-day affairs of a debtor. We
> may conclude, therefore, the Code likens the management of ordinary operating
> affairs of a debtor to those of any business entity and allows the debtor's
> management free rein to make those decisions.

*In re Buyer's Club Markets, Inc.,* 5 F.3d 455, 458 (10th Cir. 1993).  *See also In re Husting Land &*

*Development, Inc.,* 255 B.R. 772, 778 (§364(a) permits debtor-in-possession to incur unsecured debt

in "normal course of business without the requirement of obtaining court approval after notice and

a hearing").

Taxing authorities are no different that any other administrative expense creditor whose

claim is incurred in the ordinary course of the debtor's business, except that they are not optional.

They arise simply because the debtor is operating its business.  They have always been treated as administrative expenses to be paid in the ordinary course of business.  Indeed, that is the essence of United Refuse's and United Leasing's complaint against the Lehners and Frank & Company – that the taxes were not paid in the ordinary course of United Refuse's business as the United States Trustee's monthly reports, United Leasing says, led it to believe.   All §364(a) administrative expenses are to be paid no later than the effective date of the plan.

Despite United Refuse's and United Leasing's efforts to justify the non-payment of D.C. sales taxes, their arguments are without merit.  United Refuse paid all D.C. sales taxes after control was returned to United Leasing without complaint, and without the District of Columbia filing a request for payment.  They complain that the Lehners should have done the same and did not.  They are correct.  The sales taxes unpaid by the Lehners, like the sales taxes paid by United Refuse after United Leasing obtained control, were post-petition, pre-confirmation sales taxes.  They were administrative expenses that should have been timely paid in the ordinary course of United Refuse's business.  Payment was not optional.  The District did not need to file a request for payment in order to have United Refuse pay them.

United Refuse's and United Leasing's joint chapter 11 plan properly provided for payment. The delinquency was disclosed in their joint disclosure statement.  There was no discussion of United Refuse's intent to delay payment or contest payment.  United Refuse was obligated to pay them on the effective date, together with penalties and interest.  It knew that they were unpaid.  (The delinquency was discussed in the disclosure statement.)  It had the money to pay them on the effective date.  It did not pay them.

United Refuse, then under the control of United Leasing, argues:

48

(e) The Court states that counsel for United Refuse "knew of no reason why [the amount computed by United Refuse as the amount that ought to have been paid during the management by the Lehners] was not due." (MO n. 10 at 19.) The Court omits, however, that counsel provided the Court with plenty of reasons for why it was not payable. Unless the District of Columbia agreed that that was the amount due, paying it would have been the height of irresponsibility. The debtor might have miscalculated and overpaid. The District might later decide it was owed more, in which case it could file a later claim for more. The bankruptcy case could have stayed open for years waiting for the District to do anything while the potential, unallowed claim remained in limbo. The debtor used its willingness to pay this potential, unallowed claim as a carrot to get the District's attention, and even then it took a year to do so.

Motion at 15 (brackets in original).

A lot of litigants have "plenty of reasons for why" they do not do what they should do. The ones United Refuse and United Leasing now put forth are without merit. Congress recognized the problem of determining the proper amount of taxes due in a bankruptcy case. It addressed that problem in 11 U.S.C. §505. Section 505 provides a procedure for the prompt determination of tax liabilities and gives the court the authority to adjudicate such matters. United Refuse's problem was not in determining the proper amount of the tax – it had that information – but in obtaining a reprieve from penalties and interest that accrued because the Lehners failed to timely pay the taxes. Of course, the court cannot abate penalties and interest. That is a matter left to the discretion of the taxing authority. The only benefit in obtaining abatement of the penalties and interest inured to United Leasing. As it stated in its joint objection to Frank & Company's final fee application, it will be paid all funds left over after all other claims are paid.[34]

---

[34]Counsel's statement that paying the tax due "would have been the height of irresponsibility" misses the mark. United Refuse and United Leasing knew of the situation and their intentions well before the disclosure statement was written and the confirmation hearing held. They should have disclosed their intentions with respect to the payment of the D.C. sales taxes. The disclosure statement in failing to fully discuss this matter and to make full disclosure was inadequate and, in hindsight, should not have been approved. United Refuse and United Leasing had ample opportunity to bring the matter before the court or at least make the appropriate disclosures, but did not. While they state that they kept the United States Trustee fully informed, no information concerning this matter was given to the creditors in the
(continued...)

United Refuse and United Leasing state:

> The Court omits from its recitation the Court's reaction to Mr. Cullen's testimony that the sales taxes were not yet paid. That testimony came in the course of the trial of United Refuse against the Lehners, as the Court notes. The Court's reaction was to tell Mr. Cullen that the Court did not want to hear any further testimony from him. It did not want an explanation. It did not want counsel to elicit an explanation. And it did not want any further testimony from Mr. Cullen on any subject. Period.

Motion ¶22(h) at 16.

There is no citation to the transcript supporting this assertion.  That is because they relied on their recollection almost six months after the trial.  *See* Notice of Filing Excerpts of Transcripts Relied Upon at 1 (Docket Entry 415).  It is difficult to fully address the issue without the transcript. The court believes that the issue first surfaced in July 2006 during the trial in *United Refuse LLC v. James C. Lehner and Suzanne Lehner,* Adv.Proc. 05-1551.  One of the allegations in that case was that the Lehners had not paid D.C. sales taxes and had fraudulently concealed this by filing false financial reports with the United States Trustee, the court and United Leasing.  The issues before the court were whether that was true and if so, the damages.  While United Refuse's and United Leasing's description of the exchange makes it appear that the court was uninterested in the reasons for the non-payment and made a snap decision on the matter, that was not the case.  The court immediately recognized the problem.  The court was concerned.  However, why United Refuse (then under the control of United Leasing) did not pay the D.C. sales taxes on the effective date of the confirmed chapter 11 case was not material to the resolution of the trial then in progress.  While the matter was clearly a point of interest in the administration of the chapter 11 case itself, in that trial it was wholly irrelevant  as to why United Refuse (then under the control of United Leasing) failed

---

[34](...continued)
Disclosure Statement.  *See* Supp.Report at 3.

to pay the sales taxes when it first had sufficient money to pay them.  The issue was properly not

pursued at that time, and was properly set down for a separate hearing on August 22, 2007, at which

time United Refuse and United Leasing had full opportunity to discuss the matter.  They did.  Their

arguments were rejected.  *See* Tr. 8/22/2006 (Docket Entry 419).

In paragraph 22(j), United Refuse and United Leasing question the connection between the

discussion in footnote 10 and Frank & Company's fee application.  Motion ¶22 at 13-17.  It

completes the background, explaining how the sales taxes came to be paid without penalties or

interest.  The court identified the matter as a "footnote" and literally placed the entire discussion in

a footnote.  Memorandum Opinion at 18-19, n.10.  It is an educational and cautionary footnote,

noting an area in which other counsel should be wary.

**Paragraphs 4 - 9, Characterization of Transactions.**  United Refuse and United Leasing

appear very concerned with what they argue is the court's improper characterization of the Garcia's

transactions and United Leasing's actions in response to Garcia's default.  The two issues that drove

this case were the ownership of United Refuse and the extent, validity and priority of United

Leasing's interests in United Refuse's assets, that is, the nature of the interest and the amount due

arising from those interests.  Counsel for the parties recognized that the two issues were intertwined.

Both used, to some extent, the nature of the transfer of assets from Garcia's to United Refuse as

evidence of ownership.

United Refuse and United Leasing raise several issues.  The first is the use of words that,

they say, characterize the Garcia's transactions as secured transactions under Article 9 of the

Uniform Commercial Code rather than lease transactions presumably governed by Article 2A of the

UCC .[35]  The language used by the court in this regard is benign.  While terms compatible with both

legal structures were used, it is clear from the Memorandum Opinion as a whole that the court

expressed no opinion on the nature of the Garcia's transactions.  Understanding the underlying

nature of the Garcia's transactions was not critical to the proceedings.  What was important was that

the assets were moved from Garcia's to United Refuse.  What was more important was the

capitalization of United Refuse, that is, how – as between United Refuse and United Leasing –  the

assets were held,  and the financial relationship.  Mr. Lehner and Mr. Shield agreed at the beginning

that the asset ownership by United Refuse was to be temporary, until the trash business was sold as

a going concern.  After that, the ambiguity set in.  United Leasing characterized its transaction with

United Refuse as a "sublease" and relied heavily on Lease 5352.  But, the trucks (the principal

physical assets) were titled in United Refuse's name.[36]

United Leasing secured its leases with Garcia's.  United Leasing had liens on the Garcia

brother's personal residences and on the business premises to secure payment of the leases.  United

Leasing acknowledges one UCC Article 9 sale of Garcia's assets.[37]    United Refuse and United

---

[35]United Leasing's counterclaim addresses the issue in ¶¶8-11 and as to United Refuse in ¶¶23-24.  It alleged that it had six active leases for personal property or equipment with Garcia's as of mid-2001 that were secured by a first deed of trust on the business premises and "by duly perfected security interests in Garcia's inventory, accounts receivable, and certain other collateral."  Counterclaim ¶¶8-11 (Adv.Proc. 04-1196, Docket Entry 8).  It further alleged that it entered into Lease 5352 with United Refuse on June 9, 2002 and that United Refuse "granted to United Leasing a security interest in the Accounts, Inventory, General Intangibles, Equipment and Records (as defined therein) of United Refuse" to secure the lease.  Counterclaim ¶¶23-24. (Adv.Proc. 04-1196, Docket Entry 8).

[36]United Refuse and United Leasing state that "The evidence was that United Leasing 'repossessed' these assets under its leases and then transferred those repossessed assets into United Refuse under a *sublease* of the assets to United Refuse – Lease 5352."  Motion ¶6 at 5. (emphasis in original.)

[37]The ambiguity of the Garcia's-United Leasing transactions is illustrated by the acknowledged Article 9 sale. The successful bid by United Refuse was $50,000.  Mr. Cullen testified about the proposed BFI sale.  "They were not particularly interested in the equipment but, of course, they'll take it."  Tr. 2/15/2005 at 65-66.  (It is not clear whether by "equipment" he meant the trucks and the trash containers or only the trash containers, presumably the latter.)  But, the customer contracts and goodwill were a significant aspect of the proposed sale to a third party.  It was the sale of an
(continued...)

Leasing recognize the multiple transactions and the ambiguities inherent in the case.  In criticizing

the court, they said:

> That same sentence recites that "United Leasing . . . had a lien on all of Garcia's
> assets." While true, it is misleading, for all of the assets of Garcia's (save those
> properly foreclosed at a UCC sale in June 2002 and a few trucks leased by Simmons)
> were *leased* by United Leasing to Garcia's.

Motion ¶2 at 3. (emphasis in original.)  Read as a whole with an understanding of the case, the

court's terminology is not misleading.[38]  But, the issue is not the precision of the court's language,

but whether it evinces bias.  No fair reading of the Memorandum Opinion could reach that

conclusion.

United Refuse and United Leasing object to the court's comment that United Leasing made

mistakes in transferring Garcia's assets to United Refuse.  Motion ¶¶5 - 8, at 4 - 6.  The errors that

the court noted were the manner in which the transactions, both from Garcia's and to United Refuse,

were documented – really, not documented.  The failure to document the transactions was a major

problem.  Documentation serves two purposes.  First, it establishes a record of the transaction.  If

there is a later problem, it is more likely to be resolved without litigation if there is appropriate

---

[37](...continued)
on-going business, not of trucks. The question never raised was where the customer contracts stood in, first, the Garcia's
transaction and then the United Refuse transaction.  United Leasing took the position that all of Garcia's assets were
subject to United Leasing's lien, except, of course, those that were the subject of its leases.  (The subject matter of
Garcia's-United Leasing leases was principally garbage trucks and trash containers. )  Customer contracts, accounts
receivables and bank accounts are not generally leased, but are frequently collateral, as the accounts receivable were
here.  United Refuse's assets were sold to a third party for $2.5 million after United Leasing regained control of United
Refuse.

[38]The court was careful not to characterize the transactions between United Leasing and United Refuse because
of the absence of third parties who could be affected by such a determination.  The court said in its oral ruling on
March 14, 2005 in *United Refuse LLC v. United Leasing Corporation,* Adv.Proc. 04-1196, "Second, I'm not deciding
that the lease 5352 or any of the others are true leases or financing statement. It's not necessary. I know that was a prayer
requested to be made but the fact that they're true leases or they're financing situations may affect the rights of third
parties not before the Court today." Tr. 3/14/2005 at 27.  But, that is an entirely different question than the nature of the
Garcia's-United Leasing transactions.  United Refuse and United Leasing from time to time conflate the two issues –
the nature of the Garcia's-United Leasing transactions and the United Refuse-United Leasing transactions.

documentation than if there is none.  Second, the mere process of creating the documentation forces

the participants to think about the transaction.  This is more likely to result in a clearer understanding

of the transaction.  Even the best documentation cannot prevent all problems, but it reduces the

likelihood of them occurring and the disruption caused by them.   This case is illustrative.  The

failure to properly document the transactions resulted in the expenditure of probably more than

$500,000 in attorney's fees,[39] a delay in the sale of the underlying asset to a third party, and much

litigation.  It will never be known whether with proper documentation the relationship between Mr.

Shield and Mr. Lehner would have soured.  With proper documentation, however, it should not have

taken ten days of trial to unravel the transactions.[40]

United Refuse and United Leasing say that "The first two 'mistakes' were how United

Leasing documented the ownership of United Refuse – matters pertinent to the adversary proceeding

but having absolutely nothing to do with the Final Application of Frank & Co."  Motion ¶5 at 4.  The

statement is simply wrong.  Frank & Company was employed to figure out what had happened.  It

spent a lot of time looking at leases, notes, payments, liens and other financial data to determine

what United Refuse owed to United Leasing and what assets were subject to liens or were the

subject of leases.  The documentation problem is further illustrated by the tracking notes.

**Paragraph 9.**  Paragraph 9 of the motion discusses United Refuse's and United Leasing's

view of the tracking notes and their role in Mr. Lehner's "plan to steal United Refuse."  It is sets out

---

[39]Mr. Wade's fee application was allowed, with the consent of United Refuse, in the amount of $228,000, with $10,000 payable from the retainer and $218,000 as an administrative expense payable by United Refuse.  He was not involved in the later litigation between United Refuse and United Leasing and the Lehners.  It is unlikely that Mr. Sullivan's fees were any less than Mr. Wade's.

[40]The discussion of the tracking notes, Lease 5352 and the efforts to split Lease 5352 into three separate leases further illustrates the inadequacies of the documentation of the transactions.  These are discussed below but suggest that at the time the original documentation of the repossession from Garcia's and the financing of United Refuse, United Leasing's lenders were not fully considered.

the essence of their theory of the ownership issue and reflects the difference between the position

United Leasing advocated at the trial and the court's decision.[41]

    Dale Johnson's testimony is set out in the margin.[42]  During the trial, this testimony became

---

[41]Paragraph 9 is as follows:

    9. The Court states that no one "ever clearly explained the purpose or necessity for [the] tracking notes." (MO at 4.)  To the contrary, the "tracking notes" (from United Leasing's point of view) or the "purchase notes" (how Lehner claimed he bought United Refuse) were the crux of the adversary proceeding.  The notes United Leasing referred to as "tracking notes" were notes 210, 214 and 215. (Tr. 2/1505 at 99.)  Those notes represented the bank debt underlying the three main leases to Garcia's (and, thus, Lease 5352). (*Id.* at 99-100.)  The notes were created and signed by *Lehner* (two of the three of them while Shield was on vacation and Lehner took his place at United Leasing) in his attempt to show that he had bought all the assets of United Refuse for the amounts of the notes (rather than leased the assets for the amount of Lease 5352).  Thus, it was Lehner who (over Mrs. Johnson's objection) insisted on creating the notes representing only the bank-debt portion of Lease 5352 (Tr. 1/25/05 at 130-32), and it was Lehner who then refused to sign the note United Leasing prepared to represent the difference between the bank-debt portion of the lease and the full amount due. (Tr. 2/15/05 at 94-99.)

    It is difficult to believe that the Court cannot remember this aspect of Mr. Lehner's plan to steal United Refuse when, in its opinion in the adversary proceeding, the Court noted (although with regard to Lehner's suggestion that title be put in his name) that:

    Johnson, Dale Johnson, objected to Mr. Lehner's suggestion.  "He'll steal the company." That has been said so many times over the ten days of trial. It's almost prophetic from her mouth, "He'll steal the company." [Tr. 3/14/05 at 10.]

Motion ¶9 at 6-7.

[42]Mr. Sullivan is examining Ms. Johnson:

Q    Other than this one-page document, Mrs. Johnson, can you tell me what the first event was that you recall with respect to the takeover of Garcia's?

A    The Garcia deals were going bad, and Ed Shield said we needed to set up a company to run and operate this company, the Garcias.  He came up with the name of United Refuse LLC. Any company that he set up to do this always started with United.

    We had a meeting upstairs to set up this refuse LLC, and that's at the time that it was Ray, Ed Shield, myself and Jim Lehner.  We were – went up to Ray's office.  We were on the speaker phone with Jim Kane at Chaplin, Papa and Gone.  His office was going to do the paper work to set the company up, like they always did.

    Ed was going to be listed as the member of the LLC, and it's at that time when Jim Lehner said "No, you don't need to be on it.  You need to be arms-length away from it.  You need to put somebody else on there."

    So we told Jim Kane we'd just call him back, or Ray did.  He was really doing the talking.

(continued...)

known as "He'll steal the company" even though those were not Ms. Johnson's actual words.[43]  The

phrase, "He'll steal the company", captures the essence of United Leasing's theory of the case.  Its

theory was that Mr. Lehner set out to "steal" United Refuse from United Leasing and Mr. Shield

from the beginning and that all of his actions, including having himself named as the initial manager

of United Refuse, were part of his scheme.[44]  Mr. Lehner's theory of the case was different.  His

position was that Mr. Shield gave United Refuse to him, transferred it to him, or promised to transfer

it to him.  It was not a gift.  He paid for it as reflected in the notes and leases.

    The court did not embrace either theory.  It held that Mr. Lehner was named the sole

---

[42](...continued)

Q    Okay.

A    So Ray got another phone call he had to take, and Jim went to his office and Ed went downstairs to his office and I went with Ed.  I told him he really did not want Jim Lehner to be a member of the LLC, because he would try to take the company.

I reminded him that, you know, when he put him in charge of running the truck lot, he was telling everybody he owned it.  I said "That's a very bad idea."  He told me it would be okay.

So Ray got off the phone and we all went back upstairs.  Jim Lehner was in Ray's office and we were all there, and Jim Lehner told him, you know, "You need to be arms-length.  You know, put me on.  I'll do that as a favor for you."  So Ed agreed to let Lehner do the favor for him.  So then I just went back down to my office.

Q    Did you say anything to Ed, to Ed Shield in Mr. Lehner's presence, about taking the company away?

A    Yes, I did.  I told Ed, I said "You know, like I told you in your office, you don't want to put Jim Lehner as a member of this company, because he'll take it."  Jim said "I will not."

Then he just smiled his little smile.  I said "Well, put Ray on."  He said "Why?"  I said "Because you will take the company."  By then I was upset and I just went back to my office.

Tr. 1/25/2005 at 109-111.

[43]Ms. Johnson did not like or trust Mr. Lehner, a dislike and distrust that preceded the events to which she testified.

[44]*See* Motion ¶9 at 7 ("It is difficult to believe that the Court cannot remember this aspect of Mr. Lehner's plan to steal United Refuse"). *See also* United Leasing's counterclaim where it alleged that "While he was still working as an officer and employee of United Leasing, Mr. Lehner, with Mrs. Lehner, developed a scheme whereby they would seize ownership and control of United Refuse."  Counterclaim ¶32 at 9 (Adv.Proc. 0401196, Docket Entry 8).  United Leasing made the same allegations and additional claims in its complaint, *United Leasing Corporation and Edward H. Shield v. United Refuse LLC, James C. Lehner and Suzanne Lehner,* Adv.Proc. 04-1222 (Docket Entry 1).

manager of the limited liability company for the convenience of United Leasing when United Refuse

was organized and that he held his ownership interest as constructive trustee for United Leasing.

Ms. Johnson's testimony was important in reaching this conclusion.  In response to her statement,

Mr. Lehner acknowledged that the company was not his and that he was acting as manager for the

convenience of United Leasing.  This admission firmly established the initial trust relationship.

There was insufficient evidence to support Mr. Lehner's assertion that he later became the owner

of United Refuse in his own right.  The court never found that Mr. Lehner had a "plan to steal"

United Refuse.  Nor did it find that Mr. Lehner did not have such a plan.  Such a finding was

unnecessary and the court made no ruling on the issue.[45]

Paragraph 9 reflects United Refuse's and United Leasing's difficulties with the recusal

motion.  Much of their argument in this paragraph – and throughout their motion – is that the court

---

[45]The court's oral ruling was:

Johnson, Dale Johnson, objected to Mr. Lehner's suggestion.  "He'll steal the company."
That has been said so many times over the ten day of trial.  It's almost [prophetic] from her mouth,
"He'll steal the company."  Of course Mr. Lehner denied that and said:  I would not do that.  By
saying, I would not do that, he is acknowledging that he is holding, if he accepts the title and it's given
to him, as a constructive trustee for United Leasing. .   .

I do find that Mr. Lehner, James Lehner, held naked legal title without any beneficial
ownership to United Refuse from April, 2002.  He held it for the benefit of United Leasing and he held
it in constructive trust; and as a constructive trustee, he had all the duties and liabilities of a
constructive trustee.

The next issue though is the next period of time and that is the period of time that Mr. Lehner
said he acquired the beneficial ownership which is in the fall. .   .

Here the burden of proof is on Mr. Lehner, the fiduciary, to overcome the presumption of the
voidability of the transaction [transferring beneficial title from United Leasing to Mr. Lehner]. . . .

Here Mr. Lehner never proved the validity of the transfer of the beneficial interest to himself;
and I'm satisfied there never was an agreement to transfer the beneficial interest to him.  It was never
done.

Tr. 3/14/2005 at 9-12.

misstated the facts.  The problem is that United Refuse and United Leasing repeatedly rely on *their*

view of the facts.  The essence of the court's role is to determine the facts from the competing

arguments and conflicting testimony presented in court.  Their use of Ms. Johnson's testimony is

different from the court's use.  They use it to buttress their argument of a "plan to steal United

Refuse."  The court used it to establish the initial ownership of United Refuse.  The court's use of

the testimony was clear and explicit.  At trial, United Leasing's counsel in his role as a zealous

advocate had the right to use Ms. Johnson's statement as United Refuse and United Leasing now

use it; and, he did.  But, their present use – which is different from the court's use – does not create

a misstatement by the court or a ground for recusal.

United Refuse and United Leasing object to the court's comment that, "No one ever clearly

explained the purpose or necessity for such tracking notes."  Motion ¶9 at 6; Memorandum Opinion

at 4.  They then endeavor, unsuccessfully, to explain them.  The court's statement is nothing new.

On March 14, 2005, in delivering its oral ruling, the court stated: "The notes as so-called tracking

devices is an interesting concept.  I don't know what that means."  Tr. 3/14/2005 at 31.  The tracking

notes may be crystal clear to United Refuse and United Leasing, but they were not – and still are not

– to the court.[46]  United Refuse and United Leasing purport to buttress their argument about the

---

[46]There was a lot of testimony about the notes that were referred to as "tracking notes."  For the confusion
existing at United Leasing, see Mr. Cullen's testimony.  Tr. 2/15/2005 at 166-170.

Mr. Shield testified on direct examination by United Leasing's counsel, Mr. Sullivan:

Q      All right.  Do you know what the purpose of these is?
A      No.  Quite frankly, I looked at them last night, trying to figure out what in the world they
       were for other than a tracking device to track for some reason.  It reflects probably the debt
       at the time that –
Q      Where did you get the word, tracking device?  I have heard that before.
A      Well, he was only paying us – "he" means United Refuse and under his direction because
       he worked for United Leasing – could only pay us so much money; and maybe he wanted
       it for a tracking device to know.

(continued...)

meaning and significance of the tracking notes with citations to the transcripts.[47] The difficulty with their citations is that they are isolated bits and pieces of testimony favorable to them. They did not consider or discuss the rest of the testimony or the exhibits. The citations are to Mr. Cullen's and Ms. Johnson's testimony – two witnesses who were both employees of United Leasing – and constitute excerpts from 11 pages of testimony out of more than a thousand pages from a ten-day trial. Simply expanding the referenced citations to pages 76 to 93 and 159 to 171 of Mr. Cullen's testimony on February 15, 2005, and to pages 119 to 125 of Ms. Johnson's testimony on January 25, 2005, begins to paint a more complex picture.

United Refuse's and United Leasing's synopsis of the evidence does not fairly recognize the complexities presented at trial. They did not discussion the genesis of Lease 5352 or the later efforts to change it. United Leasing entered into equipment leases with its customers. It funded the purchase of the leased equipment, in part, with loans to United Leasing from banks. The banks typically took a security interest in the resulting equipment lease.[48] Garcia's had about ten leases with United Leasing, many of which were substantially completed at the time it defaulted. After recovering the equipment, United Leasing entered into a single lease with United Refuse for the equipment (principally trash trucks and trash containers) that had been leased to Garcia's, Lease 5352. The Garcia's leases had been funded by at least two different banks. This left United Leasing

---

[46](...continued)
Tr. 3/4/2005 at 74-75

[47]United Refuse and United Leasing do not cite to the official transcript, the copy filed with the court. The pagination in their copies differ from the official transcript. Their citations to (a) Tr. 2/1505 *[sic]* at 99; (b) *Id.* at 99-100; (c) Tr. 1/25/05 at 130-32; and (d) Tr. 2/15/05 at 94-99 should be (a) Tr. 2/15/2005 at 92-93; (b) *Id.* at 92-94; (c) Tr. 1/25/2005 at 122-125; and (d) Tr. 2/15/2005 at 87-94. The court will refer to the official transcript.

[48]There was testimony and exhibits relating to the titling of the trash trucks which were the subject matter of the leases and the liens on the certificates of title.

unable to give each bank a separate, first priority security interest in Lease 5352.  United Leasing

endeavored to separate Lease 5352 into two or three separate leases so that each bank could have

a security interest in a separate lease.  As a part of the effort to unravel Lease 5352, three separate

notes between United Refuse as maker and United Leasing as payee were created.  Mr. Cullen was

not fully involved in the transaction, but did change the date of two of the three notes – favorably

to United Refuse.  Other notes were created but Mr. Lehner did not execute them on behalf of

United Refuse.  Mr. Cullen testified that the three executed notes – the "tracking notes" – were not

effective because they only represented a part of the transaction and that Mr. Lehner would not

execute the remaining notes.  Notwithstanding this, payments were credited to the three notes as well

as Lease 5352.  There was also a question of what, if any, of the notes were actually entered into

United Leasing's accounting system.  There was also testimony of concern that if Lease 5352, the

intended revised leases and the notes were all booked, the same transaction would appear in United

Leasing's financial statements twice.  Some of this was simply the result of confusion.  However,

it raised the question of which notes and leases were valid obligations between United Refuse and

United Leasing and the extent of both the obligations and the security interests or leases.  The

tracking notes were a part of this milieu.  In light of the possible ratification of two of the three

tracking notes by Mr. Cullen's act in changing the date (favorably to United Refuse); the crediting

of payments against them as well as Lease 5352; the role of the tracking notes in the effort to split

Lease 5352 into three separate leases; and viewing the evidence in its entirety, the court was

unsatisfied about the purpose or necessity of the "tracking notes".  The court ultimately gave no

effect to the tracking notes because the evidence was unsatisfactory.

United Refuse and United Leasing chide the court for not remembering Ms. Johnson's

testimony and the court's use of it in its decision.  Motion ¶9 at 7.  The problem is that the court

remembers her testimony, how it used it in reaching and announcing its decision, and the

complexities and ambiguities of the "tracking notes."  By using Ms. Johnson's statement for a

different purpose than the court, re-arguing their case against Mr. Lehner and endeavoring to explain

the tracking notes, they evince disagreements with the court over the significance of the testimony.

They use selective portions of the testimony to argue their motion.  The court considered all of the

evidence to decide the case.  They are entitled to argue their position, but the court adjudicates the

matter.  Dissatisfaction with the court's ruling is cause for appeal, but not recusal.

**United States Trustee's Role and United Leasing's Knowledge of Non-payment of D.C.**

**Sales Taxes.**  United Refuse and United Leasing state that the court did not address the objections

raised by the United States Trustee.  The United States Trustee

> not only formally joined in the objections of United Refuse and United Leasing but
> participated vigorously in the argument of the matter.  Not once in the entire opinion
> is this objection even mentioned, must less is any of the arguments of counsel for the
> U.S. Trustee.

Motion ¶1 at 2-3.

The United States Trustee did participate in the proceeding.  United Refuse's and United

Leasing's assertion suggests that the court did not address the United States Trustee's objections or

that his arguments were not considered.  The fact of the matter is that Frank J. Bove, the trial

attorney from the United States Trustee's office who handled the matter, filed a six-line objection

that merely stated that the United States Trustee "joins in and adopts the arguments set forth in the

objection filed" by United Refuse and United Leasing.  Objection by United States Trustee to

Application of Frank & Company for Allowance of Compensation and Expenses (Docket Entry

309).  He raised no new objection.  His objection neither elaborated upon nor expanded any of the

61

objections United Refuse and United Leasing  made.  He participated in the hearing.[49]  The United

States Trustee did not join in United Refuse's and United Leasing's post-hearing motion to conform

its pleading to the evidence.  The United States Trustee did not file a motion for reconsideration.

The United States Trustee did not join in the present motion.  In addressing the objections and

arguments raised by United Refuse and United Leasing, the court addressed everything that the

United States Trustee joined in and argued.

In addition to incorrectly asserting that the court did not address the United States Trustee's

objections, United Refuse and United Leasing  also assert in the third part of their motion that the

court's discussion of Frank & Company's duties overlooks the United States Trustee's knowledge,

and is, therefore, wrong.  Motion at 30; Memorandum Opinion at 21-30.  In construing the

employment order, the court looked to United Leasing's conduct under the order to compare it with

its assertions as to Frank & Company's obligations.  The court concluded that United Leasing knew

of United Refuse's requirement to pay D.C. sales taxes and knew that it was not doing so.  Its

conduct was consistent with Frank & Company's understanding of the order which was that there

was no such obligation.  The court reached the conclusion that United Leasing knew of the

requirement to pay D.C. sales taxes because United Leasing had a substantial history with Garcia's.

United Refuse and United Leasing described Garcia's as a "long-time" customer;[50] the relationship

as more than ten years in duration; and Garcia's default as "major."  Disclosure Statement at 5.

---

[49]Whether Mr. Bove's participation in the matter should be characterized as "vigorously" or whether another adverb is better suited is a matter of no moment and may well depend upon whether one looks at participation at trial or in closing argument.  Mr. Bove is a competent attorney who well represents the United States Trustee and did so in this instance.  But, he did not raise any issue, at trial or in argument, that United Refuse or United Leasing did not raise.

[50]In response to Mr. Sullivan's question, Mr. Cullen testified that Garcia's had been a long-time customer.  He said, "Since 1988.  So yes, they had been, for many, many years.  They went through a bankruptcy in the early '90s. Ed [Shield] stuck with them through that.  It was a very long-term relationship.  Absolutely."  Tr. 2/15/2005 at 48.

(Docket Entry 216).  The defaults, the unwillingness of the Garcia brothers to sell the business and United Leasing's inability to obtain financial information led to the exercise of United Leasing's stock rights, which it did in early April 2002 when United Refuse was organized.  *Id.* at 6.   United Leasing knew that Garcia's operated in Northern Virginia and the District of Columbia.  *Id.* at 5. United Leasing knew that a substantial portion of Garcia's revenue derived from its D.C. operations. *See* Testimony of Raymond C. Cullen, Tr. 2/15/2005 at 65-66.  United Leasing knew that the trucks could not operate in the District without certain decals that were not going to be issued because of non-payment of taxes, including sales taxes, by Garcia's.[51]  United Leasing placed, first, Mr. Havel, and then Mr. Lehner in charge of daily operations of United Refuse.  During the first year, there was no indication of conflict between Mr. Lehner and United Leasing.  He regularly went to United Leasing's office and for a two-week period filled in for Mr. Shield when he went on vacation. During this period, United Leasing was fully informed of the financial condition of United Refuse, including that United Refuse was paying D.C. sales taxes.[52]  United Refuse's financial condition was

---

[51]This was  one of the reasons for moving the titles to the trucks to United Refuse.

[52]Edward Shield testified on cross-examination by Mr. Wade:

Q      All right.  Now, did you make any attempt to determine if the tax returns were appropriately filed for United Refuse?
A      What do you mean?  When Mr. Lehner said it was his company?
Q      At any time.
A      Up to that time, he was instructed to get the financials done, to get me the statements, and I intended to file the return but it was going to show losses because the company was losing money; and so, yes, I expected him to give me those statements so I could give them to my accountant to file it, the same way other accountants had done for me.
Q      Did you make an attempt to determine if proper withholding taxes were paid on a semi-monthly basis?
A      Yes.  We went over the cash flow with Jim on what funds were available and how – and we would talk about the fact he just had enough money to pay the landfill that week or he paid them half and hoped to pay them next week.

    *I was in constant discussions with Jim about this business.  Remember this is a heck of a lot of money.  It's not just ten or 15 thousand dollars.*

(continued...)

very important.  United Leasing was seeking to sell the trash business as a going concern.  It had

engaged in negotiations with BFI while the Garcia brothers controlled Garcia's and when they

resisted selling, replaced them.  A sale as a going concern requires financial statements.  Both United

Leasing and any potential buyer, including BFI, needed to know and understand the business.

Garcia's, then United Refuse, had an in-house bookkeeping department headed by an accountant.

Its financial records were maintained on a computer system.  It had an outside accounting firm.  All

of these factors led the court to find that United Leasing knew that Garcia's, and then United Refuse,

operated in the District of Columbia and that it was obligated to pay District of Columbia sales

taxes.

The importance of this knowledge was that United Leasing could easily tell from the weekly

and monthly reports submitted to it under the cash collateral orders and the reports submitted to the

United States Trustee that D.C. sales taxes were not being paid.  United Leasing had a significant

stake in the financial health of United Refuse.  It had sought to sell the business to BFI for $3 million

and eventually sold it for $2.5 million.  It had every incentive to read the reports.  It complained

when it felt that the reports were not sufficient or did not contain the requisite information.  It should

have read the reports.  It did read the reports.  It carefully reviewed them.[53]  It knew that United

---

[52](...continued)
Tr. 3/4/2005 at 144. (Emphasis added.)

[53]In asserting that United Leasing did not know of the nonpayment of post-petition D.C. sales taxes, United Refuse and United Leasing stated:

When United Refuse filed for bankruptcy in April 2004, and after it had filed its schedules, United Leasing was certainly on notice that United Refuse had an unpaid, prepetition obligation to the District of Columbia for sales taxes, from which it would have been on notice that United Refuse's business required the payment of such sales taxes.  But for the Court then to state that United Leasing *knew* that D.C. sales taxes were *not* being paid *during the bankruptcy* because sales taxes "did not appear on the monthly reports filed with the United States Trustee or on the cash collateral reports" is tantamount to saying that United Leasing should have conducted (**in fact *did* conduct**) an ongoing

(continued...)

Refuse was not operating within its budget.[54]  Motion ¶15 at 10.  Now it claims that it did not ***know***

about the non-payment of D.C. sales taxes.  The court concluded differently.[55]

The manner in which parties operate under an agreement or court order that they draft is a

factor in interpreting the meaning of the agreement or court order.  United Leasing did nothing with

this knowledge with respect to Frank & Company.  It did not attempt to compel Frank & Company

to perform a service that it now claims Frank & Company was obligated to perform all along.  It did

not raise this objection at the hearing on Frank & Company's interim fee application.  All strongly

suggest that United Leasing's understanding of the orders was different from the position it argues

today.[56]

---

[53](...continued)
audit of monthly reports to the United States Trustee in which Lehner declared under penalty of
perjury that sales taxes were being paid as due.

Motion at 26-27. (Italics in original; bold added.)

United Leasing demonstrated the concerns that arose out of the reports submitted by United
Refuse—that it was operating *way over* budgeted expenses, *way under* budgeted income, and
operating at negative cash-flow. (DE 118, discussed at page 10, ¶15, *supra*.)

Motion at 28. (Italics in original.)

[54]"United Leasing complained because the debtor [United Refuse under the control of the Lehners] .  .  . (b)
was *way* out of compliance with even the preliminary budget it had submitted (up to 30% over expenditures and 137%
under income), and (c) was operating on negative net cash flow. (DE 118)."  Motion ¶15 at 10 (emphasis in original).
Docket Entry 118 is United Leasing's motion to prohibit the use of cash collateral filed on November 8, 2004 and
withdrawn with leave to renew on November 23, 2004. (Docket Entries 118 and 122).  It is very comprehensive and
reflects a careful review of the financial documents it had.  There were 15 exhibits to the motion which contained about
41 pages of financial data such as proposed budgets, general ledger pages and the like.

[55]A recusal motion is not the vehicle to reargue issues lost, but to show the appearance of bias.  Differences of
opinion on factual findings between the court and counsel are rarely a basis for showing an appearance of bias.

[56]United Refuse simply did not have the cash resources to pay its cash flow obligations which included the D.C.
sales taxes.  United Leasing's analysis of United Refuse's operations in its November 8, 2004 motion to prohibit the use
of cash collateral (Docket Entry 118) clearly shows this.  At that point, United Leasing had several options: remain silent
about the non-payment of D.C. sales taxes, advance further funds to pay the taxes or close United Refuse down.  Had
it pursued its motion to prohibit the use of cash collateral, it placed the going concern value of United Refuse as risk.
Neither United Refuse nor United Leasing liked the court's the idea of a chapter 11 trustee.  A chapter 11 trustee would
have ascertained the difficulties and may well have requested conversion to chapter 7 or pressed for a prompt sale.

The United States Trustee's understanding of the order and its conduct in light of the monthly United States Trustee reports was not discussed in the Memorandum Opinion. There was nothing to discuss. There was no evidence with respect to these matters as to the United States Trustee. Whether it knew or did not know of the debtor's obligation to pay D.C. sales taxes is not known.[57] The absence of this evidence precluded the court from considering it in interpreting the court's order and determining Frank & Company's duties. However, that did not diminish the significance of United Leasing's conduct and its apparent understanding of the employment order. It was the single largest and most active creditor in the case and asserted its ownership of the debtor.

**Paragraph 3.**   United Refuse and United Leasing state:

> 3. On page 2 of the MO, the Court recites that "One participating event triggering the revised approach [supposedly an asset sale] was a claim by the District of Columbia for unpaid *sales* taxes." (Emphasis added.) The words "sales" taxes appear only once in the evidence, in the testimony by Mr. Lerner (Tr. Jan. 31, 152), as such a "participating event." Every other reference to such taxes was only as "taxes," not "sales taxes." (See, e.g. Tr. 2/1505 at 70, 169, 170; Tr. 2/1805 at 53, 54; Tr. 3/4/05 at 142.) Whether the taxes that resulted in United Leasing's "revised approach" were sales taxes or not was not an issue in that adversary proceeding—with the result that there was no reason to cross-examine the witness on whether the taxes were sales taxes or some other kind of taxes; it made absolutely no difference in that proceeding.
>
> The Court, significantly, did not find the taxes to have been *sales* taxes (Tr. 3/14/05 at 31-32)—because the *type* of taxes was irrelevant to the decision to take a "revised approach."

---

[57]This office of the United States Trustee system is one of the oldest. It was part of the initial pilot project when the Bankruptcy Code of 1978 was enacted. It is well-experienced in handling its monthly reports. It holds an informational meeting with the principals of every chapter 11 debtor to explain what is expected of them in a chapter 11 proceeding and to explain the required reports. It conducts the first meeting of creditors. It reviews the schedules and statement of financial affairs. It monitors the filing of monthly reports. It has the ability to ascertain at the commencement of the case the type of taxes a debtor is responsible for paying and the taxing authorities to which taxes are payable. It has the ability to monitor monthly reports to assure that those taxes are reported as paid and that appropriate documentation is filed evidencing payment. It is not known if that was done in this case and was, therefore, not a factor in the court's decision.

Motion at 3-4.[58]

This is what the court wrote:

> United Leasing later decided that it was better to take direct ownership of the trash company's assets because a stock sale of Garcia's was simply not realistic. There were simply too many known and unknown liabilities that would follow such a sale. An asset sale, on the other hand, was more realistic.  The assets, in a properly managed sale, could be sold free and clear of the corporate liabilities of Garcia's and result in a larger recovery by United Leasing.  One precipitating event triggering the revised approach was a claim by the District of Columbia for unpaid sales taxes. Most of Garcia's business was conducted in the District and the District threatened to prohibit Garcia's from operating its trucks in the District unless the sales taxes were paid.  The response was to move the assets to United Refuse.  When the District continued to threaten to prohibit the trash trucks from operating in the District, United Refuse successfully convinced the District that it was a new entity that was not liable for Garcia's sales taxes.  United Refuse continued to operate in the District without paying Garcia's unpaid sales taxes.

Memorandum Opinion at 2.

The thrust of United Refuse's and United Leasing's complaint seems to be that the taxes that precipitated[59] United Leasing's decision to take direct ownership of Garcia's assets through United Refuse, rather than merely relying on inserting United Refuse as manager of Garcia's, were not sales taxes, but some other type of taxes.  That is losing sight of the forest for the trees.  The point the court was making was simply that United Leasing changed its direction.  United Leasing had a problem.  In an effort to solve its problem, it first exercised its stock rights to manage and control

---

[58]The citations in United Refuse's and United Leasing's motion refer to copies of  transcripts not filed with the court. Their citations, cleaned up, are:  (a) Tr. 1/31/2005 at 152; (b) Tr. 2/15/2005 at 70, 169 and 170; (c) Tr. 2/18/2005 at 53 and 54; (d) Tr. 3/4/2005 at 142; and (e) Tr. 3/14/2005 at 31-32.  In the official transcripts filed with the court, those citations are:  (a) Tr. 1/31/2005 at 111-112; (b) Tr. 2/15/2005 at 65-66, 157-158 and 158-159; (c) Tr. 2/18/2005 at 49-50 and 50-51; (d) Tr. 3/4/2005 at 131-132; and (e) Tr. 3/14/2005 at 29.   The court will cite to the official transcripts, that is, the transcripts filed with the court.  For clarification purposes, two transcripts for February 18, 2004 were filed with the court, one on March 2, 2005 (Docket Entry 135) and the second on May 3, 2005 (Docket Entry 170).  The latter states on the cover "Revised 5/3/05 Pagination" and "Corrected Copy".  Counsel cites to the "Corrected Copy" as does the court.

[59]United Refuse's and United Leasing's use of the word "participating" twice, both times ostensibly quoting the court, is odd.  The court used the word "precipitating", the word one would expect in this context.

Garcia's, but this proved ineffective.  While United Leasing pursued a sale with BFI, no sale by

Garcia's – either a stock sale or an asset sale – was likely to be feasible because of Garcia's financial

circumstances.  The better approach for United Leasing was to invoke its creditor remedies, obtain

clear title to Garcia's assets, and resell the assets or sell the reconstituted business as a going

concern.  The immediate problem that caused United Leasing to do this  was Garcia's District of

Columbia operations.  On direct examination by Mr. Sullivan, Mr. Cullen testified as follows:

> Q    The record already shows that the vehicles that United Leasing repossessed
> that were in its own name or foreclosed upon and transferred to your name
> were then transferred to United Refuse.  Why?

> A    That was driven by a couple of things.  Understand, my responsibility in this
> period was shepherding the BFI sale sale *[sic]* through.  We knew that we
> would [have] to have the title in their names.   They were not particularly
> interested in the equipment, but, of course, they'll take it.  And so they
> needed [it] to be in their names.

> And then Rich or – Rich Havel or Jim Lehner identified that we had a real
> problem with some tax liens in the District of Columbia.  That is to say, there
> were some substantial tax liens out on the Garcias, and we had to
> differentiate that we weren't, in fact, the Garcias and we had purchased the
> assets, not the liabilities.

> And so those two things drove it.  And Aurelio [Garcia] and, I guess, Rich
> and our  D.V. guy – a guy named Tim Miller, who is our senior salesman –
> got that done for us.  A very effective job.

> Q    When did you all find out about these tax liens?

> A    I'm a little unclear on that, Mr. Sullivan.  I know there were taxes owed to
> the District.  And, remember, the District was a very substantial part [of
> Garcia's business].  I think they represented over 50 percent of the revenues
> for Garcia's.

> And the city was not going to permit us to re-permit – and I think September
> was a re-permit month – unless this issue was deal with – August, September,
> something like that.  So, I mean, we would have literally been out of business
> in some short period of time in the District, if we had not – and Jim Lehner
> had something to do with this – convinced the city that this was a separate

entity; that this was not Garcia's.

Testimony of Raymond C. Cullen, Tr. 2/15/2005 at 65-66.

United Refuse's and United Leasing's criticism of the court on the detail of the type of taxes involved, entirely misses the point of the paragraph.  Their criticism fails to recognize that the court made a finding of fact, a finding with which they apparently disagree.  They have a different theory of the case and weigh the evidence differently.  The court set out its reasons for believing that United Leasing knew of the non-payment of the D.C. sales taxes.  Differences between what they advocated and what the court found may be grounds for reconsideration or appeal, but it is not grounds for recusal.

United Refuse and United Leasing fail to recognize that this finding was made in this matter in light of the findings made in prior matters and the evidence presented here.[60]  At the hearing on

---

[60]The court commented twice on taxes in its March 14, 2005 decision.

The first is on page 9 where the court discussed the reasons United Refuse was first organized.  The court stated: "There were significant unpaid withholding taxes.  There were significant taxes payable to the District of Columbia . . . ."  Tr. 3/14/2005 at 9.  The second is on page 29 where the court is discussing the parameters of its ruling so that absent third parties are protected.  The court stated:

Who may they be?  D.C. taxes.  I'm concerned that when title was transferred in September 2002 the reason given that it was necessary was that the cars had to receive a decal from the District of Columbia where they operate the following month and without that decal they couldn't operate and the whole house would fall down.

*Id.* at 29.

Whether a finding that there were unpaid sales taxes was explicit, implicit or not made, the evidence in the adversary proceeding supports such a finding.  On direct examination by Mr. Wade, Mr. Lehner testified as follows:

Q      Now, do you know why it was that United Refuse was established to begin with?
A      Yes.
Q      Explain to me.
A      Ed Shield wanted a company – a separate company – because there was so much debt that was levied on Garcia's, Inc.  The IRS had about $450,000 out there.
Q      Do you know what the nature of the IRS obligations were?
A      I believe it was payroll tax.
Q      Payroll taxes.  Okay.  Any other governmental obligations?

(continued...)

Frank & Company's final fee application, United Refuse and United Leasing specifically raised the

issue of non-payment of sales taxes during the Lehner's tenure as managers of United Refuse and,

Frank & Company's alleged fraud in not reporting the non-payment and the inaccurate monthly

financial reports.  The court carefully considered the reports and the other evidence relating to the

non-payment of sales taxes and concluded that the sales taxes had not been paid during their tenure.

The court also concluded that United Leasing knew of the non-payment for the reasons discussed,

among others, the long relationship between United Leasing and Garcia's and the scheduling of

unpaid pre-petition D.C. sales taxes by United Refuse on its schedules.  The long relationship with

---

[60](...continued)
A       Yes.  D.C. had 750,000 for sales and use tax.
Q       And what else?
A       The state of Virginia, with the fuel tax, had 96,000.

Tr. 1/31/2005 at 112 (Docket Entry 127).

Mr. Shield testified about transferring the trucks to United Refuse.  On direct examination by Mr. Sullivan, Mr. Shield testified as follows:

Q       Now, the title vehicles transferred to United Refuse?
A       Well, two important reasons.  One is, Garcias hadn't paid anybody, not only not paid United Leasing but they had creditors everywhere that they hadn't paid for months, landfills and everything else.

        And one is, we were surprised, thought someone would probably put that company into bankruptcy, involuntarily.

        Second is, we were operating the company and we needed to get the titles into United Refuse LLC because a lot of the business was done in Washington, D.C.

        In Washington, D.C., they had said that they were owed over – and I'm guessing, about $700,000 in fees or charges against the Garcias that they hadn't paid, and each truck had to have a little sticker on it saying it was okay, like a decal, to be able to function in the city limits of D.C.

        And Jim and Mr. Havel went and talked to them and said: Well, look, we're a new entity and we had nothing to do with the old bills and we will pay you what is owed on a timely fashion, going forward.

Tr. 3/4/2005 at 53-54.

Garcia's included United Leasing's knowledge that Garcia's operated in the District of Columbia

and its familiarity with Garcia's financial data.  Familiarity with Garcia's financial data included

knowledge that Garcia's had not paid all D.C. taxes when due, including D.C. sales taxes, and that

this, in turn, had precipitated United Leasing's action in recovering Garcia's assets.

### Paragraph 18, "A Slip of the Pen"

United Refuse and United Leasing state:

> 18. The Court continues (in footnote 6) by stating that "The first time
> the issue was raised with Frank & Company was in August 2005
> more than a month after United Leasing had sufficient funds on hand
> to pay Frank & Company in full and had stopped honoring its
> commitment to make monthly payments."  Of course, it was United
> *Refuse*, not United *Leasing*, that had sufficient funds on hand to pay
> the interim application of Frank & Co.  And it was United *Refuse*, not
> United *Leasing*, that had made the "commitment" to make monthly
> payments. In this slip of the pen, the Court fully disclosed the object
> of its bias. In addition, the Court *again* omits the testimony of Mr.
> Norment that he asked for all the records of Frank & Co. in *May*
> 2005. In May 2005, United Refuse *did* pay the $2,500 installment.
> (MO at 12, n. 6, citing the May 2005 Monthly Report of United
> Refuse.)  *Non*-payment of the installments began when Mr. Norment
> got *nothing* from Frank & Co. in response to his request.

Motion ¶18 at 11-12. (Italics in original.)

The quote in United Refuse's and United Leasing's motion of the court's Memorandum

Opinion is wrong.  United Refuse and United Leasing substituted "United Leasing" for "United

Refuse" in line three, above.  It is correct in the original, the court's Memorandum Opinion.  The

court does not usually note typographical errors.  It is difficult to catch all of them, the meaning is

usually clear, and they rarely make a difference.  Here, however, the typographical error is the basis

of for an entire paragraph that directly addresses their central argument.  And it is wrong.

**Ulterior Motives.**

It is obvious that United Refuse and United Leasing do not like the court's December 20,

2006 Memorandum Opinion.  (Docket Entry 392).  They want it withdrawn.  The prayer for relief

in their motion is revealing.  It asks that this judge recuse himself, that the Memorandum Opinion

be withdrawn and that the order be vacated.  These remedies are to be expected.  If an injustice has

been done, it must be undone. They argue that the course of justice was perverted.  "American

jurisprudence is based on adjudication of facts presented by opposing parties to an impartial judge,

not a prosecutorial judge looking for facts from whatever sources he might deem appropriate and

adjudicating them himself."  Motion at 31.  In that case, the matter needs to be reheard by another

judge.  No one can argue with that.

But, United Refuse and United Leasing offer an alternative.  In their words:

> In the alternative, and solely because of the time and effort involved in a
> retrial, United Refuse and United Leasing request that the Court vacate its MO
> [Memorandum Opinion] in its entirety, vacate its Order, and enter an order, with
> only the findings necessary to its order, granting Frank & Co. the fees and expenses
> claimed less (a) the amount conceded by its counsel as not for the benefit of United
> Refuse and less (b) the sum of $1865.00 paid by United Refuse to Frank & Co. for
> services rendered to the Lehners.

*Id.* at 33.

Twelve weeks later when the motion was before the court for argument, United Refuse and

United Leasing were willing to pay Frank & Company everything it requested in its fee application,

if only the Memorandum Opinion were withdrawn.  When the case was called, counsel for United

Leasing, Mr. Sullivan, in response to the court's request for time estimates, stated:

> MR. SULLIVAN:     My presentation will be very short. Your Honor, I
> wonder if it is within the Court's wishes that counsel
> meet the meet with the Court in chambers.

> THE COURT:        No.
>
> MR. SULLIVAN:     Thank you.
>
> THE COURT:        There is no reason to meet in chambers.
>
> MR. SULLIVAN:     There is a – well, there is, but –
>
> THE COURT:        Is there a personal matter that you want to present in
>                   chambers that should not be presented in open court?
>
> MR. SULLIVAN:     No, it's a method for resolving this matter.
>
> THE COURT:        Well, you can put that on the record.  There is nothing
>                   to prevent you doing that.

Tr. 3/27/07 at 4-5.

The court recessed for lunch.  After lunch the case was called again.  Again, Mr. Sullivan,

counsel for United Leasing:

> MR. SULLIVAN:     May it please the Court.
>
> THE COURT:        You had indicated – did you resolve this?  Is that what you
>                   wanted to address?
>
> MR. SULLIVAN:     No, Your Honor, we haven't resolved it.  We thought there
>                   was a means to resolve it.  I do think that there are two means
>                   to resolve it.  One is to state that we have a check in the
>                   amount of the order, and we are prepared to give it to Mr.
>                   King [counsel for Frank & Company]. The only thing that
>                   stands in the way is the Court's memorandum opinion.  The
>                   memorandum opinion is so devastating to other interests of
>                   United Leasing, and the findings that the Court made will
>                   come back and bite us very, very hard.  And I don't believe
>                   that they are warranted, but that is set forth in my brief
>                   already.  Were the Court to vacate the opinion, we would
>                   immediately withdraw our objection and pay the money.  But
>                   that appears not acceptable to counsel for Frank & Company.
>                   They, for some reason, like the opinion and –
>
> THE COURT:        Well, let me make it very plain to you why that is an inappropriate
>                   and unavailable route.

73

*Id.* at 6-7.  When grounds for recusal exist under 28 U.S.C. §455(b), the parties may not waive them and the judge must recuse himself.  28 U.S.C. §455(e).  Here, although United Refuse and United Leasing only referenced §455(a) in their motion, the allegations are ones of actual bias.  Neither alternative suggested by United Refuse and United Leasing in their motion or at the hearing are available.  Once the issue of actual bias or, even the appearance of bias, is raised, it must be addressed and resolved.  Section 455(b) properly limits the resolution of a §455(b)(1) motion to one of two outcomes: recusal or no recusal.  There is no third alternative.  There are no negotiations.  There is no withdrawal of the motion for the sake of expediency.

Other indications that it is the Memorandum Opinion and not the judge to which United Refuse and United Leasing object are its other actions and inactions in this case.  In particular, the court announced its decision in *United Refuse LLC v. James C. Lehner and Suzanne Lehner,* Adv.Proc. 05-1551 on August 16, 2006.  (Transcript of Hearing, Docket Entry 46).  Both parties sought reconsideration which is presently under advisement pending resolution of this motion.  They responded to additional inquiries from the court concerning the matter notwithstanding that they had already filed this recusal motion.  Neither United Refuse nor United Leasing has taken any action in that proceeding to seek recusal of this judge even though it is quite clear that they assert that this judge is biased against them.[61]  In addition, they filed a Motion to Reopen Evidence on February 15, 2007 (Docket Entry 50)[62] and argued it on April 10, 2007 (Docket Entry 63), also without consideration of this motion.  Quite clearly, if the recusal motion is granted, the court must recuse

---

[61]"All of this leads to but one conclusion: that the trier of fact in this contested matter was inexcusably biased against United Refuse and United Leasing.  It stretched – not only the law, not only its role in the adversarial process, but its required impartiality as a judicial finder of facts – to reach a result not so much *for* Frank & Co. (although there is that) but *against* United Refuse and United Leasing."  Motion at 32.  (emphasis added.)

[62]The gist of the motion is that there is newly discovered evidence.

itself from all matters in this bankruptcy case, including all adversary proceedings.

United Refuse and United Leasing appear to argue that United Refuse's non-payment of the D.C. sales tax on the effective date of the plan is the genesis of the court's bias.  But, the court's rulings after the issue surfaced are the same as before the issue surfaced, thus belying the argument that the issue affected any of the court's rulings or that there was any bias.  The first ruling was in *United Refuse LLC v. United Leasing Corporation,* Adv.Proc. 04-1196 on March 14, 2005. (Transcript, Docket Entries147 and 183).  The second was in *United Refuse LLC v. James C. Lehner and Suzanne Lehner,* Adv.Proc. 05-1551 on August 16, 2006.  (Transcript, Docket Entry 46).  The third was the court's Memorandum Opinion of December 20, 2006 in the bankruptcy case concerning Frank & Company's final fee application.  (Docket Entry 392).  The order to pay the D.C. sales taxes was entered on August 24, 2006 (Docket Entry 375) and a second order granting a motion to alter or amend in part on August 29, 2006 (Docket Entry 381) along with a Memorandum Opinion dated August 29, 2006.  (Docket Entry 380).

The issue of United Refuse's non-payment of D.C. sales taxes at the time of the first ruling on March 14, 2005 did not exist.  The issue did not arise until August 12, 2005, when the joint chapter 11 plan was confirmed.  (Docket Entry 225).  The matter probably first came to the court's attention during the second trial in July 2006.  The court knew of the issue when it announced its second decision on August 16, 2006, but had not held the hearing on it.  The hearing was held on August 22, 2006.  It was specifically addressed in the August 29, 2006 Memorandum Opinion.  The decision on Frank & Company's final fee application was December 20, 2006.  Nothing in the December 20, 2006 Memorandum Opinion concerning the non-payment of D.C. sales taxes was new.  It substantially repeated the August 29, 2006 Memorandum Opinion from which no appeal

was taken and the other discussions in the December 20, 2006 Memorandum Opinion followed those

of the March 14, 2005 and August 16, 2006 decisions.  Thus, the recognition of the non-payment

of D.C. sales taxes had no effect on the December 20, 2006 Memorandum Opinion.  If United

Refuse and United Leasing were serious about the recusal motion, it should have recognized the

issues giving it pause long ago because the same rulings were made in connection with an earlier

decision.  In light of the consistent rulings by the court, filing the recusal motion at this time

corroborates that their concern is not with this judge, but with this decision.


### Conclusion – Recusal Motion

The test for recusal is whether "another with knowledge of all of the circumstances might

reasonably question the judge's impartiality." *In re Beard,* 811 F.2d at 827.  "A judge is not

disqualified because his familiarity with the facts of a case stem from his judicial conduct in

presiding over earlier proceedings." *Id.* (*citing United States v. Parker,* 742 F.2d 127 (4th Cir. 1984).

United Refuse and United Leasing recognized that disagreement with the court's findings

of fact and conclusions of law is not sufficient to create the appearance of bias.  It is for that reason

they sought to find numerous errors.  From that predicate, they endeavored to make the argument

that the cumulative nature of the errors was not the result of error itself, but of bias.  The problem

is that the so-called "catalog" of "misstatements and omissions" is neither.

United Refuse and United Leasing sought to create "misstatements" by using words

differently than the court.  In paragraph 13 they argued that the court's use of the word

"consolidated" was error.  In paragraph 14 they argued that the court mislabeled their joint chapter

11 plan as a "liquidating" plan rather than a "reorganization."  In paragraph 21, they took the word

76

"complaint" out of context.  They objected to the court's discussion of the Garica's transactions and the United Refuse transactions throughout their motion because the court did not clearly label them in the manner they labeled them.  The court made clear that whatever the label, the court was not determining their substance.  The court's language was benign and was consistent with the unresolved question of the substance of the transactions.

United Refuse and United Leasing sought to create issues where none exist.  They complained that the court ignored the United States Trustee's objections when, in fact, he only seconded their objections.  By addressing United Refuse's and United Leasing's objections, the United States Trustee's objections were necessarily addressed as well.  Motion ¶11.  They complained about the recitation of the pre-petition litigation in state court, the essence of which was correctly recited by the court in its Memorandum Opinion and by them in their joint disclosure statement.  Neither recited every detail, every twist and turn.  Both accurately set the stage for the bankruptcy filing and the issues presented in this court.  Motion ¶12.

United Refuse and United Leasing sought to make the trivial significant.  Does it matter who filed the first adversary proceeding, United Refuse (then controlled by the Lehners) or United Leasing?  Does it matter whether the two adversary proceedings were technically "consolidated" or practically consolidated in an ad hoc manner?  Does it matter whether the chapter 11 plan is labeled as a liquidation or a reorganization?  Does it matter whether a judgment was entered or only announced, particularly where in the same sentence, the court notes that the parties sought reconsideration which was under advisement?  Motion ¶¶ 13, 14 and 31.

United Refuse and United Leasing presented arguments that cause the court concern.  They only mentioned half of their own objections to the debtor's reports in criticizing the court's

comments on the weekly reports in paragraphs 15 and 21.  They inaccurately quoted the court's memorandum opinion, using "participate" for "precipitate" and reversing "United Leasing" and "United Refuse" in paragraphs 3 and 18.  They presented the court in a false light in paragraph 15 ("[T]he court implies that United Leasing was simply a "complainer" without reason.") and paragraph 12 (use of the word "attack").  In paragraph 22 they relied on their memories rather than the transcript, and in the process failed to address the reasons for the court's rulings, the relevancy of the inquiry at that time and the fact that the court set a separate hearing to address the matter. Notice of Filing Excerpts at 1 (Docket Entry 415).  They presented bits and pieces of evidence from the trial, suggesting that the court erred in not seeing it the same way they did.  An example is Ms. Johnson's "He'll steal the company" statement in paragraph 9.  They accused the court of not considering their legal argument that D.C. sales tax not paid by United Refuse during the Lehner's tenure were not required to be paid on the effective date of the plan even though the argument was never fully developed and post-dated the court's rulings while not recognizing their own disclosure problem.  *See* Motion at ¶22(g).  The assertions of "repetitive excoriation" (Motion at 2) and "egregiously disproportionate" criticism (Motion at 24) of United Refuse and United Leasing are plainly not supported.

Finally, there is their candid admission at the hearing on the recusal motion.  They were prepared to pay Frank & Company everything it asked for in its fee application.  "The only thing that stands in the way is the Court's memorandum opinion.  The memorandum opinion is so devastating to other interests of United Leasing, and the findings that the Court made will come back and bite us very, very hard.  And I don't believe that they are warranted, but that is set forth in my brief already.  Were the Court to vacate the opinion, we would immediately withdraw our objection

and pay the money." Tr. 3/27/2007 at 6-7.

The essence of United Refuse's and United Leasing's argument is that:

> In this case, a reasonable person need not even know the facts of the case to question the impartiality of the Court – it is so evident on the face of the MO that it screams out at any unbiased reader. *Knowing* the facts of the case, however, makes the impartiality of the Court hit a reasonable person like a ton of bricks.

Motion at 33.  (emphasis in original).

Of course, knowledge of the facts is an integral part of the standard for recusal.  After a reasonable person reads the record and has a knowledge of the facts, would he, in the quiet of calm reflection, conclude that the Memorandum Opinion "screams" out at him, or that the motion is simply sound and fury?  A reasonable person with knowledge of the facts would reject United Refuse's and United Leasing's arguments.

## II.  Reconsideration

The court cannot within a Memorandum Opinion of reasonable length address every assertion made by United Refuse and United Leasing.  Those selected above should be enough to guide a reasonable person through the rest.  United Refuse and United Leasing seek, in the alternative, reconsideration.   Reconsideration is different from consideration of a recusal motion.  While they do not explicitly set out those matters that they feel the court should reconsider, the thrust of their comments is clear.  Most of their comments revolve around three principal issues, the meaning of the word "audit"; the requested fee reductions or set-offs; and the adequacy of time records.

**Audit.** United Refuse and United Leasing argue that the court was mistaken in understanding their position that the use of the term "audit" in the employment application and order required a full

79

audit of United Refuse's books and records to be made by Frank & Company. It acknowledges that the employment order did not require such an audit.[63] The court held that the term "audit" was not used in its technical meaning. "The term 'audit' was used more casually; it meant the services the debtor needed to determine the liabilities between it and United Leasing." Memorandum Opinion at 23. "The term 'audit' does not include an audit of the financial statements of United Refuse. Frank & Company was expected to, and did, investigate and analyze the leases, notes and liens between United Refuse and United Leasing. The order used the term 'audit' in this sense only." *Id.* at 26. United Refuse and United Leasing appear to agree with the court's finding to the extent that the word "audit" was used in its common, non-technical sense. They, however, suggest a different application of the word "audit." Simply put, they seem to be arguing that Frank & Company should have been overseeing or checking Germaine Harris' work and the reports that were being filed. Ms. Harris was United Refuse's in-house accountant who prepared the reports. Mr. Sullivan, in his final argument stated:

> I'm real sorry we're going to have [to] pay to have somebody else work against us but I sure am happy that somebody is going to be in there to look over their shoulder and make sure that what they're doing is right, that they're auditing, that they're filing the taxes, that they're doing the general corporate filings and they're assisting in the U.S. Trustee reports; and I think that that is what a reasonable person seeing this order would say.

Tr. 3/29/2006 at 84.

> But they were supposed to be auditors. They were supposed to be handling the debtor's taxes. That's what the application says, to handle the debtor's taxes; and they were supposed to be assisting in the U.S. Trustee reports.

> If they were assisting in the U.S. Trustee reports, the one question that's the focus of this is: Are all the taxes paid and are they current? That's why they were

---

[63]They express this as follows: "The Court's misstatement in this regard certainly makes the position of United Leasing (and United Refuse and the United States Trustee) look foolish." Motion ¶27 at 20.

hired.  At least that is what was before this Court and before the creditors of this estate when they were hired, and this is the basis for the Court's order.

*Id.* at 23-24.

Mr. Bove for the United States Trustee addressed his interpretation of the language in Frank & Company's employment application relating to Frank & Company assisting the preparation of the monthly reports.  Ms. Harris, the in-house accountant for United Refuse, actually prepared the reports from United Refuse's books and records that she maintained.  The court asked Mr. Bove:

| | |
|---|---|
| THE COURT: | And if she needed no assistance, what would [Frank & Company] be doing? |
| MR. BOVE: | I think one could clearly interpret that to mean, that language, Your Honor, that their obligation would be to review her work.  She's clearly the one on the frontlines doing the work.  I think the evidence is pretty much indisputable about that.  But this application brings them into the process of assisting in the periodic accounting reports; and if they're not the ones on the frontline doing the work, the only conclusion I can reach after that is that they were to review the work. |
| THE COURT: | And what would they review? |
| MR. BOVE: | The accuracy. |
| THE COURT: | How would they do that? |
| MR. BOVE: | I would suppose they'd ask questions and look at the backup documentation that was being used to fill out the forms. |
| THE COURT: | That goes beyond the compilation then. |
| MR. BOVE: | I would think so. |
| THE COURT: | So, subparagraph two or sub-clause two.  You would argue "assist" means to review Ms. Harris' work for accuracy? |
| MR. BOVE: | I would, Your Honor .   .   . |
| THE COURT: | .   .   . Your interpretation is that Frank & Company was |

81

|            | responsible for reviewing the work done by Ms. Harris, to ensure the accuracy of the U.S. Trustee's reports.   As I understood it, that's what you interpret clause two to mean. Am I right about that? |
|------------|---|
| MR. BOVE:  | That is an interpretation. |
| THE COURT: | Well, is that your interpretation? |
| MR. BOVE:  | I would interpret it that way.  I don't think Mr. King and Mr. Young would interpret it that way but that's the way I would interpret it. |
| THE COURT: | All right.  And with that interpretation are you saying that if there is an error in the reports, Frank & Young is responsible or whoever the professional is is responsible? |
| MR. BOVE:  | I think they share in the responsibility. |

*Id.* at 56-57, 60-61.

The significance of the compilation question is the extent of an accountant's responsibility. Different levels of review carry different responsibilities.  An audit, as the word is used in its technical sense, requires the accountant's certification of the accuracy of the financial statement. Before an accountant makes such a certification, he tests the financial statement to assure that the entries are correct.  He goes behind the financial statement.  A compilation is different.  The accountant does not go behind the statement; he only compiles, or aggregates, various financial records and puts them into a particular form.  He does not certify the accuracy of the underlying statements and does not verify their accuracy.  For example, Mr. Young testified that in preparing a tax return, the tax preparer only compiles financial data from the taxpayer.  He does not test it for accuracy.  Tr. 2/8/2005 at 27-28.

United Refuse, United Leasing and the United States Trustee argue that Frank & Company was not required to prepare the monthly United States Trustee reports, but was required, in Mr.

82

Sullivan's words, "to look over their shoulder and make sure that what they're doing is right, that they're auditing." Tr. 3/29/2006 at 84. That is, Frank & Company was required to verify the accuracy of the monthly reports.

The operative language of the employment application is paragraph 19. It states:

> Mr. Young will render specialized accounting and auditing services to the Debtor necessary throughout the Debtor's case. These services are aimed primarily to determine the amount owed by the Debtor to the Creditor, United Leasing. In addition, the Debtor seeks to rely upon Frank & Company P.C.'s professional accounting and auditing services to 1) handle the general corporate filings and taxes of the Debtor as has been done in the Debtor's ordinary course of business; 2) assist in the preparation of reports as is required by the United States Trustee's Office; and 3) assist and advise on the periodic accounting reports to United Leasing

Employment Application ¶19.

This argument relates primarily to items 2 and 3, "assist in the preparation of reports" and "assist and advise on the periodic accounting reports." Frank & Company were employed to "assist" or "assist and advise." The employment application did not state how Frank & Company was to assist the debtor. There is a significant difference between assisting – that is, helping – and certifying or verifying. Assist means to aid or support. One assists as necessary. Certifying or verifying requires continuous independent activity. The court is unwilling to stretch the words "assist" and "advise" into "certify" or verify". The court concludes that Frank & Company was not to regularly look over Ms. Harris' shoulder, review, verify or assure the accuracy of the reports. It was only to render assistance, if and when requested.[64]

---

[64]Certifying the reports or verifying them for accuracy requires more than a quick glance. (United Refuse and United Leasing agree. They describe looking for unpaid sales taxes as "looking for the one item in a haystack of ordinary business expenses that might not actually have been paid." Motion at 27.) Verification would require that Frank & Company check the numbers on the reports, all of the numbers. The certification argument goes to all information on the reports, not merely the answer to one question concerning the payment of taxes. The balance sheet on the United States Trustee's report would itself require a full audit in order for Frank & Company to certify it. That was simply not possible. Some of the numbers related to obligations between United Refuse and United Leasing and
(continued...)

This is more clearly understood in the context of the case at that time. United Leasing closely reviewed the reports that United Refuse submitted, analyzed them, and found them wanting. They raised their concerns with the court. One reason that Frank & Company was retained was to address these concerns. However, Frank & Company was not retained to prepare the reports. That was done in-house both before and after they were employed. Frank & Company was not retained to supplant Ms. Harris but to assist her, as necessary.[65] The order does not speak of a certification requirement by Frank & Company, nor did Frank & Company ever give a written certification. No such certification appears on any report. No statement ever identified Frank & Company as a compiler, reviewer or auditor of any of the financial reports. The time records do not show any activity by Frank & Company in this respect.

Paragraph 19 of the employment application makes this clear. "These services," it said, "are aimed primarily to determine the amount owed by the Debtor to the Creditor, United Leasing."

---

[64](...continued)
were in litigation and contested. There are other numbers relating to valuations of physical assets, the amount of accounts receivables, and even the income and expenses, for example, that could not be certified without proper auditing procedures. There is no reasoned argument that would charge Frank & Company with certifying one part of the report, but not another. It cannot be charged with certifying the answer to Question 9, Taxes, without also being charged with certifying everything else. This is highlighted by Mr. Bove's statement that, assuming Frank & Company was charged with verifying the reports, if there were an error, any error, Frank & Company would share in the responsibility for the error. No accounting firm can be expected to undertake such a liability without performing its due diligence. In this case, it could be nothing less than a full, on-going audit.

[65]Mr. Wade, in answer to Mr. King's questions, testified as follows:

Q    And it's your understanding that Frank & Company prepared that tax return?
A    And if they didn't – I don't know whether they prepared them or not. I have no idea who prepared them. The way I assumed things worked is that Germaine Harris did most of that work, as I said before; and either one, if she needed help, she would go to Mr. Young. Or if it's particularly involved, something involving bankruptcy, then I would expect her and I instructed her to the extent that I could instruct her to seek help, because she had no experience in bankruptcy filings before.
Q    Do you know specifically whether she ever sought that help?
A    I have no idea.

Deposition of Gregory Wade, Tr. 3/17/2006 at 20.

Employment Application at ¶19.  This was a central issue in the case.  This is what Frank &

Company did.  Mr. Wade, the debtor's counsel, testified to that.[66]  Mr. Young, the accountant in

charge of the engagement, testified to it as well.  The time records fully support it.

---

[66]Mr. Wade testified as follows in response to questions by Mr. King:

Q    What was the purpose for which you engaged Frank & Company?
A    Well, there were a couple of purposes.  The primary purpose was to trace payments and
     assets to that we could properly allocate them to certain leases, certain equipment leases.

     One of the issues in the case at that point was how much had been paid, on what leases, and
     how they'd been applied.  And it was a very complicated issue.  We asked them to do that.

     In my view, that was the primary thing that we needed.  There's also a question of somebody
     to do regular corporate filings, and again to be of assistance, if needed, for bankruptcy
     filings.

Deposition of Gregory Wade, Tr. 3/17/2006 at 15.

Q    Was it your intention when you filed that application that Frank & Company would be
     required to perform the services that were described in the application?

                         .   .   .

Q    Answer the question, Mr. Wade.
A    My purpose in filing the application as we did was to make it sufficiently broad so that it
     included areas that might arise where we might need his assistance.  It wasn't to suggest that
     every area that we included was one in which we were certain that we did need his
     assistance.

Deposition of Gregory Wade, Tr. 3/17/2006 at 16-17.

Q    Well let me be specific.  In you application, you described as one of the areas of services to
     be performed by Frank & Company auditing work.  Do you recall that?
A    Yes.
Q    Once the Court entered the order approving the application, was it your understanding that
     Frank & Company would without any further request go into the company and conduct an
     audit, or was it your understanding that that was within the scope of their employment, that
     someone at United Refuse would still have to ask them to come in and do the audit?

                         .   .   .

Q    Go ahead.
A    As far as I was concerned, that was just general language, accountants and auditors.  To some
     extent I construed him going through and tracing the payments and allocating them to leases
     to be a form of auditing.  And that was primarily what we wanted to do.  Nobody – I
     certainly did not expect him to conduct an audit based upon principles of accounting of the
     books of United Leasing – United Refuse.

Deposition of Gregory Wade, Tr. 3/17/2006 at 18-19.

The third part of paragraph 19 was to "handle the general corporate filings and taxes of the Debtor as has been done in the Debtor's ordinary course of business." Employment Application ¶19 at 4. This was discussed in the Memorandum Opinion at pages 26-27. United Refuse and United Leasing needed to establish two things: that the order mandated, as opposed to permitted, Frank & Company to "handle" the matters stated; and that the D.C. sales tax had been prepared in the past by United Refuse's prior accountants in the ordinary course of United Refuse's business. The court held that there was no mandated duty and that they had failed to establish any prior practice with respect to D.C. sales taxes. The court examined their present arguments and finds nothing to cause it to alter these findings.[67]

**Fee Reductions**. United Refuse and United Leasing request, as alternative relief, that the amount of Frank & Company's allowed fee be reduced or off-set by "(a) the amount conceded by its counsel as not for the benefit of United Refuse and less (b) the sum of $1865.00 paid by United Refuse to Frank & Co. for services rendered to the Lehners." Motion at 33.

The first item was not discussed in the motion. It refers to Frank & Company's response to the court's inquiry at the beginning of the final arguments on the objections to Frank & Company's final fee application. It is found at pages 3-4 of the March 29, 2006 transcript. Nowhere does counsel concede that the three items were not for the benefit of United Refuse. Here is what Mr. King, counsel for Frank & Company, said:

> We were able to identify three time entries that arguably might be considered work that was indirectly performed for the Lehners personally as opposed to the

---

[67]United Refuse and United Leasing again set out a number of time entries that they say show that Frank & Company worked on the monthly reports. Motion ¶29 at 21-22. *See also* Tr. 3/29/2006 at 18-20 (Mr. Sullivan in closing argument); Amended Objection at 9-10. The court was not persuaded then and is not persuaded now. Those time entries are entirely consistent with and, in fact, reflect Frank & Company's work on the principal engagement – determining what United Refuse owed to United Leasing.

debtor and I think these were the three time entries that were, I guess, most identified by opposing counsel. .   .   .

Again, those were tasks that were requested, as testified to by Mr. Young, by Mr. Wade.  They didn't have any knowledge of the context within which it was requested; don't know specifically how the information was put to use.

Frank & Company certainly is prepared to, if the Court believes it appropriate, to adjust its fee application as to these time entries; but Frank & Company still believes that these are matters that were specifically requested by its client or counsel and that consequently it shouldn't be made to suffer if they decided to put it to some use other than for the direct benefit of the debtor.

Tr. 3/29/2006 at 4-5.

The court reviewed them and found that the services were reasonably requested by debtor's counsel.  The one that United Refuse and United Leasing focused on was Ms. Miller's research to determine who was responsible for filing tax returns for a single-member limited liability company.  The research took about one and a half hours.  Mr. Sullivan sought to show that the work was performed for the benefit of the Lehners since a limited liability company's income is reflected on Schedule C of the member's personal return and to minimize Ms. Miller's efforts.  This is Mr. Sullivan examining Ms. Miller:

Q    Now, you knew the answer off the top of your head.  As you said in your deposition, "Duh."

A    That was your word.

Q    But you agreed that it was a "Duh" answer, right?

A    Yes.

Q    And the "Duh" answer is that, just as Mr. Lehner had filed the tax return for the previous year, he was the one responsible for filing the tax return this year.

A    Correct.

Q      Okay.  And it took an hour and a half of tax research to answer that question?

A      No.  Answering the question was the easy part.

Q      Okay.  What was the hard part?

A      Because it's an LLC – which is a limited liability company, which is a
       hybrid; not really a corporation, not really a sole proprietorship – and an *[sic]*
       fairly new entity, there is not a lot in the Internal Revenue Code that
       specifically addresses limited liability companies.  You infer it, either from
       the corporate statutes or from the individual statutes.

       And I had been asked specifically to find something in the Code.  Well, that
       takes a little longer to ascertain.  It's not easily obtained in black and white.

Tr. 3/23/2006 at 74.

The request from Mr. Wade was a legitimate request to debtor's accountants.  Mr. Wade

wanted a more definitive answer as to the responsibility for reporting United Refuse's income and

expenses to the taxing authorities.  The payment of taxes or the allocation of losses is an important

part of a chapter 11 case as is illustrated in this case by the District of Columbia sales taxes.  Taxes

must be accounted for in a chapter 11 plan.  Counsel for the debtor was properly doing his job in

making sure of the answer to the question and requiring statutory authority for the answer.  He was

not satisfied with a pat answer off the top of Ms. Miller's head.  The court was satisfied that this

work was for the benefit of the debtor.  It clarified a tax matter that could have required the debtor's

attention.  The amount of time it took was reasonable.

The other two time entries identified by Mr. King also satisfy the benefit test of 11 U.S.C.

§330(a)(3)(C).  That test is whether the service was "beneficial at the time at which the service was

rendered."  A professional is not a guarantor that work performed will actually benefit the debtor.

As long as it is reasonably likely to benefit the debtor, the professional is entitled to compensation.

Whether the non-disclosure agreement was later used for the Lehners' personal benefit is not

relevant. A non-disclosure agreement helps a debtor if the debtor is looking for financing, an equity infusion or a sale. All of those were possibilities here, particularly outside financing.

The $1,865.00 paid by United Refuse to Frank & Company for the preparation of the Lehners' personal tax return is different. The court addressed the matter in its Memorandum Opinion at 29, n.19. United Refuse and United Leasing addressed the footnote in paragraph 31 of their motion, but did not discuss the payment itself.[68] It was not raised in their original objection to Frank & Company's final fee application. Nor, was it raised in their amended objection submitted after final argument. The issue of the tax returns was raised in the hearing on the interim fee application. Frank & Company prepared the Lehners' personal tax return for 2003 in October 2004, shortly after the engagement began. The company did no further individual work for them. The court found that while the work was ill-advised no actual conflict of interest arose. Frank & Company billed the Lehners for the work, not United Refuse. The Lehners issued a check from United Refuse to pay for it, although there is no evidence to suggest that Frank & Company's billing department recognized the source of the payment or the significance. In *United Refuse LLC v. James C. Lehner and Suzanne Lehner,* Adv. Proc. 05-1551, the court found that the amount should have been paid by the Lehners, not United Refuse.

The payment by United Refuse does not affect the amount of fee that should be awarded Frank & Company. None of the work in preparing the return was included in the time records submitted with the interim or final fee applications. The amount of the fee ***allowed*** will neither be increased nor decreased because of the payment. The issue is different. The payment is a

---

[68]Counsel did not address the merits of the payment, they only attempted to show the court's footnote was "purely misstatement". They took exception to court's characterization of the relative "vigor" with which the issue was pursued in this and another proceeding and whether judgment was "entered" in the other proceeding as opposed to only "announced."

potentially unauthorized post-petition payment.   Congress recognized that there may be

unauthorized post-petition payments made by a debtor and established a specific remedy for that.

It is 11 U.S.C. §549.  Such an action is an action to recover money and is an adversary proceeding

governed by Fed.R.Bankr.P. 7001.  *See* Advisory Committee note to Fed.R.Bankr.P. 7001

("Proceedings to which the rules of Part VII apply directly include those brought to avoid transfers

by the debtor under .   .  .§549").  In light of the record in this case, the ruling made in United

Refuse's adversary proceeding, the absence of a claim for recovery in this contested matter, and the

failure to comply with 11 U.S.C. §549 and Fed.R.Bankr.P. 7001, the court will deny using the

payment as a set-off against any fee approved in this contested matter and will not order Frank &

Company to disgorge any portion of that payment as a part of this proceeding.  Disgorgement, which

is different than an unauthorized post-petition payment, is properly raised where, for example, there

is an administrative insolvency and a need to equalize, on a pro rata basis, amounts previously

distributed to professionals, or if, in approving a final fee application the allowed fees are less than

those previously paid.[69]  There are other circumstances where disgorgement may be appropriate.

Disgorgement, though, is different in substance than recovering an unauthorized post-petition

payment.

**Adequacy of Time Records.**  United Refuse and United Leasing again raise issues as to the

adequacy of Frank & Company's time records, its destruction of "its only copy of electronic

information submitted by United Refuse", its failure to "retain those records of United Refuse used

in rendering services  to the Lehners", and its objection that Frank & Company did not carry its

burden of proof under 11 U.S.C. §330.  Motion ¶23 at 17-18.  United Refuse and United Leasing

---

[69]This may occur where a procedure is established that allows a percentage of fees to be paid on a monthly basis
in advance of court approval.

raised each of these issues at the hearing on the final fee application and in its post-hearing amended

objection. The court considered them and rejected them. One premise of United Refuse's and

United Leasing's argument appears to be what they characterize as the absence of contemporaneous

time records. The presence or absence of original time records was recently addressed by the

District Court in *The Boleman Law Firm, P.C. v. U.S. Trustee,* 355 B.R. 548 (E.D.Va.2006). There,

the bankruptcy court was presented with objections to 133 supplements fee applications by The

Boleman Law Firm in chapter 13 cases. The law firm essentially charged a fixed rate for particular

services. The United States Trustee objected because the fixed charges were not based on the actual

number of hours that each item took to complete. The court, in a two-day trial, examined 11 of the

supplemental fee applications and agreed with the United States Trustee that the charges were "little

more than estimates in disguise and held that actual contemporaneous time records are required

when submitting supplemental fee applications. On that basis, the Bankruptcy Court denied all

eleven of the Boleman Firm's supplemental fee applications." *Id.* at 551. The District Court

reversed. It said:

> It is clear, then, that the court, acting as "a disinterested arbiter," makes the
> ultimate decision as to the reasonableness of the number of hours submitted by a fee
> applicant. *Id. (quoting Cohen & Thiros, P.C. v. Keen Enters., Inc.,* 44 B.R. 570, 573
> N.D.Ind.1984)). In making that decision, the court is greatly aided by the submission
> of actual time records. Indeed, actual time records are the preferred starting point in
> the lodestar analysis and, as such, can be rightfully requested by the court. Their
> unavailability, however, does not preclude further analysis – especially when, as in
> this case, it is undisputed that the work for which compensation is sought was
> performed.

> Such inadequate documentation is clearly "a proper basis for reducing a fee
> award." *Guidry v. Clare,* 442 F.Supp.2d 282, 294 (E.D.Va.2006)*; see also Hensley
> v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("Where
> documentation of hours is inadequate, the . . . court may reduce the award
> accordingly.") When presented with inadequate time records, the court must "make
> an independent determination of the reasonableness of hours devoted to the case."

*In re Great Sweats, Inc.,* 113 B.R. at 242.  To that end, the court should, employing the twelve *Johnson* [*Johnson v. Georgia Highway Express,* 488 F.2d 714, 717-19 (5th Cir.1974)] factors and "other considerations," review the fee application and evidence submitted in support thereof (*e.g.,* testimony and affidavits), and adjust the award "(I) by identifying and disallowing specific hours that are not adequately documented, or (ii) by reducing the overall fee award by a fixed percentage or amount based on the trial court's familiarity with the case, its complexity, and the counsel involved." *Guidry,* 442 F.Supp.2d at 294. This exercise will result in the lodestar, which "is presumed to be a reasonable award and is to be modified only rarely." *In re Great Sweats, Inc.,* 113 B.R. at 241 ( *citing Blum v. Stenson,* 465 U.S. 886, 899, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)).

*Id.* at 553.

The principle is clear.  A professional is entitled to compensation under 11 U.S.C. §330 for work performed that satisfies the criteria set out in Bankruptcy Code §330.  The burden of proof is on the professional to show that he satisfied the requirements.  While contemporaneous time records are preferred and are the most commonly used evidence, they are not essential.  They are not conclusive.  They may be challenged as was done in this case.  In the end, the court must determine from all of the evidence presented the proper fee to be awarded.

This court did that.  It evaluated the evidence presented, both for and against Frank & Company.  It found the evidence adequate to make a fee award and did so.  In doing so, it considered the factors set out in Bankruptcy Code §330 and discussed in the case law.  United Refuse's and United Leasing's discussion of this matter merely reflects their disagreement with the court's findings and conclusions.

United Refuse and United Leasing urge that the court consider Frank & Company's disposition of electronic information given to it by United Refuse during the course of its engagement.  They suggest spoilation of evidence.  The court rejected that argument.  The only evidence on this matter was Mr. Young's testimony.  He testified that United Refuse requested that

92

all of the information it gave to Frank & Company be returned to it and that any information on its computer system be deleted.  Frank & Company complied.  The information belonged to United Refuse and it had ultimate control over it.  It would have been better if Frank & Company had written documentation of the request and its compliance.  However, the court fully credits Mr. Young's testimony in this regard.  The request was made about March 2005 when the court resolved the ownership issue.  There was no indication that Frank & Company's work would be questioned or that the information would be necessary.  The papers were to be returned to United Refuse.  The information originally came from United Refuse and was duplicative of United Refuse's information.  Frank & Company's interim fee application was approved and United Refuse (under the control of United Leasing) agreed to pay the allowed fee in monthly installments, an agreement that was initially honored.  At that time, neither Frank & Company nor United Refuse (under the control of United Leasing) foresaw a dispute between them.  Some of these events occurred after Mr. Norment requested documents from Frank & Company and are corroborative of the circumstances that existed when the request was made and complied with.  The court considered the spoilation argument but gave it no weight.  United Refuse and United Leasing continue to press their argument.

United Refuse and United Leasing again assert that Frank & Company was not disinterested because it prepared the Lehners' 2003 income tax returns in October 2004 shortly after the firm was engaged by United Refuse.  The court rejected the argument when it was raised by United Leasing as an objection to the interim fee application. Objection to Interim Fee Application at 6 (Docket Entry 308).  It rejected it when raised as an objection to the final fee application.  Memorandum Opinion at 28-29.  It rejects the argument once again.  While it was improvident for Frank &

93

Company to undertake the assignment, it did not develop into an actual conflict.  Neither United

Refuse nor United Leasing has shown how that relatively modest engagement adversely affected

Frank & Company performing its duties to the debtor.  The evidence presented by Mr. Young and

Ms. Miller reflect that there was no effect.  They were each undertaken without impacting on the

other.  Forfeitures are not favored at law.  Here, the tax return was a relatively modest undertaking

in comparison to the work performed for the debtor, the two engagements did not affect each other;

and the potential conflict did not develop into an actual conflict.  The court is unwilling to disqualify

the accounting firm *ex post facto* and disallow its fees in these circumstances.  There are conflicts

that require that action.  This is not one of them.

Finally, United Refuse and United Leasing raise the issue of the weight to be given to the

approval of the interim fee application.  All interim fee applications are provisional and subject to

later modification.  That principle must be balanced with the principles associated with res judicata,

collateral estoppel and law of the case, that is, once an issue is decided, the contest is over.[70]  The

better rule with respect to interim fee applications is that if parties actually litigate a specific issue,

then that issue is barred from being re-litigated by them (and very possibly by other interested

parties in the case).  The issue of disinterestedness arising from the 2003 tax return is just such an

issue.  It was known when the interim fee application was before the court.  It was argued.  It was

decided.  There is no reason to allow United Leasing to litigate the same issue on every subsequent

interim or final fee application submitted by Frank & Company.  Litigants are entitled to only one

bite at the apple.  Professionals are entitled to rely on the court's rulings in deciding whether to

---

[70]Fed.R.Civ.P. 59 and 60 address circumstances when new evidence is discovered after a hearing and other
matters.

94

continue working for a debtor.[71]  In this instance, the court reconsidered the issue in light of the

additional testimony at the hearing on the final fee application and adheres to its earlier ruling.

---

[71]Reliance can only be limited.  Interim fee applications may not be final orders.  *In re Computer Learning Centers, Inc.*, 407 F.3d 656 (4th Cir.2005).

## Conclusion

Recusal motions are important mechanisms that protect the integrity of the judicial system by permitting litigants to seek recusal of a judge if there is an appearance of partiality. Where there is a basis for filing a recusal motion, counsel has a professional responsibility to both his client and the court to do so. It is not just another trial tactic. It is not a means to reargue or re-litigate issues resolved by the court. There are other well-established procedures to do that.

Resolution of a recusal motion is based on whether "a person with knowledge of the relevant facts might reasonably question [the judge's] impartiality." *United States v. Cherry,* 330 F.3d at 665. In this case, a reasonable person would not. There is nothing in the tone or language of the Memorandum Opinion – or any of the other rulings of the court – that remotely suggests that a reasonable person could conclude that there was an appearance of bias, let alone, actual bias. The "catalog" of "misstatements and omissions" may be lengthy, but it is hollow. A reasonable person with knowledge of the facts would not conclude that there is an appearance of partiality.

The court also reviewed its findings of fact and conclusions of law in light of the motion and finds no reason to alter or amend its decision.

The motion will be denied.

Alexandria, Virginia
June 7, 2007

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

96

copies to:

William Daniel Sullivan
Kermit A. Rosenberg
Donald F. King
Frank J. Bove

13487